_____
Docket No. 11-56986
Docket No. 12-55429
_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

_____

SGT. JEFFREY S. SARVER,

Plaintiff-Appellant

vs.

NICHOLAS CHARTIER; et. al.,

Defendants-Appellees,

and

PLAYBOY ENTERPRISES, INC.,

Defendant

_____

On Appeal from the United States District Court, Central District of California
No. 2:10-CV-09034 JHN-JC
JUDGE JACQUELINE H. NGUYEN

_____

APPELLANT'S CONSOLIDATED OPENING BRIEF ON APPEAL

_____

Submitted by:

Michael R. Dezsi
Law Office of Michael R. Dezsi, PLLC
615 Griswold, Suite 700
Detroit, MI 48226
(313)281-8090
www.dezsilaw.com
Counsel for Plaintiff-Appellant

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................. iii

JURISDICTION ............................................................................. 1

STATEMENT OF ISSUES ................................................................ 2

STATEMENT OF FACTS ................................................................. 3

STATEMENT OF CASE .................................................................. 7

SUMMARY OF THE ARGUMENT .................................................... 9

ARGUMENT ............................................................................... 11

    A. The California District Court erroneously concluded
       that the transferor New Jersey District Court would have
       applied California law instead of New Jersey Law ...................... 11

    B. Assuming California law applies, the district court should
       nonetheless have declined to consider Defendants untimely
       anti-SLAPP motions or denied the motions on the merits ........... 16

         1. The anti SLAPP motions were untimely and
           Duplicative of the previously denied New Jersey
           Motions to dismiss ............................................... 16

         2. The district court erred by concluding that
           Sarver's claim is barred by the First Amendment
           as a matter of law. ............................................... 20

            a. The court erred by concluding that
               the "principal thrust of Sarver's claim
               arose from Defendants exercise of free
               speech in connection with a public issue ............ 22

            b. The district judge erred by concluding as
               a matter of law that Sarver's likeness was

so transformed in "The Hurt Locker" that it became Defendants' own artistic expression entitled to First Amendment protection .................................................................. 28

3. The district court erred in striking Sarver's misappropriation, false light invasion of privacy, defamation, and intentional infliction of emotional distress claims because, properly crediting his evidence, Sarver satisfied his minimal burden to show a probability of success on the merits ................................................................... 35

4. The district court erred by denying Sarver's Motion For Stay and waiver of bond requirement ........................... 49

CONCLUSION ............................................................................................... 49

STATEMENT OF RELATED CASES ...................................................... 50

# INDEX OF AUTHORITIES

## Cases

*Abdul-Jabbar v General Motors*, 85F3d 407, 414(9th Cir. 1997)........................... 38

*Batzel v Smith*, 333F.3d 1018,1025-26(9th Cir. 2003)............................................ 17

*Bosley Med. Inst. Inc. v Kremer*, 403 F3d 672,682 (9th Cir. 2005) ........................ 22

*Cervantes v. J.C. Penny Co.*, 24 Cal. 3d 579, 593 (1979)...................................... 47

*Christoff v Nestle USA, Inc.*, 202 Cal App 4th 529, 544 (2007).............................. 37

*Cibenko v Worth Publishers*, 510 F. Supp. 761, 766(D.N.J 1981)........................ 15

*City of Cotati v Cashman*, 29 Cal. 4th 69,78 (2002) ......................................... 23, 25

*Comedy III Productions, Inc. v. Gary Saderup, Inc.* ("Comedy III"), 25 Cal. 4th 387 (2001).......................................................................................................... passim

*Cortes v American Airlines, Inc.*, 177 F. 3d 1272, 1296 (11the Cir. 1999)........... 11

*Dependable Highway Express, Inc. v. Navigators Ins. Co.*, 498 F/.3d 1059.1066 (9th Cir. 2007)...................................................................................................... 49

*Doe v Gangland Productions, Inc.*, 802 F. Supp 2d 116 (CD Cal. 2011) ........ 26, 27

*Downing v. Abercrombie & Fitch*, 265 F. 3d 994 1001 (9th Cir. 2001) ................. 37

*Dyer v. Childress*, 147 Cal. App. 4th 1273 (2007)........................... 23,24, 25, 27, 44

*Equilon Enter. v. Consumer Cause, Inc.*, at 67; §425.16(b)(1) ........................ 23, 35

*Fairfield v. Hagan*, 56 Cal. Rptr. 402, 248 (1967)................................................. 43

*Fellows v National Enquirer*, 42 Cal. 3d234, 238-239(1986) ............................... 42

*Hill v. National Collegiate Athletic Assn,* 7 Cal 4th 1, 24 (1994) ......................... 41

*Hilton v Hallmark Cards*, 599 F3d 894 (9th Cir. 2010) ....................... 32, 33, 35, 36

*Keaton v. Hustler Magazine*, 465 U.S. 770,777 (1984) ......................................... 15

*Keller* ........................................................................................................... 34, 35

*Keller v Electronics arts, Inc.*, 2010 U.S. Dist. LEXIS 10719 (N.D. Cal 2010)........
.................................................................................................................... 34, 35

*Kirby v. Sega of America, Inc.*, 144 Call App 4th 44 (2006) ..... 11, 30,31, 32, 33, 35

*KNBEnt.,v Matthews*, 78 Cal. App. 4th 362, 367 (2002).......................................... 37

*Kunysz v Sandler*, 146 Cal. App. 4th 1540, 1543(2007) ......................................... 18

*M.G. v Time Warner, Inc.,* 89 Cal App 4th 623, 630 (2001)......................... 36,41,44

*Manufactured Home Communities, Inc. v City of San Diego*, 655 F.3d 1171, 1176-
77 (9th Cir. 2011)................................................................................................ 36

*Metabolite Intl., Inc. v. Wornick*, 264F.3d 832, 839 (9th Cir. 2001) ...................... 22

*MG v Time Warner* ................................................................................................. 40

*Moore v. Greene,* 431 F.2d 584 (C.A 9 1970). ...................................................... 42

*Morin v Rosenthal*, 122 Cal App 4th 673, 679, 681(2004) .................................... 19

*Navellier v Seelton*, 53 P.3 703, 708(2002),.......................................................... 36

*New.net Inc., v. Lavasoft* 356 F. Supp 2d 1090, 1100(CD Cal 2004) .................... 18

*No Doubt*.................................................................................................. 32, 33, 35

*No Doubt v Activision Publishing*, Inc., 192 Cal. App. 4th 1018 (2011) ............... 31

*Olsen v Harrison*, 134 Cal. App 4th 278, 286(2005) ............................................... 19

*P.V. v Camp Jaycee*, 197 N.J. 132, 139-142 (2008) ........................ 10,12, 13, 15,16

*Parks v. La Face Records*, 329 F.3d 437, 454(6th Cir.2003).................................. 21

*Platypus Wear Inc. v. Goldberg*, 166 Cal. App. 4th 772 (2008) ............................ 19

*Polydoros v Twentieth Century Fox Film Cor*., 67 Cal App 4th 318, 322 (1997) .. 39

*Prager v American Broadcasting Cos., Inc.,* 569 F. Supp 1229 (D.N.J 1983) ...... 16

*Prima v Darden Restaurants*, 78 F. Supp2d 337(D.N.J 2000).............................. 16

*Thomas v Fry's Electronics, Inc.*,  400 F.3d 1206, 1207 (9th Cir. 2005)................ 36

*USANA Health Services, Inc. v. Minkow*, 2008WL 619287, 19287(D. Utah 2008) ................................................................................................................. 17

*Van Dusen v Barrack*, 376 U.S. 612, 642 (1964).................................................. 12

*Vess v. Ciba-Gergy Corp. USA*, 317 F.3d 1097, 11.02 ......................................... 21

*Whitaker v A & E Television Networks*, 2009WL 1383617 (Cal. App. 4Dist.) 25, 27

*Wilson v Parker, Covert & Chidester*, 50 P.3d 733, 739(Cal. 2002) .................... 36

*Winter v. DC Comics*, 30 Cal. 4th 881 (2003) ................................. 11,29, 31, 33, 35

*Yow v. National Enquirer, Inc.*, 550 F. Supp. 2d 1179 (E.D. Cal. 2008) .............. 43

*Zacchini v. Scripps-Howard Broadcasting Co*., 433 U.S. 562, 576 (1977) ...... 20,21

## Statutes and Rules

Cal. Civ. Code § 45 ...................................................................42

Cal. Civ. Code §3344(a)............................................................37

28 U.S.C §1332(a)(1) ..................................................................1

Cal. Civ Proc. Code §425.16......................................................22

Cal. Civ Proc. Code §425.16(e)(4)............................................24

Cal. Civ Proc. Code §425.16(f)..................................................17

Fed. R. Civ. P 12 .........................................................................3

FRAP 4(a)(1)(a)............................................................................1

## Treatises

Restatement of Torts (Second) §652B ........................................41

Restatement Second Conflicts §153............................................14

Restatement Second Torts, §577A ..............................................15

Under Restatement Second of Torts §652 B ...............................41

## Constitutional Provisions

First Amendment..........................................................................37

# I. JURISDICTION

The district court had diversity jurisdiction under 28 U.S.C §1332(a)(1). Appellant Sarver, a citizen of the United States, has no relationship with the State of California, having never lived there, worked there, or even vacationed there [R 105:Saver Doc. § 47, p 126].  At all relevant times, Defendants were residents of California or conducted business in California.

The district court granted Appellees' anti-SLAPP dismissal motion on October 13, 2011[R. 129: Opinion/Order, p 37[1]].  Pursuant to FRAP 4(a)(1)(a), Sarver  filed his timely notice of appeal in No 11-56986 from that Order on November 11, 2011[R. 135: Notice of Appeal, p. 73].  The district court awarded sanctions and then declined Sarver's motion for stay on February 2, 2012. [Doc.146, R. 154, 159, 160 p 1, 3, 11; Judgment R.156: Order Denying Stay/Bond Waiver p5].  Sarver timely appealed in No. 12-55429 from the stay denial on March 5, 2012 [R. 161: Notice of Appeal, p71].  This Court has jurisdiction over these consolidated appeals pursuant to 28 U.S.C. §1291.

---

[1] The page numbers referred to throughout the brief correspond to the page of the Excerpts of Records, Vol. I & II.

## II. STATEMENT OF THE ISSUES

A. Whether the California District Court erroneously concluded that the Transferor New Jersey District Court would have applied California law instead of New Jersey law.

B. Assuming California law applies, whether the district court should nonetheless declined to consider Defendants'' untimely anti-SLAPP motions or denied the motions on the merits.

    1. Whether the anti-SLAPP motions were untimely and duplicative of the previously denied New Jersey motions to dismiss.

    2. Whether the district court erred by concluding that Sarver's claim is barred by the First Amendment as a matter of law.

        a. Whether the court erred by concluding that the "principal thrust of Sarver's claim arose from Defendants exercise of free speech in connection with a public issue.

        b. Whether the district judge erred by concluding as a matter of law that Sarver's likeness was so transformed in "The Hurt Locker" that it became defendants' own artistic expression entitled to First Amendment protection.

    3. Whether the district court erred in striking Sarver's misappropriation, false light invasion of privacy, defamation, and intentional infliction of emotional distress claims because, properly crediting his evidence, Sarver satisfied his minimal burden to show a probability of success on the merits.

    4. Whether the district court erred by denying Sarver's Motion for Stay and waiver of bond requirement.

## III. STATEMENT OF FACTS

The facts are drawn from the Complaint [R. 1 p174], the declarations of Sarver [R.105 p112], Paul Wilcock [R. 110-1 p107] and Defendant Mark Boal [R. 98-1, p153], the district court's tentative opinion [R. 149-2 p13], the district court's opinion [R. 129, p37], Boal's Playboy article [R. 105: Sarver Decl. Ex. D p142], and "The Hurt Locker" movie [Doc.80: 2/1/11 Notice of Manual filing of "The Hurt Locker" in DVD format] all of which are in the record.

Plaintiff Jeffrey S. Sarver ("Sarver") joined the United States Army in 1991[R. 105: Sarver decl ¶12 p113]. In July 2004, Staff Sergeant Sarver, a trained and experienced explosive ordnance disposal ("EOD") technician with the Army's 788th Ordnance Company received orders to deploy to Iraq for six months to assemble and lead one of three "Bomb Squad" teams for the 788th [R.105: Sarver decl. ¶ ¶ 4-6, p113]. As one of approximately 150 EOD technicians in Iraq, Sgt. Sarver's central mission was to identify, render safe, and dispose of improvised explosive devices ("IED's") [R. 105: Sarver decl . ¶ ¶ 7, 8, p113].

In December 2004, Defendant Mark Boal was embedded with Sarver's unit at Camp Victory in Baghdad, Iraq pursuant to the United States Department of Defense ("DOD") embedment "ground rules" to research an article for Playboy magazine about EOD operations in Iraq [R. 105: Sarver decl. ¶12 p114]. Defendant Boal spent 30 days embedded with Sarver's three man team and he

3

assured Sarver that his report/article was focused upon EOD disposal operations in general [R. 105: Sarver decl. ¶¶ 13, 14, 16, pp114, 115]. During Boal's embedment with Sarver, he became familiar not only with the general operations of Sarver's EOD unit, but also with Sarver's physical characteristics, his likeness, his personality, his mannerisms, his personal effects, and Sarver's personal life story [R. 105: Sarver decl. ¶ 18, p115].  When Sarver's deployment ended in January 2005, Boal even followed Sarver back to Wisconsin for a personal interview there ostensibly to document that his EOD disposal team were "safely home" [ R. 105: Sarver decl. ¶22, p116]. Boal never informed Sarver that he intended to publish personal information about Sarver, his likeness, mannerisms, habits and discussions in a published article or movie [R. 105: Sarver decl. ¶¶  16,19,23, pp116,117].

When Boal sent Sarver an advance copy of the article about him, "The Man in the Bomb Suit" which was later published in the September 2005 Playboy, Sarver immediately complained to both Boal and his Army supervisors that he did not approve of the article because it was about him personally, it contained several untruths, and it portrayed him in a false light.  Despite Sarver's complaints about the article Boal changed nothing in it [R. 105: Sarver decl. ¶¶ 26, 27, pp 116-117]. Instead, he later sold a condensed version that was published in Reader's Digest in 2006 and he adapted the article on Sarver into the widely acclaimed motion picture

"The Hurt Locker" which was released in 2009 [R. 105: Sarver decl. ¶¶ 32,33 p119].

   A. "The Hurt Locker" movie.

   During the period when Sarver was stationed and resided at the Picatinny Arsenal in Dover, New Jersey, "The Hurt Locker" premiered on limited release in New York City [R. 105: Sarver decl. ¶¶32-33, p119]. Sarver and several other service members from the garrison attended the New York premiere showing of the movie on June 26, 2009 [R. 105 Sarver Decl. ¶ ¶ 33, 35, pp119-120]. When "The Hurt Locker" went into more widespread release on July 24, 2009, and at least until Sarver was transferred in September 2009 to Fort Campbell, Tennessee, the movie was showing in New Jersey theaters including one just outside the gates of the Picatinny Arsenal [R.105: Sarver decl. ¶¶ 37-38 p120].

   Among those accompanying Sarver to the premiere showing of the movie was Sergeant Paul Wilcock, who came to know Sarver and became familiar with his personality, mannerisms, expressions, habits and persona while both were stationed at the Fort Picatinny arsenal [R. 110-1: Wilcock Decl ¶5, p109]. Watching the movie, Wilcock immediately recognized that the Will James character played by Jeremy Renner, "was not a fictional character, but rather a complete and literal portrayal of Sgt. Sarver" who displayed the same personality, expressions, habits, behaviors, demeanor, attitude and even physical

characteristic[s]" of Sarver [R. 110-1: Wilcock decl ¶6, pp 109-110]. After the movie, Defendants Boal and Bigleow answered questions from the audience with Boal admitting "that the movie was based upon his experiences with a single EOD team he spent time with while embedded in Iraq in December of 2004 [R.110-1: Wilcock decl ¶ 9, p110]. Boal and Bigelow, at first were very relaxed while discussing the movie with the audience, but as soon as Boal recognized Sarver in the audience, "their carefree demeanor changed" as their answers became short and guarded, and they were in a hurry to leave the theater" [R. 110-1: Wilcock decl. ¶¶ 10, 13, p110]. Later, at the February 27, 2010 Oscars, " The Hurt Locker" won a host of awards, including Best Original Screenplay, Best Director, and Best Picture. A year later, the movie had grossed over $50 million, not including DVD sales, on a budget of about $11million.

In his declaration, Sarver details 29 examples of the movie's theft of his likeness and personal information as documented in Boal's Playboy article or observed heard or recorded by Boal during his embedment with Sarver's EOD team [R.105: Sarver decl. ¶44 pp121-144]. This includes the You Tube video entitled "NYC Comic Con 2009 Hurt Locker—Jeremy Renner" in which the actor who played "will James" essentially admitted that in preparing for the role he watched a video Boal had taken of Sarver kicking an IED. [R. 105-3: Sarver decl ¶ 44c Renner You Tube Video pp 121-122 and Video]. Beyond the theft of his life

story, Sarver's complaint objects to several movie scenes where he is falsely portrayed and asserts that both the accurate and false portrayals harmed him by placing him at an increased risk of injury while doing his Army job by placing a target on his back, has injured him in his family relationship with his son, and has portrayed him as a reckless soldier which has made him a counter intelligence risk [R. 105: Sarver decl. ¶46, p125].

These allegations are further detailed in the Argument that follows.

## IV. STATEMENT OF THE CASE

Sarver filed suit in New Jersey on March 2, 2010 because he resided there when "The Hurt Locker" was released and it was the most significant place for his damages. [R1: Complaint in 2:10-cv-01076-DMC, p.174] The Hurt Locker Defendants filed their combined Fed. R. Civ. P 12(b)(2), (3) and (6) motion to dismiss or transfer on June 1, 2010 [Doc 15].

Significantly, the 12(b)(6) portion of their brief relied not on California law, but on New Jersey law [Doc. 15-1,pp 27-36]. The Bigelow/Boal Defendants filed their motion/brief on June 15, 2012 and likewise asserted New Jersey law as support [Doc. 20-1 pp 13-18]. Defendant Summit followed suit on June 16, 2012, citing only New Jersey law, and stating it "assume[d] (without conceding) that this

[New Jersey District] Court would apply New Jersey law to all of Plaintiff's claims" [Doc. 25, Summit's Motion to Dismiss, p11 n 4]. When Defendants Kingsgate/Shapiro filed their joinder motion on August 30, 2012, they too relied on New Jersey, not California, law [Doc. 53]. Accordingly, no Defendant had even hinted in the New Jersey District Court proceedings, let alone filed, a claim that the California anti-SLAPP law should apply as a basis for dismissal of Sarver's complaint.

The New Jersey District Court denied the motions to dismiss, holding in relevant part that "[t]he nationwide release of the film ought to have put Defendants on notice that they might be hailed into court in any forum in which the film was shown or distributed" (R.54: Opinion pp 68,70; R.55 Order p.60). The New Jersey District Court, however, pursuant to §1404(a), transferred venue saying that "all thirteen [Defendants] either reside, or have corporate residences in, California" [R 54: Opinion p.70].

The California District Court noticed the transfer on November 23, 2012[Doc. 56]. Nine weeks later, on February 1, 2011, Defendants filed their anti-SLAPP motion to strike and joinders [Docs. 78, 82, 83]. Plaintiff responded in opposition on March 14, 2011 [Docs. 103-105].

On July 22, 2011, the district judge announced that she would release a written tentative order in advance of oral argument that was to be held on August

8, 2011 [Doc. 123]. Hearing was held on that date [Doc. 125; R. 130: Tr of 8/8/11, Hearing p. 75]. On October 13, 2011, the court issued its Order Granting Defendants' Motion to Strike [R. 129 p.37]. On November 11, 2011 Plaintiff filed his Notice of Appeal [R. 135 p.73].

Defendants sought, and over Plaintiff's objection, were granted, attorney fees by order dated December 8, 2011 (Doc. 146). Plaintiff moved for a stay and waiver of bond requirement. The court denied that motion by order dated February 2, 2012 [R. 156 p.5]. Attorney fees to the three Defendant groups totaled $187,124.65 [R. 154, 159, 160 : Judgments pp1, 3, 11]. On March 5, 2012, Plaintiff appealed from the Stay denial order [R. 161].

## V. SUMMARY OF ARGUMENT

The district court committed several major errors in granting Defendants' Motion to strike [R. 129: Order Granting Defendants' Motion to Strike, p37].

As a threshold matter, the transferee California District Court correctly recognized that New Jersey state choice-of-law rules should be applied, but erred in actually applying the New Jersey state rules when the district court concluded

that under the analysis in P.V. v Camp Jaycee, 197 N.J. 132 (2008), California, not New Jersey law should apply. [Argument §VI A.].

Even if the district court's choice-of-law analysis was correct, given the nearly one year delay by Defendants in asserting that California law should apply and in actually filing their California anti-SLAPP motions to dismiss, the district court should have declined to consider the motions because they were untimely [Argument §VI B.1.].

The district court further erred by concluding that Defendants First Amendment affirmative defense barred Sarver's claim as a matter of law. From the court's opinion, it is absolutely clear that the judge invaded the province of the factfinder and inappropriately assessed credibility when she held that "no reasonable trier of fact could conclude that [The Hurt Locker's portrayal of the will James character] was transformative." The district court specifically erred in holding that the "principal thrust" of Sarver's claim arose from Defendants' exercise of free speech in connection with a public issue. In fact, the 'principal thrust' of the claim was Defendants' misappropriation of Sarver's persona; it had nothing to do directly with the public issue of EOD technicians in the Iraq war. Sarver's image was not transformed by Defendants in the movie –the similarities of the Will James character to Sarver are readily apparent and the movie character operated in the identical setting and did the identical job as Sarver. The two

10

California precedents that have found transformative use, *Winter v. DC Comics*, 30 Cal. 4th 881 (2003) and *Kirby v. Sega of America, Inc.*, 144 Cal. App. 4th 44 (2006) are at the opposite end of the transformative use continuum from the claim brought in this case [Arguments §VI B2 a, b]. The First Amendment concerns in this case are not well-taken and they must be balanced against Sarver's misappropriation and right to privacy claims.

Finally, the district court erred because fairly read, Sarver has satisfied his "minimal burden" under the anti-SLAPP motion to dismiss procedure to show a probability of success on the merits on his claim whether it is styled at this early stage as misappropriation, false light invasion of privacy, defamation, or intentional infliction of emotional distress [Argument V B.3].

As fully set forth, infra, the decision of the district court should be reversed.

## VI. ARGUMENT

**A. The California District Court erroneously concluded that the transferor New Jersey District Court would have applied California law instead of New Jersey law.**

Appellate courts review de novo decisions on choice of law questions. *Cortes v American Airlines, Inc.,* 177 F. 3d 1272, 1296 (11th Cir. 1999).

The district court rejected Sarver's argument that because he resided in New Jersey when "The Hurt Locker" was released, and because his injury occurred

11

there, and he had no relationship at all with California, New Jersey law should apply and nullify Defendants' anti-SLAPP motions since New Jersey has no anti-SLAPP statute. While the district court did agree that under *Van Dusen v Barrack*, 376 U.S. 612, 642 (1964), 28 U.S.C.§1404(a) in *forum non conveniens* transfers, the transferee court must apply the choice of law rules of the state where the transferor court sits, she erroneously concluded that the New Jersey District Court would have applied California law "because it has the greatest relationship with the occurrence and parties" [R. 129: Order Granting Defendants' Motions to Strike, pp 40-41). This Court should reverse this ill-formulated ruling.

The district court correctly recognized that New Jersey's Supreme Court adopted the Restatement Second, Conflict of Laws, "most significant relationship" standard in tort cases in *P.V. v Camp Jaycee*, 197 N.J. 132, 139-142 (2008). The district judge, however, unlike the New Jersey Supreme Court, then immediately departed from the Second Restatement's methodology of using presumptions and detailed considerations that bear conflicts analysis. She excused itself for doing so by holding that choice of law is ultimately left to the subjective whims of the judge: "The Second Restatement provides judges with a starting point… It is then up to the judge to make it all work." *Camp Jaycee,* 197 NJ at 140.

Critically, in her choice of law analysis the district court ignored the fact that as the *Camp Jaycee* Court went on to recognize, "[a]lthough the Second Restatement eschews the bright lines established by its predecessor, it does not abandon all rules:"

> Once one ventures past section 145, however, the chapter dramatically changes character. Instead of infinitely open-ended sections, the Second Restatement, for the most part, articulates reasonably definite rules. To be sure, these succeeding sections contain escape valves that refer to section 6. Many of the rules echo the First Restatement's preference for choosing the law of the injury state. Others do not refer to the injury state directly, but choose connecting factors very likely, if not certain, to lead to the application of the law of the injury state…. Only a relatively few sections refer solely to the general formula of section 145 without providing some presumptive choice.
>
> [Patrick J. Borchers, Courts and the Second Conflicts Restatement: Some Observations and an Empirical Note, 56 Md L.Rev. 1232, 1239-40 (1997)(footnotes omitted).]
> *Camp Jaycee* at 142.

The relevant presumption in a personal injury case is contained in §146, which provides that "the local law of the state where the injury occurred determines the rights and liabilities of all parties…" unless some other state has a more significant relationship to the parties and issues under the principles stated in §6. *Id* at 143. The *Camp Jaycee* Court added that "Section 146 recognizes the intuitively correct principle that the state in which the injury occurs is likely to have the predominant,

if not exclusive, relationship to the parties and issues in the litigation." *Id* at 144. Here, New Jersey law is presumptively applicable because it is the state of injury.

This is demonstrated, not only in the language of Restatement §146, but also in Restatements §150 on multistate defamation and in Restatement §153 on multistate invasion of privacy. Both of these sections favor a plaintiff's place of residence or domicile because that is likely most significant as the place where he suffered the most reputational injury:

> §150 (2) When a natural person claims that he has been defamed by a aggregate communication, the state of the most significant relationship will usually be the state where the person was domiciled at the time, if the matter complained of was published in that state.

As comment 2 explains, §150 directs the choice of law analysis to "the local law of the state where the plaintiff has suffered the greatest injury by his loss of reputation." This is true even though some or all of the defamer's acts of communication were done in another state…" Here, New Jersey was the state where Sarver was best known to his Army cohorts when "The Hurt Locker" was released. He had lived there for two years while stationed at the Picatinny Arsenal. It was there that his fellow servicemen best knew of him and his EOD job with the Army.

Likewise, Restatement Second Conflicts §153 uses the "local law of the state which, with respect to the particular issue, has the most significant

relationship to the occurrence and the parties…" These specific choice of law rules notwithstanding, the district judge decided that the injury occurred in California, a place where Sarver has never had any relationship and ignored New Jersey where he had lived for two years, saying that living there did not mean he was domiciled there.[2]

In *Keaton v. Hustler Magazine*, 465 U.S. 770,777 (1984), a jurisdictional minimum contacts case, the Supreme Court recognized that under Restatement Second Torts, §577A, Comment a, "the tort of libel is generally held to occur wherever the offending material is circulated." While *Camp Jaycee* did not involve a defamation or misappropriation tort, it followed the principle that New Jersey will apply the law of the place of the tort injury, in that case Pennsylvania, instead of New Jersey. And in three tort cases that predate *Camp Jaycee*, the New Jersey District Court resolved the conflict of laws issue by applying New Jersey law. In *Cibenko v Worth Publishers*, 510 F. Supp. 761, 766(D.N.J 1981), plaintiff, a New York/New Jersey Port Authority employee who resided in New Jersey claimed that defendant's publication in New Jersey violated a New York statutory

---

[2] The district court at p5, over read the significance of the word "domicile" which is discussed at length in Restatement Second Conflicts §11. Subsection (1) states that "Domicile is a place, usually a person's home, to which the rules of Conflict of Laws sometimes accord determinative significance because of the person's identification with that place." See also Comment k on the use of the word "residence." For two years including the time period when he and his fellow servicemen saw "the Hurt Locker", Sarver's most significant relationship was with New Jersey where he resided and where he sustained his damages.

right to privacy. The district court dismissed the New York statutory claim on the basis that New Jersey law applied. See also: *Prager v American Broadcasting Cos., Inc.,* 569 F. Supp 1229 (D.N.J 1983) [applying New Jersey law where claim was brought by New Jersey resident alleging defamatory TV broadcasts transmitted to him from New York]. In *Prima v Darden Restaurants*, 78 F. Supp.2d 337(D.N.J 2000), the District Court held that New Jersey law, not Louisiana law governed the question of whether a commercial violated Louis Prima's widow's right to publicity. Here, properly construing *PV v Camp Jaycee* and the Second Restatement adopted by the New Jersey Supreme Court the New Jersey District Court would have applied New Jersey law to this case. The decision of the district court on the dispositive choice of law question should be reversed.

**B. Assuming that California law applies, the district court should nonetheless have declined to consider Defendants' untimely anti-SLAPP motions or they should have been denied under the applicable law**

**1. The anti-SLAPP motions were untimely and duplicative of the previously denied New Jersey motions to dismiss.**

Sarver raised this issue in his March 14, 2011 Opposition to Motion to Strike (Doc 103 pp 16-20). The district judge addressed the argument briefly in footnote 5 of her order granting the motion to strike saying that she would review the anti-

SLAPP motions because "the case has not proceeded in any material respect: [R. 129: Opinion /Order, p 43]. In doing so, the district judge abused her discretion.

Here, Defendants' anti-SLAPP motions were obviously untimely and they should have been denied for that reason alone. The various Defendants filed their New Jersey law motions to dismiss or transfer beginning on June 1, 2010, but they never asserted California law or raised the anti-SLAPP defense while in the New Jersey court. The California District Court acknowledged the transfer on November 23, 2010, but Defendants still waited until February 1, 2011, at least 8 months after service of the complaint, to file the anti-SLAPP motions.

Under Cal. Civ Proc. Code §425.16(f), an anti-SLAPP motion "may be filed within 60 days of the service of the complaint, or in the court's discretion, at any later time upon terms it deems proper." The fact that a case is venued in another state's federal district court is not an excuse for delay because the California anti-SLAPP statue is considered substantive law to be applied by all federal courts. [3] See *Batzel v Smith*, 333F.3d 1018,1025-26(9th Cir. 2003) [anti-SLAPP is "substantive" for Erie purposes and thus recognized in diversity cases in federal court]; See also *USANA Health Services, Inc. v. Minkow*, 2008WL 619287, 19287(D. Utah 2008) [applying California anti-SLAPP statute].

---

[3] But, of course Defendants at all times indicated they relied on New Jersey law until the case was transferred to California.

The district court cited *New.net Inc. v. Lavasoft* 356 F. Supp.2d 1090, 1100(C.D. Cal. 2004) for the proposition that Defendants' late motion here would be considered because "the case had not proceeded in any material respect," but the stark contrast between *New.net* and this case is obvious. In *New.net*, Lavasoft apparently gave plaintiff a courtesy copy of a draft anti-SLAPP motion early on in the battle over plaintiff's motion for preliminary injunction. When the court denied the preliminary injunction it provided much of the support for defendant's anti-SLAPP motion. Thus, the court found the filing delay excusable.

Here, by contrast, during the New Jersey proceedings Defendants gave no hint whatsoever that they wanted the case in California so that they could file an anti-SLAPP. Instead, Defendants at all times relied on New Jersey substantive law in their motions there. Their tactical delay was akin to lying back in the weeds until they succeeded in moving the case to a defendant-favorable forum in order to file the anti-SLAPP motion that does not exist in New Jersey law.

The results of the two other cases the district judge cited in her terse footnote actually support the exercise of discretion against Defendants' late filing. In *Kunysz v Sandler*, 146 Cal. App. 4th 1540, 1543 (2007), without acknowledging the statutory 60 day limit or seeking leave of the court, defendant sought reconsideration of the trial court's denial of his anti-SLAPP motion nine months after plaintiffs first amended complaint was filed. The trial court denied the late

motion and the appellate court affirmed observing that a case is long past its earliest stages when it has been pending for nearly a year. And, in *Morin v Rosenthal*, 122 Cal App 4th 673, 679, 681(2004), the appellate court affirmed the trial court's refusal to allow defendants to file their late anti-SLAPP motions where, somewhat analogous to the instant case, they devoted their time, energy and resources to moving the case from state court to federal court, and after remand from federal court, moving the case from one branch of the superior court to another and then from on judge to another. In doing so, appellate court rejected defendant's contention that the time to refile their anti-SLAPP motions were tolled while their various transfer motions were pending. The same considerations should preclude the late anti-SLAPP motions following transfer in this case.

*Platypus Wear Inc. v. Goldberg*, 166 Cal. App. 4th 772 (2008) is analogous. In *Platypus Wear*, the Court of Appeals held that while a trial court has discretion to allow the late filing of an anti-SLAPP motion; the court abused its discretion in granting defendant's late motion because the defendant did not establish good cause for the late filing. The *Platypus Wear* court observed that the defendant "failed to provide a compelling explanation for why he did not file an application for permission to file an anti-SLAPP motion earlier in the case," and he "did not articulate any extenuating circumstances justifying a late filing" *Id*. at 776. See also: *Olsen v Harrison*, 134 Cal. App 4th 278, 286(2005) [upholding trial court's

discretion in denying where anti-SLAPP was filed 278 days after service of complaint].

Reasoning by analogy, the district judge abused her discretion by allowing Defendants' extremely late anti-SLAPP motion.

### 2. The district court erred by concluding that Sarver's claim is barred by the First Amendment as a matter of law.

The district court correctly recognized that, "no social purpose is sewed by having the Defendant get free some aspect of the plaintiff that would have market value and for which he would normally pay." *Zacchini v. Scripps-Howard Broadcasting Co.*, 433 U.S. 562, 576 (1977). Nonetheless, the district court, under the mantle of California's anti-SLAPP statute, overbroadly applied the transformative use test to hold that the First Amendment provides Defendants with a complete defense to Sarver's misappropriation of his persona claims. In so ruling, the district court lost sight of the fact that despite the First Amendment, Defendants do not have the unfettered right to generate millions of dollars in movie revenue through their commercial exploitation of Sarver's life story without seeking authorization from, or providing compensation, to him.

As in *Zacchini, supra*, no social purpose is served by denying Sarver compensation for his right to his own persona. As demonstrated in this brief, the "principal thrust" of Sarver's claim is not an attack on Defendants' right to speak

publicly on elements of the Iraq war. Nor is the use of Sarver's likeness and experiences in the movie "transformative". Defendants neither placed Sarver in a setting different from the Iraq war, nor did they alter his physical likeness, biography, or the mission he was performing in some fantastical and creative manner.

As the Sixth Circuit Court of Appeals critically remarked in *Parks v. La Face Records*, 329 F.3d 437, 454(6th Cir.2003), "crying 'artist' does not confer *carte blanche* authority to appropriate a celebrity's name" and "crying 'symbol' does not change that proposition and confer authority to use a celebrity's name when none, in fact, may exist." The considerations reflected in that quote apply just as much when a non-celebrity plaintiff seeks to vindicate his right to privacy.

*Zacchini* makes it clear that the right of publicity is not automatically trumped by a defendant's First Amendment rights. Instead, a defendant's right to engage in protected expression must be carefully balanced against a plaintiff's right to privacy, and to not be defamed or cast in a false light. Special care must be taken to insure that neither right impinges too greatly, upon the other.

This Court reviews de novo a district court's grant of defendants' motion to strike under the California anti-SLAPP statute. *Vess v. Ciba-Gergy Corp. USA,* 317 F.3d 1097, 1102 (9th Cir. 2003); *Metabolite Intl., Inc. v. Wornick*, 264F.3d 832,

839 (9th Cir. 2001) For the reasons that follow, based on that review, the Court should reverse.

### a. The court erred by concluding that the "principal thrust" of Sarver's claim arose from Defendants' exercise of free speech in connection with a public issue.

The court held that Defendants "were engaged in free speech in connection to a public issue." (R.129: Opinion/Order, pp 7-9). This was an error.

Consideration of a §425.16 anti-SLAPP special motion to strike occurs in a two-step process with shifting burdens.[4] " A defendant filing an anti-SLAPP motion to strike 'must make an initial prima facie showing that plaintiff's suit arises from an act in furtherance of defendant's right of petition or free speech.'" *Bosley Med. Inst. Inc. v Kremer*, 403 F3d 672,682 (9th Cir. 2005) (citations omitted). As the California Supreme Court has stated:

> First, the court decides whether the defendant has made a threshold showing that the challenged cause of action is one arising from protected activity. The moving defendant's burden is to demonstrate that the act or acts of which the plaintiff complains were taken "in furtherance of the [defendant]'s right of petition or free speech under the United States or California Constitution in connection with a public issue," as defined in the statute. (§425.16, subd. (b)(1)). If the court finds such a showing has been made, it then determines whether the plaintiff has demonstrated a probability of prevailing on

---

[4] The second prong which requires Plaintiff to satisfy his minimal burden to establish a probability of success on his claims is discussed in section 3 infra. §425.16(b)(1).

the claim.  *Equilon Enterprises v. Consumer Cause, Inc.*,
29 Cal. 4th 63, 67(2002)

As to a defendant's threshold showing, the Court further explained in *City of Cotati v Cashman*, 29 Cal. 4th 69,78 (2002):

> [T]he statutory phrase "cause or action… arising from " means simply that the defendant's act underlying the plaintiff's cause of action must itself have been an act in furtherance of the right of petition or free speech.  In the anti-SLAPP context, the critical point is whether the plaintiff's cause of action itself was based on an act in furtherance of the defendant's right of petition or free speech.  A defendant meets this burden by demonstration that the act underlying the plaintiff's cause fits one of the categories spelled out in section 425.16, subdivision (e)…(citations omitted).

Defendants here failed to make their threshold prima facie showing under §425.16(e)(4) that the speech at issue was made in furtherance of their right of free speech.  The district judge erred when she construed the statute so broadly to conclude that the "principal thrust" of Sarver's claim chilled Defendants' free speech in connection with a public issue.

In *Dyer v. Childress*, 147 Cal. App. 4th 1273 (2007), an important case that Sarver discussed below, but the district court ignored, defendants filed an anti-SLAPP special motion to strike claims for defamation and false light invasion of privacy.  Plaintiff claimed that in the movie, "Reality Bites", defendants used his name for the main character in the story and misrepresented his actual persona

based on the allegedly unflattering representation of the fictional character in the movie. The plaintiff, Troy Dyer, knew the defendant screenwriter when they attended USC film school together. In the movie, Ethan Hawke portrayed a rebellious slacker named Troy Dyer. Defendants claimed that publication of the movie was conduct in furtherance of the exercise of the constitutional right of free speech in connection with an issue of public interest because the film raised issues of genuine widespread interest about the challenges facing Generation X in the early 1990's and thus plaintiff's suit fell within §425.16(e)(4). *Id.* at 1279-80.

The *Dyer* Court disagreed with defendants' argument and affirmed the trial court's denial of the motion to strike. The Court agreed that it is "beyond dispute that movies involve free speech", but cogently recognized that "not all speech in a movie is of public significance and therefore entitled to protection under the anti-SLAPP statute." *Id.* at 1280. The *Dyer* Court focused on "the specific nature of the speech at issue rather than generalities abstracted from it," and concluded that even if the movie addressed a topic of widespread public interest, defendants were unable to draw any connection between those generalized topics and plaintiff's defamation and false light claims.

The *Dyer* Court went on to explain that defendants failed to show that plaintiffs complaint about the use of his persona went beyond "the parochial particulars" of the case, and the court added that it was not enough for anti-SLAPP

purposes that "a broad and amorphous public interest" could be connected to the specific dispute. *Id.* (citation omitted). The Court also distinguished cases where, unlike *Dyer* (and unlike here), private plaintiffs had "voluntarily thrust themselves into a discussion of public topics." *Id.* at 1281.

Another panel followed *Dyer* in *Whitaker v A & E Television Networks*, 2009 WL 1383617 (Cal. App. 4th Dist.) In *Whitaker*, the court affirmed an order denying an anti-SLAPP special motion to strike plaintiff's complaint for defamation, invasion of privacy, and intentional infliction of emotional distress. Factually, A & E produced, broadcasted, and released on DVD a documentary called "The History of Sex." During a discussion of the HIV/AIDS epidemic, the narrator stated, "AIDS has exacted a deadly toll on gay men and [intravenous] drug users as well as hundreds of thousands of heterosexuals in Africa and Haiti." As the narrator said this, plaintiff was shown for 3 seconds on the street at night shaking what appeared to be a cup and nodding at people walking by. The documentary never mentioned his name or said he had HIV/AIDS, or that he was a homosexual or intravenous drug user.

Discussing and quoting *Dyer*, the court found that "the principal thrust or gravamen" of plaintiff's causes of action was the false portrayal of him as an intravenous drug user and HIV/AIDS sufferer. 2009 WL 13861 **3-4 (quoting *Cotati,* supra at 78). The court held that even though the documentary's act of

speaking on the AIDS epidemic and the history of sexuality were topics of public interest, because Whitaker was not a public figure, whether he is an intravenous drug user who is an HIV/AIDS sufferer was not a matter of public interest.

Most recently in *Doe v Gangland Productions, Inc.*, 802 F. Supp.2d 116 (C.D. Cal. 2011),[5] the district court denied defendants' anti-SLAPP dismissal motion when plaintiff sued for appropriation of likeness, public disclosure of private information, and intentional infliction of emotional distress after defendants allegedly breached a promise not to reveal the identity of plaintiff, a former " Nazi Low Riders" gang member, when they interviewed him on their A & E Television Network program "Gangland" about the murder of a former gang member who was killed after it was revealed that he had spoken to media. The court rejected defendants' argument that the disclosure of plaintiff's identity on the program was in furtherance of defendants' right of free speech. The court explained that while the broadcast of the program discussing gang-related activity was "in connection with a public issue or an issue of public interest," the disclosure of plaintiff's identity was not. Saying that the crucial question was whether the "principal thrust" of plaintiff's claim arose from such activity, the court disagreed with defendants' broad reading of § 425.16 that "any communicative activity" is entitled to blanket protection.

---

[5] *Doe* is pending before this Court No. 11-00389

Here analogous to *Doe*, *Whitatker* and *Dyer*, the principal thrust of Sarver's misappropriation, defamation, invasion of privacy and intentional infliction of emotional distress suit is not predicated on the fact that "The Hurt Locker*"* was about the Iraq war, the prevalence of IED's there or the dangers EOD technicians there faced in disarming them. Instead the primary thrust of his suit is the theft of his private persona and the false implications Defendants made about him in their movie. Appellant, whose persona is readily identifiable in the "Will James" character played by Jeremy Renner, was never in the public eye; he was a private member of the United States Army who was doing his job. Sarver was ordered to cooperate with Boal when Boal was embedded with his EOD team; he never voluntarily "injected himself into… public debate" as the district court so cavalierly suggested. *Dyer supra* at 1281. The unwanted scrutiny was involuntarily thrust upon Sarver first by the Playboy article and then by the movie.

The claims of Jeffrey Sarver do not involve the First Amendment, but, rather Sarver's personal reputation and his right to privacy. That the backdrop for the movie involves a matter of public interest does not give Defendants license to misappropriate his likeness, invade his privacy and defame him. The district court should have dismissed the special motion to strike because Defendants failed to carry their burden to establish that the "principal thrust" of Sarver's lawsuit arises from their exercise of free speech in connection with a public issue.

27

**b. The district judge erred by concluding as a matter of law that Sgt. Sarver's likeness was so transformed in "The Hurt Locker" that it became Defendants' own artistic expression entitled to First Amendment protection.**

After recognizing in her tentative opinion that, as a non-celebrity, Sgt. Sarver's case was distinct from the California transformative use decisions and that Sarver's claim was that his life story was appropriated as the sole basis for "The Hurt Locker", and saying at the hearing that the issue was " quite a close call" (R.130: Tr8/8/11, p98), the judge ruled that "no reasonable trier of fact could conclude that [The Hurt Locker] was not transformative" (R.129: Opinion/Order, p48). The judge erroneously applied the transformative use test because a reasonable fact finder could conclude that the Will James character in the movie was appropriated directly from Sgt. Sarver's life and lacked "significantly distinctive and expressive content" to satisfy the transformative use test for First Amendment protection.

In *Comedy III Productions, Inc. v. Gary Saderup, Inc.* ("*Comedy III*"), 25 Cal. 4th 387 (2001), the California Supreme Court adopted the "transformative use" defense to right of publicity claims. Borrowing from fair use copyright law, the Court explained that to be transformative and qualify for legal protection, the artist's depiction must contribute something more than a "merely trivial" variation, the artist must create something recognizably "his own." In *Comedy III*, the owner of the "Three Stooges'" intellectual property rights sued a portrait artist who made

28

lithographs and T-shirts featuring the characters. Applying the test the Court concluded that defendant's portrait was not transformative. The portraits' "marketability and economic value…derive[d] primarily from the fame of the celebrities depicted," and the Court could "discern no significant transformative or creative contribution" *Id.* at 811. Instead, the artist's "undeniable skill [was] significantly subordinated to the overall goal of creating literal, conventional depictions of The Three Stooges so as to exploit their fame." *Id.*

Since *Comedy III*, only two California cases have applied the transformative use test as a matter of law to invoke First Amendment protection, and both are readily distinguishable from the present case. In *Winter v DC Comics*, 30 Cal. 4th 881 (2003), the California Supreme Court applied the transformative use test to cartoon figures evoking, but significantly departing from, the images of rock musician brothers Jonny and Edgar Winter. The comic book publisher created characters named "Johnny and Edgar Autumn" who had "long white hair and albino features similar to [the Winters];" Johnny Autumn "was depicted as wearing a tall black top hat similar to the one Johnny Winter often wore;" and the title of the comic volume that introduced the characters "Autumns of our Discontent" – included a pun based upon the Winters brothers' last name.

Unlike the Winters, however, Johnny and Edgar Autumn were "villainous half-worm, half-human offspring born from the rape of their mother by a

supernatural worm creature that had escaped from a hole in the ground." Further, these fanciful caricatures appeared as central characters in a fantastical story alien to the Winters' public personas as musical performers. Moreover, the cartoon characters were depicted as "vile, depraved, stupid, cowardly, subhuman" gunfighters, engaged in "wanton acts of violence, murder and bestiality for pleasure…" The California Supreme Court concluded that the comic book characters were "transformative" because they "contain[ed] significant expressive content other than plaintiffs' mere likenesses." Although the characters were "less than subtle evocations of Johnny and Edgar Winter, the books did not depict plaintiffs literally."

In the second California decision that applied the transformative use test to bar a plaintiff's claim as a matter of law, the lead singer of a musical group sued a videogame distributor for breaching her right of publicity. *Kirby v. Sega of America Inc.*, 144 Cal. App. 4th 47 (2006). The game featured a female lead character who resembled plaintiff in many respects. The California Court of Appeal compared the plaintiff and the video character's features and concluded there were sufficient dissimilarities such that the video character "Ulala" was an expressive or transformative character rather than a literal depiction of the plaintiff:

> First, Ulala is not a literal depiction of Kirby. As discussed above, the two share similarities. However they also differ quite a bit: Ulala's extremely tall, slender computer-generated physique is dissimilar form Kirby's.

30

> Evidence also indicated Ulala was based, at least in part, on the Japanese style of "anime." Ulala's typical hairstyle and primary costume differ from those worn by Kirby who varied her costumes and outfits, and wore her hair in several styles. *Id.* At 59.

The *Kirby* Court also contrasted plaintiff's actual performance setting with the video game's setting for an animation of the Ulala character:

> Moreover, the setting for the game that features Ulala— as a space-age reporter in the 25th century—is unlike any public depiction of Kirby. Finally, we agree with the trial court that the dance moves performed by Ulala— typically short, quick movements of the arms, legs and head—are unlike Kirby's movements in any of her music videos. *Id.*

The Court concluded, "[t]aken together, these differences demonstrate Ulala is 'transformative,'" and respondents added creative elements to create a new expression.

Most recently, in *No Doubt v Activision Publishing*, Inc., 192 Cal. App. 4th 1018 (2011), the Court applied the *Comedy III*, *Winter* and *Kirby* analysis and rejected the video game publisher's transformative use claim in a suit by the popular rock band where defendant asserted that its use of the band's likeness was transformative "because the videogame shows [the band's ] avatars surrounded by unique, creative elements, including in fanciful venues such as outer space… and performing songs that that [the band] avowedly would never perform in real life." While recognizing "[t]hat the avatars can be manipulated to perform at fanciful

venues including outer space or to sing songs the real band would object to singing [and] that the avatars' appear in the context of a video game that contains many other creative elements," the Court found the use of the band's likenesses non-transformative, because the band's avatars "perform[ed] rock songs, the same activity by which the band achieved and maintains its fame" and did so "as literal recreations of the band members. "  The game did not "transform the avatars into anything other than exact depictions of [the band's] members doing exactly what they do…" *No Doubt* stands for the proposition that surrounding the literal likeness with "creative elements" does not make the theft of that likeness transformative.

In *Hilton v. Hallmark Cards*, 599 F.3d 894 (9th Cir. 2010), this Court analyzed the *Comedy II, Winter* and *Kirby* decisions.  In *Hilton*, the Court ruled that a greeting card mimicking Paris Hilton and her role in a television reality show "did not entitle Hallmark to the transformative use defense as a matter of law. 599 F.3d at 911.  In the reality show, Hilton lived the life of an average person.  In one episode, "Sonic Burger Shenanigans," Hilton worked at a drive-in restaurant, cruising up to customers' cars on roller skates and serving them their orders. Hilton's tagline word on the show referring to a particular person, thing or event was "hot." *Id*.

The card drawn in a cartoon style but using a photograph of Hilton's head ripped off the episode.  Examining only the depiction of Hilton and the setting, the

Court found that the card was imitative. As the Court described the card, we see Paris Hilton, born to privilege, working as a waitress." *Id*. Hilton, as a waitress delivering a plate of food to a diner in a restaurant, utters Hilton's catch phrase, "that's hot." The Court also noted differences: her uniform, the restaurant format, and Hilton's body drawn as a "generic female body." *Id*.

Despite these differences the Court concluded "the card falls short of the level of new expression" deemed transformative in *Winter* and *Kirby*, leaving "enough doubt as to whether Hallmark's card is transformative under our case law that we cannot say Hallmark is entitled to the defense as a matter of law." Id.

This Court's *Hilton* decision, together with the other California state authorities including *No Doubt*, defeat the district court's analysis here. In each case, the transformative use inquiry was limited only to plaintiff's image and its setting. Where, as here, the depiction of these two factors mimic reality, the likeness in the drawing, videogame or movie was not sufficiently transformative to warrant First Amendment protection as a matter of law.

Defendants' use of Sarver's life story in "The Hurt Locker" was in no way transformative. Sarver was not placed in a setting different from that in which he worked and lived—the Iraq War. His physical likeness, biography or attributes were not altered. The Will James (Jeremy Renner) character was simply walking in Jeffrey Sarver's shoes. Defendants instead invaded Sarver's privacy, stole his

likeness and his life story and then defamed him by casting him in a false light. The mere fact that Defendants changed some minor aspects of his likeness does not render The Hurt Locker's portrayal of Sarver transformative. And, the fact that Defendants exercised creativity and skill in the overall making of the movie does not render their usurpation of Sarver's likeness transformative as a matter of law. See *Comedy III*, 21 p.3d at 810.

The district court opinion [R. 129: Opinion/Order p50, n9] disregarded the decision in *Keller v Electronics Arts, Inc.*, 2010 U.S. Dist. LEXIS 10719 (N.D. Cal 2010)[6] as not controlling and "distinguishable because, unlike Defendants here, the defendants in *Keller* added little distinctive and expressive content." As "distinctions" the court pointed to the fact that in the videogame Keller was depicted as the same height and weight, wearing his college uniform, wearing the jersey number he wore in college, and playing football." The movie Sarver, "Will James" played by Jeremy Renner, was approximately the same height, weight and age, wore the same military woodland camouflage body armor as Sarver, and was an EOD technician in the Iraq war performing mostly identical missions that were based out of Camp Victory where Sarver's EOD team was based.

Moreover, in *Keller*, Judge Claudia Wilken rejected EA's assertion that the video game should be "taken as a whole" when the transformative elements

---

[6] Court of Appeals Docket No 10-15387 (scheduled for oral argument 7/19/12.).

analysis is performed. The judge looked at the transformative use analysis in *Winter*, where the Court focused on the depictions of the Winter brothers, "not the content of the other portions of the comic book," and in *Kirby*, where the court compared Ulala with the plaintiff "and its analysis did not extend beyond the game's elements unrelated to Ulala" *Id* at *18. The court concluded that *Winter* and *Kirby* showed that the transformative use analysis "must be on the depiction of Plaintiff in 'NCAA Football,' not the game's other elements." *Id*.

So it is here. The facts of Jeffrey Sarver's claim in terms of image and setting are analogous to *Comedy III*, *Hilton*, *No Doubt* and *Keller,* but contrast with the transformed images in *Winter* and *Kirby*. A reasonable fact finder could conclude that Defendants simply placed Sgt. Sarver's literal likeness into a movie over his express objections.

**3. The district court erred in striking Sarver's misappropriation, false light invasion of privacy, defamation and intentional infliction of emotional distress claims because properly crediting Sarver's evidence, he satisfied his minimal burden to show a probability of success on the merits.**

The second prong in analyzing a California anti-SLAPP dismissal motion is to determine "whether the plaintiff has demonstrated a probability of prevailing on the claim." *Equilon Enter. v. Consumer Cause, Inc.,* at 67; §425.16(b)(1). At the second step, the required probability that a plaintiff will prevail is not high. As the

California Supreme Court stated in *Navellier v Sletton*, 2 P.3d 703, 708 (2002), suits subject to being stricken at this step are those that "lack[]even minimal merit." This is not such a case.

Moreover, in *Thomas v Fry's Electronics, Inc*., 400 F.3d 1206, 1207 (9th Cir. 2005), the Court stated that "federal courts may not impose a heightened pleading requirement in derogation of federal notice pleading rules." Accord: *Manufactured Home Communities, Inc. v City of San Diego*, 655 F.3d 1171, 1176-77 (9th Cir. 2011) As stated in *Hilton* quoting *Wilson v Parker, Covert & Chidester*, 50 P.3d 733, 739 (Cal. 2002):

> "Put another way, the plaintiff must demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited. [T]hough the court does not weigh the credibility or comparative probative strength of competing evidence, it should grant the motion if, as matter of law, the defendant's evidence supporting the motion defeats the plaintiff's attempt to establish evidentiary support for the claim." Cal. Civ. Proc. Code §425. 16(b)(2). *Hilton* at 903.

In addition, in *M.G. v Time Warner, Inc.,* 89 Cal App 4th 623, 630 (2001), the court made it clear that where plaintiff had pleaded various theories as separate causes of action that were based on the same facts and seeking the same damages, if just one theory is adequate, it would provide a basis for denial of the motion to strike on all of the common theories.

### a. Plaintiff sufficiently pleaded his claim for misappropriation of personality.

A misappropriation claim includes alternative claims for right of publicity and for misappropriation of personality. *KNB Ent.,v Matthews*, 78 Cal. App. 4th 362, 367 (2002) [unauthorized appropriation of an obscure plaintiff's name voice signature or likeness]; *Christoff v Nestle USA, Inc.,* 202 Cal App 4th 529, 544 (2007)[right of privacy protects from damages to a person's feelings based on unauthorized use while right of publicity protects commercial values in a person's identity]  Moreover, California recognizes both a common law and a statutory cause of action.  To state a common law cause of action, a plaintiff must allege: (1) the defendant's use of plaintiff's identity; (2) the appropriation of plaintiff's name or likeness to defendant's advantage, commercially or otherwise; (3) lack of consent; and (4) resulting injury.  *Downing v. Abercrombie & Fitch*, 265 F. 3d 994 1001 (9th Cir. 2001) [reversing summary judgment and holding that First Amendment did not bar misappropriation  claim where defendant used a more than 30 year-old photograph of plaintiff surfers without their permission in a surf-themed catalog].

California's statutory cause of action prohibits the knowing use of another's name, voice or likeness without consent.  Cal. Civ. Code §3344(a).  The statute compliments rather than codifies, the common law cause of action, because the

two are not identical. *Abdul-Jabbar v. General Motors*, 85 F.3d 407, 414 (9th Cir. 1997). The statutory cause of action adds two elements to the common law: knowing use and direct connection to commercial activity. *Id*. Violators are liable for any profits from unauthorized use, and punitive damages may be awarded. With non-celebrities, commercial value is presumed from the fact that defendant viewed plaintiff's identity as having commercial value, because defendant took and used plaintiff's identity for a commercial purpose. A non-celebrity's market value is established by the value gained by defendant in the use of plaintiff's identity.

In this case, Sarver acknowledges that he is not a celebrity and that his claim is for misappropriation of his personality. The district judge recognized that the cause of action was a viable one, but, even though Sarver's claim is not for right of publicity, in her opinion, she held the fact that he was not a celebrity against him. Stating that the value of "The Hurt Locker" "unquestionably derived from the creativity and skill of the writers, directors, and producers who conceived, wrote, directed, edited and produced" the movie, rather than the fame of the Plaintiff, the judge went on to hold that a completely inapposite "secondary inquiry" obliquely alluded to by the California Supreme Court in *Comedy III* required that his claim was barred by the First Amendment as a matter of law [R. 129: Opinon/Order, p.50]. In so ruling, the judge completely failed to distinguish between the

misappropriation of Sarver's likeness for use as the "Will James" character and the creative aspects of the movie itself.

Here, when one fully considers the backstory of Defendant Boal's embedment with Sarver's EOD unit in Iraq, his subsequent Playboy article about Sarver that named him by name and disclosed personal details about him, and Boal's eventual thinly disguised adaptation of the article into the central character in the screenplay, there is no doubt that the virtually undisguised "Will James" character is Jeffrey Sarver. The at least "minimal merit" of Sarver's claim is obvious.

The district judge's final opinion also wrongly analogized Sarver's claim to the claim in *Polydoros v. Twentieth Century Fox Film Cor*., 67 Cal. App. 4th 318, 322 (1997). She did so even after she had first recognized in her tentative opinon that Sarver's claim was distinguishable because, while in *Polydoros,* a 40- year-old adult argued that he was the basis for a fictional child movie character in "*The Sandlot*" movie, Sarver "argues that his life story was appropriated as the sole basis for The Hurt Locker." (R. 149-2:Tentative Ruling pp 26-27; Doc 129: Opinion, p49 n7). The court was correct the first time in the tentative ruling, because in *Polydoros*, defendant writer/director, had been a former schoolmate of plaintiff as a child some 30 years earlier. He made a "patently fictional" movie that revealed no private facts about plaintiff. The court said that plaintiff conceded

that the work was fiction, that he was not harmed financially by the movie and that "[o]ther than the similarity in names and attire, the enjoyment of baseball and swimming, and the brash nature of the "Squints" character, appellant cannot point to any other aspects in which the film accurately depicts his life." *Id.* at 321. Here, by contrast, "The Hurt Locker" is not patently fictional, it reveals private facts about Sarver, and he has alleged both financial and career damages from the portrayal of him as the EOD technician Will James in the movie. His claim certainly has more than minimal merit, and the district court erred by concluding to the contrary as a matter of law.

### b. False light invasion of privacy and defamation

Before briefly discussing Plaintiff's false light allegations, his defamation claim, and his intentional infliction of emotional distress claim, counsel reiterates Plaintiff's "minimal burden" in responding to this anti-SLAPP dismissal motion and the fact that the reviewing court is prohibited from "weigh[ing] the credibility or comparative probative strength of the competing evidence" *Manufactured Home Communities, Inc supra*; *Wilson, supra*. A cursory reading of the district court opinion establishes that the judge certainly lost sight of these guideposts when she ruled as a matter of law that these claims[7] lacked "minimal merit."

---

[7] Plaintiff recognizes that ultimately he may only have a single cause of action under *MG v Time Warner, supra*. At this early stage of the case, however, before any discovery has been done, the ferreting out of the crux of Plaintiff's claim

Under California common law, "one who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other person for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person." Restatement of Torts (Second) §652B; *Hill v. National Collegiate Athletic Assn,* 7 Cal 4th 1, 24 (1994). The plaintiff must show that the defendant penetrated some zone of physical or sensory privacy surrounding, or obtained unwanted access to data about, the plaintiff." *Sanders v. American Broadcasting Co.*, 20 Cal. App. 4th 907, 914-915 (1999).

The elements for the California common law tort of public disclosure of private facts are: (1) public disclosure, (2) of a private fact, (3) which would be offensive and objectionable to the reasonable person, and (4) which is not of legitimate, public concern. *M.G. v Time Warner, Inc., supra*, at 631. Like the tort of intrusion, the disclosure/invasion under the public disclosure of private facts must also be highly offensive.

Under Restatement Second of Torts §652 B and *Hill*, supra, false light invasion of privacy is defined as:

> One who gives publicity to a matter concerning another
> that places the other before the public in a false light is

---

should be saved for later proceeding. The test here and now is whether the complaint is legally sufficient and supported by a sufficient prima facie showing of facts.

> subject to liability to the other for invasion of privacy, if
> (a) the false light in which the other was placed would be
> highly offensive to a reasonable person, and (b) the actor
> had knowledge of or acted in reckless disregard as to the
> falsity of the publicized matter and the false light in
> which the other would be placed.

Under a false light claim, it is not necessary that the Plaintiff also be defamed ('though publicly placing one in a highly offensive false light will in most cases be defamatory as well'). *Fellows v National Enquirer*, 42 Cal. 3d234, 238-239(1986).

As to defamation, Cal. Civ. Code § 45 provides:

> §45 Libel.
> Libel is a false and unprivileged publication by writing,
> printing, picture, effigy, or other fixed representation to
> the eye, which exposes any person to hatred, contempt,
> ridicule, or obloquy, or which causes him to be shunned
> or avoided, or which has a tendency to injury him in his
> occupation.

Libel includes almost any language, which, upon its face, has natural tendency to injure a person's reputation. *Moore v. Greene,* 431 F.2d 584 (9th Cir. 1970). Furthermore, there is no requirement that a person defamed be mentioned by name. It is sufficient if from the evidence, the jury can infer that the defamatory statement applies to the plaintiff, or if the publication points to the plaintiff by description or circumstances tending to identify him *Yow v. National Enquirer, Inc.*, 550 F. Supp.

2d 1179 (E.D. Cal. 2008). Also, a defendant is liable for what is insinuated as well as for what is stated explicitly. *Fairfield v. Hagan,* 56 Cal. Rptr. 402, 248 (1967).

In light of the facts alleged, Plaintiff has certainly a pleaded claim for false light invasion of privacy and for defamation. Defendants acted with reckless disregard for Plaintiff's personal life by placing him in a false light before the public and depicting him in a manner that is highly offensive to a reasonable person and grossly inaccurate with regard to Sarver's professional and personal life. As a result of Defendants' false and defamatory statements concerning Plaintiff's fitness and integrity in the performance of his daily functions as a First Sergeant in the United States Army, as well as in his family affairs, Sergeant Sarver has been significantly injured.

Specifically, Defendants have portrayed Plaintiff as a reckless, gung-ho war addict who has a morbid fascination with death that causes him to carelessly risk both his and his colleagues' lives in the theater of war, simply to feel the thrill of cheating death. [R1: Complaint ¶¶ 68, pg. 188]. Defendants knowingly portrayed Plaintiff, through the acting of Jeremy Renner, in this manner knowing that the movie would garner better ratings if they depicted Plaintiff in light less favorable than what is the actual reality of Plaintiff's life. Defendants knew, or reasonably should have known, that showing the likeness of Plaintiff as a man who was abnormally fascinated with death, who had a drinking problem and who struggled

with personal relations would be more marketable and profitable for the movie than that of a devout father figure who rarely drank and simply performed his job function. [R1: Complaint ¶ 67k,1, pg. 187]. Defendants have not only ruined the Plaintiffs reputation and his position as a First Sergeant within the United States Army, Defendants have placed Plaintiff in a false light, ultimately portraying him as a bad father and an unstable person who is addicted to the thrill of war [R.1: Complaint ¶ 79, pp191-192].

In *M. G. v Time Warner, Inc.*, supra at 626-37, a magazine and a television program ran a story about child/molesters involved in youth sports, and reported on a coach with a history of molesting children he met through Little League. The article named the convicted coach and included a team photograph partially revealing the name of the team and showing the faces of the boys, many of whom were victims. The boys and two assistant coaches sued for invasion of privacy and infliction of emotional distress for invasion of privacy. The Court denied defendants' anti-SLAPP motions because plaintiff demonstrated a probability of prevailing on the merits because showing the plaintiffs' faces unnecessarily intruded on their privacy interests more than journalistic interest justified.

In *Dyer*, supra, the California Court of Appeal affirmed the denial of an anti-SLAPP motion where the character in the movie "Reality Bites" who bore plaintiff's name used drugs could not keep a job and treated women poorly. The

Court found that plaintiff's declaration, which stated that he did not consent to the use of his name, that he is completely different from the fictional character, and that the use of his name injured and would continue to injure his reputation were sufficient at the pleading stage to establish a probability that he would prevail at trial on his defamation and false light claims. 147 Cal. App 4th at 1279-81

Similarly, in this case, Defendants took the events of Plaintiff's personal and professional life and twisted them in a way that would produce a high-grossing movie at the expense of Sergeant Sarver's career, reputation and well-being. Defendants knew the information about Plaintiff that they published/showed was untrue based on Plaintiff's life and they recognized the similarity between "The Hurt Locker" story and Sergeant Sarver's life. Defendants should not be allowed to wield the First Amendment sword to thrash Sarver's own rights with complete impunity. This case presents more than "minimal merit."

Relying on her faulty transformative use analysis, the district court continued her erroneous excursion into the facts in tossing out the false light invasion of privacy and defamation claims. The court usurped the fact finder and weighed the credibility and strength of the parties' competing allegations. Saying that "Plaintiff has not established a prima facie case that the alleged depictions of [Sarver] are provably false, she goes on to express her own opinion that "the Court does not agree with Plaintiff's characterization of Will James as a man who does

not love his son." [Doc. 129, p17]  Then, relying on statements attributed to him by Boal in the Playboy article, the trial judge conclusorily decided that the alleged depiction of Sarver in the movie as a man who is fascinated with death cannot be shown to be "provably false."  [Doc.129, p17].  Next, referring to Sarver's allegation that he was shunned and avoided and that leadership and junior soldiers doubted his judgment (i.e., injured in his occupation) by a false scene where the Will James character responded to a burning car bomb with a fire extinguisher, the court inexplicably concludes that "the scene would [not] tend to injure Plaintiff in his occupation."  Finally, she concludes that the false light claim fails because, "If the character of Will James was in fact modeled on Plaintiff, then Plaintiff was portrayed as a war hero…"  With all due respect, these are blatantly prohibited factual findings that should have been left to a jury.

In *Comedy III, supra,* the California Supreme Court speaking in the context of the subtle "distinction between protected and unprotected expression, " reaffirmed that these are the distinctions that "triers of fact are called on to make in First Amendment jurisprudence" 25 Cal 4th at 409.  So too with the weighing of credibility and comparative probative strength of competing evidence.  The court's matter of law ruling should be reversed.

### c. **Intentional infliction of emotional distress.**

Plaintiff satisfied the minimal merit prong by alleging sufficient facts to state a claim for intentional infliction of emotional distress.

In California, the elements of a course of action for intentional infliction of emotional distress are: (1) outrageous conduct by the defendant; (2) intention to cause or reckless disregard of the probability of causing emotional distress. *Cervantes v. J.C. Penny Co.*, 24 Cal. 3d 579, 593 (1979). A claim of negligent infliction of emotional distress is not an independent tort, but the tort of negligence, to which the traditional elements of duty, breach of duty, causation and damage apply. *Marlene F. v. Affiliated Psychiatric Medical Clinic, Inc.*, 48 Cal. 3d 583, 588 (1989). Contrary to Defendants' contention is, Plaintiff has stated a cognizable claim under California law for infliction of emotional distress.

Plaintiff alleges that Defendant Boal fraudulently misrepresented the purpose of his reporting in order to gain Plaintiff's trust. At the same time, Boal was allegedly talking to Defendant Bigelow about how to misappropriate Plaintiff's story for their own commercial benefit. To do this, Boal photographed Plaintiff in his private living space, talked extensively to him about his background, his family, and his personal thoughts and ideas. Boal did this under the false pretense of writing a general story about Plaintiff's military unit.

At no time did Defendant Boal tell Plaintiff that he was secretly planning to disclose Plaintiff's entire life history and story in an article published by Playboy and later a film that would eventually be distributed by Defendants and shown all over the world. Each Defendant in this instance participated in the writing, producing, directing, distributing, and release of a film that exploited, to an extreme, the most humble surroundings of Plaintiff's life into a worldwide sensation. Defendants have caused Sarver severe emotional suffering by releasing "The Hurt Locker" with the likeness of Plaintiff involved in scenes and information about his personal life that has greatly embarrassed him and his family members. The movie contains scenes that have caused severe emotional suffering by placing Plaintiff at an increased risk of harm or death during his current and future deployments by further inciting enemies to hunt down a high profile bomb squad hero. The movie has also caused Sarver severe emotional suffering because it has caused him a loss of respect that he previously enjoyed amongst his Army colleagues.

These facts, as alleged, are sufficient to state a claim for intentional infliction of emotional distress under California law, and thus Defendants' motions to strike should have been denied.

**4. The district court erred by denying Sarver's motion for stay and waiver of the bond requirement.**

Appellant timely appealed from the district court's order denying his motion to stay execution and waive bond pending appeal [R. 161: Notice of Appeal, p73; R.156: Order, p5]. This Court subsequently combined the appeals. A district court stay order is reviewed for an abuse of discretion. *Dependable Highway Express, Inc. v. Navigators Ins. Co.*, 498 F/.3d 1059.1066 (9th Cir. 2007).

Because the Appellees have not undertaken any collection efforts against Sarver to date, Appellant defers extended argument on the issue at the present time. Nonetheless, Appellant maintains his position that the district judge abused her discretion by denying his motion to waive bond.

**CONCLUSION**

For the reasons set forth, the district court decision granting the anti-SLAPP motion to strike should be reversed and the attorney fee awards should be vacated.

# STATEMENT OF RELATED CASES

Pursuant to 9 Cir. R. 28-2.6, Appellant files his instant Statement of Related Cases.   The instant appeal, Case No. 11-56986, is an appeal of the district court's order granting Defendants' motions to strike Plaintiff's complaint.   After granting Defendants' motions to strike, the district court granted Defendants' motions for attorney fees to which Plaintiff sought a stay of execution.   The district court's denial of Plaintiff's motion for stay of execution was appealed to this Court, Case No. 12-55429 and was consolidated with the earlier case number.   There are no other related cases under 9 Cir. R 28-2.6(a)-(d).

**Submitted by:**

**/s/ *Michael R. Dezsi***
**Michael R. Dezsi**
**Law Office of Michael R. Dezsi, PLLC**
**615 Griswold, Suite 700**
**Detroit, MI 48226**
**(313)281-8090**
**www.dezsilaw.com**

## <u>CERTIFICATE OF COMPLIANCE</u>

I certify under Fed. R. App. P. 32(a)(7)(C) and Ninth Circuit Rule 32-1 that the opening brief is proportionally spaced, has a type face of 14 points and contains 11,698 words (excluding the cover page, table of contents, table of authorities, certificate of Service and certificate of compliance).

<u>/s/ *Michael R. Dezsi*</u>
**Michael R. Dezsi**

Dated: July 2, 2012

## <u>CERTIFICATE OF SERVICE</u>

MICHAEL R. DEZSI, certifies that on July 2, 2012, he electronically filed the foregoing with the Clerk of the Court using the court's electronic filing system which will send notification of such filing to all interested parties.

<u>/s/ Michael R. Dezsi</u>
Michael R. Dezsi