Nos. 11-56986, 12-55429

# IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

SGT. JEFFREY S. SARVER

*Plaintiff / Appellant*

*versus*

NICOLAS CHARTIER, SUMMIT ENTERTAINMENT, LLC, KATHRYN BIGELOW, THE HURT LOCKER, LLC, MARK BOAL, GREG SHAPIRO, VOLTAGE PICTURES, LLC, GROSVENOR PARK MEDIA, L.P., KINGSGATE FILMS, INC., TONY MARK, DONALL MCKLUSKER, AND FIRST LIGHT PRODUCTIONS, INC.

*Defendants / Appellees*

———————————————————————

Appeal from U.S. District Court, Central District of California
The Honorable Jacqueline H. Nguyen
U.S.D.C. Case No. 2:10-cv-09034-JHN-JC

———————————————————————

### APPELLEES' JOINT ANSWERING BRIEF

———————————————————————

Timothy J. Gorry   (SBN 143797)
Jon-Jamison Hill    (SBN 203959)
Jackie M. Joseph   (SBN 151102)
EISNER, KAHAN & GORRY
9601 Wilshire Boulevard, Suite 700
Beverly Hills, California 90210
Telephone:   (310) 855-3200
Facsimile:    (310) 855-3201
Attorneys for The Hurt Locker, LLC,
Greg Shapiro, Nicolas Chartier,
Voltage Pictures, LLC, Grosvenor
Park Media, L.P. and
Kingsgate Films, Inc.

David Halberstadter   (SBN 107033)
Rebecca F. Ganz    (SBN 265199)
KATTEN MUCHIN ROSENMAN LLP
2029 Century Park East, Suite 2600
Los Angeles, California 90067
Telephone:   (310) 788-4400
Facsimile:    (310) 788-4471
Attorneys for Summit Entertainment LLC

Dale F. Kinsella     (SBN 063370)
Jeremiah T. Reynolds  (SBN 223554)
KINSELLA WEITZMAN ISER KUMP
  & ALDISERT LLP
808 Wilshire Boulevard, 3rd Floor
Santa Monica, California 90401
Telephone:   (310) 566-9800
Facsimile:    (310) 566-9850
Attorneys for Mark Boal and
Kathryn Bigelow

<u>CORPORATE DISCLOSURE STATEMENT</u>

The undersigned counsel for Appellee Voltage Pictures, LLC states that: (a) Voltage Pictures, LLC is a non-governmental corporate party; (b) Voltage Pictures, LLC does not have a parent corporation; and (c) no publically held corporation owns ten percent (10%) or more of Voltage Pictures, LLC.

The undersigned counsel for Appellee Kingsgate Films, Inc. states that: (a) Kingsgate Films, Inc. is a non-governmental corporate party; (b) Kingsgate Films, Inc. does not have a parent corporation; and (c) no publically held corporation owns ten percent (10%) or more of Kingsgate Films, Inc.

The undersigned counsel for Appellee Summit Entertainment LLC states that: (a) Summit Entertainment LLC is a non-governmental corporate party; and (b) Summit Entertainment LLC is a subsidiary of Lions Gate Entertainment Corp., a publicly held company.

The undersigned counsel for Appellee The Hurt Locker, LLC states that: (a) The Hurt Locker, LLC is a non-governmental corporate party; (b) Underdogs, LLC owns ten percent (10%) or more ownership interest in The Hurt Locker, LLC;

i

and (c) no publically held corporation owns ten percent (10%) or more of The

Hurt Locker, LLC.


Dated: August 22, 2012    EISNER, KAHAN & GORRY


        By:  */s/ Jon-Jamison Hill*
          Jon-Jamison Hill
          Attorneys for Appellees The Hurt Locker,
          LLC, Greg Shapiro, Nicolas Chartier,
          Voltage Pictures, LLC, Grosvenor Park
          Media, L.P. and Kingsgate Films, Inc.


Dated: August 22, 2012    KATTEN MUCHIN ROSENMAN LLP


        By:  */s/ David Halberstadter*
          David Halberstadter
          Attorneys for Appellee Summit
          Entertainment LLC

## TABLE OF CONTENTS

INTRODUCTION ...............................................................................................1

JURISDICTIONAL STATEMENT .................................................................2

STATEMENT OF ISSUES ...............................................................................3

PRIMARY AUTHORITY ..................................................................................4

STATEMENT OF FACTS .................................................................................4

STATEMENT OF THE CASE...........................................................................6

STANDARD OF REVIEW ................................................................................8

SUMMARY OF ARGUMENT ..........................................................................9

LEGAL ARGUMENT.......................................................................................11

I.     THE DISTRICT COURT PROPERLY APPLIED CALIFORNIA LAW
TO THIS CASE AND PROPERLY EXERCISED ITS DISCRETION
TO HEAR THE SPECIAL MOTIONS TO STRIKE. ..................................11

     A.     California Law Applies To This Case..................................................11

          1.     New Jersey Choice Of Law Rules Required The District
Court To Utilize A Four-Factor Test To Determine
Which State's Laws Govern The Case. ...................................12

          2.     Appellant Was Not Domiciled In New Jersey When The
Film Was Released...................................................................13

          3.     Appellant's Claimed Injury Did Not Occur In New
Jersey.......................................................................................16

          4.     The Remaining Factors To Be Considered In Connection
With Choice Of Law All Favor Application Of California
Law..........................................................................................18

B.    Federal Courts Should Not Enforce The 60-Day Timeframe Set By Cal. Civ. Proc. Code §425.16(f). ..................................20

C.    The District Court Properly Exercised Its Discretion To Hear Appellees' Motions To Strike. ..............................................21

II.    THE DISTRICT COURT PROPERLY DISMISSED EACH OF APPELLANT'S CLAIMS PURSUANT TO CAL. CIV. PROC. CODE SECTION 425.16. ..........................................................................25

A.    Appellees Were Engaged in the Exercise of Free Speech In Connection With A Public Issue. ........................................26

B.    Cal. Civ. Proc. Code Section 425.16 Required Appellant To Demonstrate The Merit Of His Claims. ...............................34

III.    APPELLANT HAS FAILED TO DEMONSTRATE THE PROBABILITY OF PREVAILING ON ANY OF HIS CLAIMS. ..............34

A.    Appellant Cannot Prevail On His Misappropriation Of Likeness Claim Because The Film Is Protected By The First Amendment, And In Any Event, The Film Does Not Use Appellant's Name Or Likeness. ................................................................................34

1.    Even If The Film Had Made Use Of Appellant's Name And Likeness, Appellant's Misappropriation Claim Would Be Barred By The First Amendment. ...........................36

2.    Appellant's Misappropriation Claim Is Subject To The Actual Malice Standard...........................................41

a)    The Actual Malice Standard Applies Because Appellant Is A Limited Purpose Public Figure And Appellant's Claim Involves Matters In The Public Interest. ..........................................................42

b)    Appellant Was Required To, But Did Not, Submit Clear And Convincing Evidence To Demonstrate That Appellees Acted With Actual Malice. ..................45

3.    Appellant's Misappropriation Claim Fails Because The Film Is A Fictional Work That Does Not Use Appellant's Name, Photograph Or Likeness. ...............................46

iv

B.  Appellant Cannot Demonstrate The Probability Of Prevailing On His Claims For Defamation, Invasion Of Privacy And Intentional Infliction Of Emotional Distress. .......................................................52

    1.  The Actual Malice Standard Applies To Appellant's Defamation, Privacy And Emotional Distress Claims, But Appellant Did Not Submit Clear And Convincing Evidence To Demonstrate That Appellees Acted With Actual Malice. ......................................................................52

    2.  Appellant's Defamation Based Claims Fail Because No Reasonable Person Would Believe The Fictional James Character Was Appellant. ..........................................................53

    3.  Appellant Failed To Demonstrate That The Film Includes A Provably False Or Defamatory Statement About Him. ........54

    4.  The District Court Correctly Concluded That Appellant Cannot Prevail On His False Light/Invasion Of Privacy Claim. ......................................................................................57

    5.  Appellant Cannot Prevail on His Claim For Intentional Infliction Of Emotional Distress. ..............................................59

C.  Appellant Waived Any Challenge To The District Court's Dismissal of His Breach of Contract, Fraud and Negligent Misrepresentation Claims Because His Opening Brief Contains No Argument With Respect To These Claims. ...................................60

IV.  THIS COURT SHOULD AFFIRM THE DISTRICT COURT'S ORDER DENYING APPELLANT'S MOTION FOR STAY OF EXECUTION AND WAIVER OF BOND PENDING APPEAL. .......................................62

A.  Appellant Abandoned This Issue Because His Opening Brief Contains No Argument Or Legal Authority With Respect To It. .......62

B.  The Relief Appellant Requests From This Court Is Moot, Because The Efficacy Of The Requested Stay Will Be Determined At The Same Time As The Merits Of The Appeal. .......................................63

CONCLUSION ..........................................................................................64

ADDENDUM ............................................................................................66

STATEMENT OF RELATED CASES ...................................................................70

CERTIFICATE OF COMPLIANCE .......................................................................71

## TABLE OF AUTHORITIES

**Cases**

Abdul-Jabbar v. General Motors Corp., 85 F.3d 407 (9th Cir. 1996) ............................................................................... 48

Aguilar v. Universal City Studios, Inc., 174 Cal. App. 3d 384 (1985) .............................................................................. 48

Berkley v. Dowds, 152 Cal. App. 4th 518 (2007) ................................... 60

Blatty v. New York Times Co., 42 Cal. 3d 1033 (1986) ........................... 48, 52, 53

Brown v. Kelly Broad. Co., 48 Cal. 3d 711 (1989) ................................ 45

Chitsazzahdeh v. Kramer & Kaslow, 199 Cal. App. 4th 676 (2011) ........................................................................ 9, 22, 23, 24

Christian Legal Soc. Chapter of Univ. of Calif. v. Wu, 626 F.3d 483 (9th Cir. 2010) ...................................................... 62

City of Cotati v. Cashman, 29 Cal. 4th 69 (2002) .................................. 25

Comedy III Prod., Inc. v. Gary Saderup, Inc., 25 Cal. 4th 387 (2001) ........................................................................ 36, 37, 38, 39

Couch v. San Juan Unified School Dist., 33 Cal. App. 4th 1491 (1995) .............................................................................. 59

Damon v. Ocean Hills Journalism Club, 85 Cal. App. 4th 468 (2000) .............................................................................. 27

Denney v. Lawrence, 22 Cal. App. 4th 927 (1994) ................................ 43

Doe v. Gangland Productions, Inc., 802 F. Supp. 2d 1116 (C.D. Cal. 2011) ......................................................................... 33

Dora v. Frontline Video, Inc., 15 Cal. App. 4th 536 (1993) .................... 42

Downing v. Abercrombie & Fitch, 265 F.3d 994 (9th Cir. 2001) ............... 46

Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc., 472 U.S. 749 (1985)........................................................................44

Dyer v. Childress, 147 Cal. App. 4th 1273 (2007) ........................... 31, 59

Equilon Enter., LLC v. Consumer Cause, Inc., 29 Cal. 4th 53 (2002)............................................................... 25, 34

Fellows v. National Inquirer, Inc., 42 Cal. 3d 234 (1986)........................................58

Four Navy Seals v. Associated Press, 413 F. Supp. 2d 1136 (S.D. Cal. 2005) ....................................................................28

General Signal Corp. v. MCI Telecomm. Corp., 66 F.3d 1500 (9th Cir. 1995) .................................................................12

Gertz v. Robert Welch, Inc., 418 U.S. 323 (1974) ...............................45

Gilbert v. Sykes, 147 Cal. App. 4th 13 (2007) ................................. 28, 57

Greenwood v. FAA, 28 F.3d 971 (9th Cir. 1994)....................................60

Guglielmi v. Spelling-Goldberg Productions, 25 Cal. 3d 860 (1979)............................................................41

Hampton-Stein v. Aviation Fin. Group, LLC, No. 10-56537, 2012 WL 892455 (9th Cir. March 16, 2012)...............................22

Hiken v. Dept. of Defense, 521 F. Supp. 2d 1047 (N.D. Cal. 2007) ....................................................................28

Hilton v. Hallmark Cards, 599 F.3d 894 (9th Cir. 2010).......................... 25, 34, 38

Hoffman v. Capital Cities, 255 F.3d 1180 (9th Cir. 2001)......................42

Huntingdon Life Sci. v. Stop Huntingdon Animal Cruelty USA, 129 Cal. App. 4th 1228 (2005) ....................................................60

Hustler Magazine v. Falwell, 485 U.S. 46 (1988) ...................................53

In re Trans World Airlines, Inc., 322 F.3d 283 (3d Cir. 2003) ...............63

Jacobson v. Schwarzenegger, 357 F. Supp. 2d 1198 (C.D. Cal. 2004) ....................................................................57

Joseph Burstyn, Inc. v. Wilson, 343 U.S. 495 (1952) ..................................... 26, 36

Kapellas v. Kofman, 1 Cal. 3d 20 (1969) ...............................................................57

Keller v. Electronic Arts, Inc., 2010 WL 530108 (N.D. Cal. Feb. 8, 2010) ...................................................................................................39

Khawar v. Globe Internat., 19 Cal. 4th 254 (1998) ...............................................45

Kirby v. Sega of Am., Inc., 144 Cal. App. 4th 47 (2006).......................... 37, 38, 47

Kronemyer v. Internet Movie Data Base, Inc., 150 Cal. App. 4th 941 (2007)............................................................................................ 27, 28

Kunysz v. Sandler, 146 Cal. App. 4th 1540 (2007).................................................24

Lam v. Ngo, 91 Cal. App. 4th 832 (2001) ..............................................................21

Lew v. Moss, 797 F.2d 747 (9th Cir. 1986)............................................................15

M.G. v. Time Warner, Inc., 89 Cal. App. 4th 623 (2001) .......................................58

Manufactured Homes Commn., Inc. v. City of San Diego, 655 F.3d 1171 (9th Cir. 2011) ...............................................................54

Mayer v. Monroe County Cmty. Sch. Corp., 1:04-cv-1695-SEB-VSS, 2006 WL 693555 (S.D. Ind. Mar. 10, 2006).......................................28

McCann v. Newman Irrevocable Trust, 458 F.3d 281 (3d Cir. 2006) .......................................................................................................16

McGarry v. Univ. of San Diego, 154 Cal. App. 4th 97 (2007) ...............................45

Metabolife Int'l, Inc. v. Wornick, 264 F.3d 832 (9th Cir. 2001)............................21

Midler v. Ford Motor Co., 849 F.2d 460 (9th Cir. 1988) ............................... 47, 48

Miller v. Fairchild Indus., Inc., 797 F.2d 727 (9th Cir. 1986)................................60

Morin v. Rosenthal, 122 Cal. App. 4th 673 (2004) ................................................22

N/S Corp. v. Liberty Mut. Ins. Co., 127 F.3d 1145 (9th Cir. 1997) ................................................................................................ 14, 16

ix

New.net, Inc. v. Lavasoft, 356 F. Supp. 2d 1090 (C.D. Cal. 2004) ................ 23, 24

Newton v. Thomason, 22 F.3d 1455 (9th Cir. 1994)................................................12

No Doubt v. Activision Publishing, Inc., 192 Cal. App. 4th 1018
(2011)..........................................................................................................39

Nygard, Inc. v. Uusi-Kerttula, 159 Cal. App. 4th 1027 (2008) ..............................27

P.V. ex rel. T.V. v. Camp Jaycee, 197 N.J. 132 (2008)...........................................12

People ex rel. Maggio v. Charles Scribner's Sons, 130 N.Y.S.2d
514 (1954)....................................................................................................49

Philadelphia Newspapers, Inc. v. Hepps, 475 U.S. 767 (1986)...............................52

Platypus Wear, Inc. v. Goldberg, 166 Cal. App. 4th 772 (2008) ............................24

Polydoros v. Twentieth Century Fox Film Corp., 67 Cal. App.
4th 318 (1997)...................................................................................... passim

Prager v. American Broadcasting Cos., Inc., 569 F. Supp. 1229
(D.N.J. 1983) ...............................................................................................17

Quan v. Computer Sciences Corp., 623 F. 3d 870 (9th Cir. 2010) ................. 61, 62

Reader's Digest Ass'n v. Superior Court, 37 Cal. 3d 244 (1984) ................... 41, 42

Rudnick v. McMillan, 25 Cal. App. 4th 1183 (1994)...............................................43

Schoenberg v. Extradora de Sal, S.A. de C.V., 930 F.2d 777 (9th
Cir. 1991) ......................................................................................................8

Selleck v. Globe International, 166 Cal. App. 3d 1123 (1986) ...............................57

Smith v. Maldonado, 72 Cal. App. 4th 637 (1999) ................................................55

Sofias v. Bank of Am. Nat'l Trust & Sav. Ass'n., 172 Cal. App.
3d 583 (2009)...............................................................................................61

Stewart v. Rolling Stone LLC, 181 Cal. App. 4th 664 (2010) ................. 34, 36, 42

Sullivan, 623 F.3d 770 (9th Cir. 2010) ...................................................................60

Summit Bank v. Rogers, 206 Cal. App. 4th 669 (2012)................................... 55, 56

Swartz v. KPMG LLP, 476 F.3d 756 (9th Cir. 2007) .............................................61

Tamkin v. CBS Broadcasting, Inc., 193 Cal. App. 4th 133 (2011).................. 29, 30

Time, Inc. v. Hill, 385 U.S. 374 (1967)............................................................. 45, 53

Traditional Cat Ass'n, Inc. v. Gilbreath, 118 Cal. App. 4th 392
 (2004)...................................................................................................27

U.S. *ex rel.* Robinson Rancheria Citizens Council v. Borneo,
 Inc., 971 F.2d 244 (9th Cir. 1992)......................................................... 14, 16

Vess v. Ciba-Geigy Corp. USA, 317 F.3d 1097 (9th Cir. 2003)........................ 9, 21

Whitaker v. A&E Television Networks, 2009 WL 1383617 (Cal.
 App. 2009) ...................................................................................... 32, 33

White v. Samsung Electronics Am., Inc., 971 F. 2d 1395 (9th
 Cir. 1992).......................................................................................... 46, 47

Wilson v. Parker, Covert & Chidester, 28 Cal. 4th 811 (2002)..............................54

Winter v. DC Comics, 30 Cal. 4th 881 (2003) .................................................. 37, 38

## Statutes And Rules

28 U.S.C. §1291............................................................................................2, 3

28 U.S.C. §1332....................................................................................................2

Cal. Civ. Code §3344 .................................................................................. 42, 46

Cal. Civ. Proc. Code §425.16 ........................................................... passim

Cal. Civ. Proc. Code §425.17 ...............................................................................26

Cal. Ct. R. 8.1115................................................................................................32

Fed. R. App. P. 28................................................................................................62

Fed. R. App. P. 32.1.............................................................................................22

Fed. R. App. P. 4 ....................................................................................3

Fed. R. Civ. P. 56 ................................................................................20

Fed. R. Civ. P. 9 ..................................................................................61

Ninth Cir. R. 36-3 ...............................................................................22

## Other Authorities

Restatement (Second) of Conflict of Laws §145 (1971) ................................. 13, 18

Restatement (Second) of Conflict of Laws §15 (1971) ..........................................15

Restatement (Second) of Conflict of Laws §153 (1971) ........................................17

Restatement (Second) of Conflict of Laws §17 (1971) ..........................................15

<u>INTRODUCTION</u>

Appellant Sgt. Jeffrey S. Sarver ("Appellant") invites this Court to significantly curtail the right of screenwriters and filmmakers to draw upon real-life events as inspiration for characters in fictional works by finding that the Academy Award winning film, "The Hurt Locker" (the "Film") is not protected by the First Amendment.

Although the Film does not use Appellant's name, likeness or image, Appellant contends that Appellees (which include the Film's screenwriter, director, producers, financiers, and distributors) can be found liable for violating Appellant's right of publicity based upon generic similarities between himself and the Film's protagonist. Appellant's position has been rejected by the California Supreme Court, which recognizes that the values of free expression and artistic freedom protected by the First Amendment outweigh the state's interest in protecting the right of publicity when an expressive work contains significant "transformative" elements.

There can be no doubt that the Film is "transformative" and therefore protected by the First Amendment. The Film is a work of artistic expression that is the result of the talent and creative input of numerous individuals, including, but not limited to, the Film's screenwriter (Appellee Mark Boal), director (Appellee Kathryn Bigelow), producers, cast and even crew. The Film follows a fictional

1

protagonist as he participates in imaginary events that take place in the setting of the Iraq War. The protagonist speaks lines of invented dialogue with other fictional characters that were conceived and written by Boal. The Film was brought to life on the screen through the creative collaboration between the Film's director, Bigelow, with the Film's cast who all contributed their own individual artistic expression in the process. By any reasonable measure, the Film must be considered a "transformative" work of artistic expression that is protected by the First Amendment. Accordingly, this Court should affirm the District Court's decision dismissing Appellant's claims.

## JURISDICTIONAL STATEMENT

The District Court had subject matter jurisdiction over this action pursuant to 28 U.S.C. §1332(a), because at the time the Complaint was filed, Appellant was a citizen of the State of Tennessee and no defendant was a citizen of that State, and the amount in controversy exceeded $75,000.

With respect to Sarver v. Chartier, Ninth Circuit Case No. 11-56986, Appellant appeals from the District Court's Order Granting Defendants' Motions To Strike, which was entered on October 13, 2011. [Appellant's Excerpts of Record, volume 1, pages 37 through 58 ("1-ER:37-58").] That order resolved the entire proceeding before the District Court and is a final, appealable decision pursuant to 28 U.S.C. §1291. Appellant filed a notice of appeal of the District

2

Court's order on November 11, 2011. [2-ER:73-74.] The notice of appeal was timely pursuant to Fed. R. App. P. 4(a)(1)(A).

With respect to <u>Sarver v. Chartier</u>, Ninth Circuit Case No. 12-55429, Appellant appeals from the District Court's Order Denying Plaintiff's Motion For Stay Of Execution And Waiver Of Bond Pending Appeal, which was entered on February 2, 2012. [1-ER:5-10.] That order is final, appealable order pursuant to 28 U.S.C. §1291. Appellant filed a notice of appeal of the District Court's order on March 5, 2012. [2-ER:73-74.] The notice of appeal was timely pursuant to Fed. R. App. P. 4(a)(1)(A).

STATEMENT OF ISSUES

I.     Whether the District Court properly applied California substantive law to this lawsuit.

II.     Whether the District Court properly exercised its discretion to hear Appellees' special motions to strike made pursuant to Cal. Civ. Proc. Code §425.16, which were filed more than 60 days after the initiation of this lawsuit.

III.     Whether the District Court properly granted Appellees' special motions to strike pursuant to Cal. Civ. Proc. Code §425.16.

IV.     Whether Appellant abandoned his contention that the District Court erred by refusing to stay judgment enforcement efforts pending appeal (*i.e.* Ninth Circuit Case No. 12-55429) by failing to address this issue in his Opening Brief.

PRIMARY AUTHORITY

The primary authority cited in this brief, specifically Cal. Civ. Proc. Code §425.16, is set forth verbatim in the attached addendum.

STATEMENT OF FACTS

Appellant was an explosive ordnance disposal ("EOD") technician in the United States Army. [2-ER:113, ¶¶2,4.] In July 2004, Appellant was deployed to Iraq as part of the Army's 788th Ordnance Company. [2-ER:113, ¶5.] Appellant was one of approximately 150 EOD technicians stationed in Iraq at that time. [2-ER:113, ¶8.] His primary mission was to identify and dispose of improvised explosive devices ("IEDs"). [2-ER:113, ¶7.]

Appellee Mark Boal was a journalist embedded with various units serving in Iraq during 2004, including approximately 14 days with Appellant's unit, during which time Boal photographed Appellant and interviewed him at length. [2-ER:154, ¶3.] The purpose of Boal's embedment was to research EOD teams working in Iraq. [2-ER:154,158, ¶¶3,13.] Boal also visited and interviewed Appellant in Wisconsin in early 2005. [2-ER:116, ¶23.] Appellant was not the only EOD technician Boal interviewed in connection with his EOD research; Boal interviewed more than 60 military personnel who were involved in explosive ordnance disposal. [2-ER:155, ¶7.] After his embedment, Boal wrote a nonfiction article about EOD technicians that focused on Appellant and his experiences in

4

Iraq. [2-ER:154-155, ¶¶2-4.] That article was published in *Playboy* magazine in August 2005 (the "*Playboy* Article"), and an abridged version appeared in *Reader's Digest* in 2006. [2-ER:154-155, ¶¶2,6.]

Boal also wrote the screenplay for the Film. [2-ER:155, ¶7.] The Film is objectively a fictional work with all of the material events conceived from Boal's imagination. [2-ER:155-157, ¶¶7-8.] Key elements of the Film are also drawn from military history and other literary works. [2-ER:157-158, ¶¶9-10.]

The Film's plot centers around an EOD team deployed in Iraq. [2-ER:155-157, ¶¶7-8.] The Film's fictional protagonist, Sgt. William James, is an Army EOD technician thrust into a leadership role after the team's former leader was killed by an explosion. [2-ER:155-157, ¶8.] James is a colorful character inspired by many different people. [2-ER:155, ¶7.] Although Appellant believes that a number of James' traits and experiences depicted in the Film mirror his own, in fact, many are generic traits that describe numerous armed services personnel. [2-ER:121-124, ¶44.] James also exhibits many traits and experiences that do not resemble Appellant in any way. [2-ER:155-157, ¶8; 2-ER:124-125, ¶45.]

The Film was primarily shot outside of the United States, in locales that include Jordan and Canada. [Supplemental Excerpts of Record, page 10 ("SER:10"), ¶10.] Appellees are based almost exclusively in Southern California. [SER:9-10, ¶¶4-8; SER:5, ¶3; SER:7, ¶2; SER:2, ¶3; 2-ER:175-176, ¶¶3-14.] Pre-

5

production, domestic production work, and post-production work for the Film were all performed in Southern California. [SER:10, ¶10.]

The Film initially premiered at overseas film festivals. [SER:10-11, ¶13.] It first premiered in the United States in theaters in Los Angeles and New York. [SER:10-11, ¶13.] At the time of the Film's U.S. premiere, Appellant was stationed at the Picatinny Arsenal in New Jersey. [2-ER:119, ¶34.] On June 26, 2009, Appellant travelled with other service members to attend the Film's premiere in New York. [2-ER:119-120, ¶35.] The Film eventually had a limited theatrical release throughout the U.S., including a handful of theaters in New Jersey during July and August of 2009, although Appellant does not claim to have seen the Film in New Jersey. [SER:10-11, ¶13; SER:15, ¶6-7.] Appellant was transferred to Fort Campbell in Tennessee in September, 2009. [2-ER:120, ¶38.]

## STATEMENT OF THE CASE

Appellant filed this action on March 2, 2010 in the District of New Jersey. [2-ER:174-199.] Appellant claims that by writing, producing and distributing the Film, all of the Appellees misappropriated Appellant's name and likeness, defamed him and invaded his privacy by depicting him in a negative, false light, intentionally inflicted emotional distress upon him, violated the terms of the Defense Department's embedment guidelines, and intentionally, constructively and negligently defrauded him. [2-ER:174-199.]

6

Appellees initially moved to dismiss Appellant's Complaint, or in the alternative, to transfer the action to California. [1-ER:62-70.] The New Jersey District Court granted Appellant's motions to transfer venue made pursuant to 28 U.S.C. §1404(a). [1-ER:70.] In deciding to transfer the action to California, the New Jersey District Court denied Appellants motions to dismiss pursuant to Fed. R. Civ. P. 12(b)(2) and 12(b)(3). [1-ER:62-70.] The court did not address or otherwise rule on the merits of Appellees' motions to dismiss pursuant to Fed. R. Civ. P. 12(b)(6). [1-ER:62-70.]

Upon transfer of the action to the Central District, Appellees filed special motions to strike pursuant to Cal. Civ. Proc. Code §425.16, California's Strategic Lawsuit Against Public Policy ("SLAPP") statute. [1-ER:39.]

The District Court issued a tentative ruling, heard oral argument from the parties, and took the matter under submission. [1-ER:26-36,40; 2-ER:75-105.] Ultimately, the District Court determined that Appellant could not meet his burden of proof on any of his claims. [1-ER:45-51.] The District Court granted Appellees' SLAPP Motions, striking the entirety of Appellant's Complaint. [1-ER:37.] The District Court also awarded Appellees their reasonable attorneys fees

pursuant to Cal. Civ. Proc. Code §425.16(c).[1]  [1-ER:58.]  The Court later entered Judgment in favor of Appellees.  [1-ER:1-4,11-12.]

After the District Court awarded Appellees their reasonable attorneys' fees, Appellant moved for a stay of enforcement pending appeal and waiver of posting a *supersedeas* bond.  [1-ER:6.]  The District Court found that there was no factual or legal basis for Appellant's request and denied Appellant's motion in its entirety.  [1-ER:6-10; 1-ER:10.]  Although Appellant filed a notice of appeal that specifically referred to the Court's denial of this motion, Appellant took no other steps to pursue a stay of enforcement.  [2-ER:71-72.]

## STANDARD OF REVIEW

I.    This Court reviews the District Court's decision to apply California law *de novo*.  Schoenberg v. Extradora de Sal, S.A. de C.V., 930 F.2d 777, 782 (9th Cir. 1991).

II.    This Court reviews the District Court's decision to hear a special motion to strike made pursuant to Cal. Civ. Proc. Code §425.16 and filed more than 60 days after the initiation of the lawsuit for abuse of discretion.  See Cal. Civ.

---

[1]  Neither of Appellant's notices of appeal challenged the District Court's order granting Appellees' motions for attorneys' fees.  The fee awards themselves therefore are not subject to appellate review.

8

Proc. Code §425.16(f); <u>Chitsazzahdeh v. Kramer & Kaslow</u>, 199 Cal. App. 4th 676, 684 (2011).

III.  This Court reviews the District Court's order granting Appellees' special motion to strike made pursuant to Cal. Civ. Proc. Code §425.16 *de novo*. <u>Vess v. Ciba-Geigy Corp. USA</u>, 317 F.3d 1097, 1102 (9th Cir. 2003).

<u>SUMMARY OF ARGUMENT</u>

Through his appeal in Ninth Circuit Case No. 11-56986, Appellant contends that the District Court erred in granting the SLAPP Motions.  First, Appellant contends that the District Court should have applied New Jersey law to this action, which effectively would have barred the SLAPP Motions because New Jersey does not have a SLAPP statute.  However, the District Court correctly employed New Jersey's choice of law rules and correctly determined that California substantive law applies to this action.  The District Court's  finding is supported by the fact that New Jersey is not where Appellant's injury occurred, Appellant was not domiciled in New Jersey, California is the place where Appellees' produced the Film, the vast majority of the parties reside in California, and New Jersey is not the place where the parties' relationship was centered.

Second, Appellant contends that the SLAPP Motions are untimely because they were filed more than 60 days after the initiation of the lawsuit in New Jersey.  However, the Ninth Circuit has determined that this procedural provision "directly

collides" with certain provisions of the Federal Rules of Civil Procedure and, therefore, the 60 day time frame should not apply to federal actions. Moreover, Cal. Civ. Proc. Code §425.16(f) expressly permits a court in its discretion to hear later-filed motions. Here, the District Court did not abuse its discretion in hearing the SLAPP Motions given the posture of the action at the time, and the absence of any demonstrable prejudice to Appellant.

Third, Appellant contends that the District Court erred in ultimately granting the SLAPP Motions. Yet in reaching its decision, the District Court properly employed the required two-step analysis, first determining that Appellees' creation, production and distribution of the Film was conduct in furtherance of free speech related to an issue of public concern, and then concluding, based on the evidence presented, that Appellant had failed to demonstrate the probability of prevailing on any of his claims.

Through his appeal in Ninth Circuit Case No. 12-55429, Appellant contends that the District Court erred in denying Appellant's Motion For Stay Of Execution And Waiver Of Bond Pending Appeal. However, Appellant's failure to brief the issue constitutes an abandonment of this issue on appeal. In addition, the relief Appellant seeks through that appeal is moot at this stage of the litigation, because this Court will decide the substantive merits of Appellant's appeal (*i.e.* the propriety of the District Court's dismissal of Appellant's claims) at the same time

10

the Court reviews the District Court's denial of Appellant's motion for stay. For these reasons, Appellees respectfully ask this Court to affirm the District Court's denial of Appellant's request for a stay.

## LEGAL ARGUMENT

I.   THE DISTRICT COURT PROPERLY APPLIED CALIFORNIA LAW TO THIS CASE AND PROPERLY EXERCISED ITS DISCRETION TO HEAR THE SPECIAL MOTIONS TO STRIKE.

### A.   California Law Applies To This Case.

Appellant filed this lawsuit in New Jersey despite that neither he, nor any of the defendants, were residents of New Jersey at the time. The New Jersey District Court determined that this lawsuit should be resolved in California and transferred it to the Central District of California. [1-ER:68-70.] Appellant did not seek review of the transfer order.

Appellees filed their SLAPP Motions in the Central District, and argued that California law applies to this case. [1-ER:40-41.] Appellant claims the District Court erred in applying California law for two reasons. First, Appellant argues that, because Appellees cited New Jersey law, not California law, in their initial motions to transfer venue and dismiss the lawsuit filed in the New Jersey District Court, Appellees consented to application of New Jersey law. [AOB:8,17.] Appellant's argument contravenes the law of this Circuit and must be summarily rejected. General Signal Corp. v. MCI Telecomm. Corp., 66 F.3d 1500, 1505 (9th

11

Cir. 1995) (holding that defendant's reliance on California law for first 21 months of the case did not bar later determination that New York law applied, where choice of law issue had not previously been decided and there was no evidence of intentional delay). The New Jersey District Court did not determine which State's substantive law applies, leaving the issue to be decided in the Central District.

Second, Appellant argues that in choosing to apply California substantive law to his action, the District Court failed to apply – or at a minimum incorrectly applied – New Jersey's choice of law rules. It is, however, Appellant who has misconstrued the law and critical facts, and whose analysis disregards most of the New Jersey rules' essential factors.

> 1. New Jersey Choice Of Law Rules Required The District Court To Utilize A Four-Factor Test To Determine Which State's Laws Govern The Case.

The choice of law analysis is governed by New Jersey's choice of law rules because Appellant initially filed this lawsuit in New Jersey and the action was transferred to California for convenience. Newton v. Thomason, 22 F.3d 1455, 1459 (9th Cir. 1994). New Jersey recently adopted the choice of law standards set forth in the Restatement (Second) of Conflict of Laws through the New Jersey Supreme Court's decision in P.V. *ex rel.* T.V. v. Camp Jaycee, 197 N.J. 132 (2008). Id. at 142-143.

12

Appellant's Complaint consists of six tort claims and a single breach of contract claim. [2-ER:174-199.] Under the Restatement's test, "[t]he rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties." Restatement (Second) of Conflict of Laws §145(1) (1971). To make this determination, the Court must weigh the following four factors: (a) the place where the injury occurred; (b) the place where the conduct causing the injury occurred; (c) the domicile, residence, nationality, place of incorporation and place of business of the parties; and (d) the place where the relationship, if any, between the parties is centered. Id. at §145(2).

Appellant's Opening Brief does not address these four factors. Instead, Appellant incorrectly argues that New Jersey law presumptively applies because New Jersey was Appellant's domicile and because New Jersey is the place where Appellant's "injury" purportedly occurred. Appellant is wrong as a matter of fact and law.

2.     Appellant Was Not Domiciled In New Jersey When The Film Was Released.

Appellant erroneously asserts that he was domiciled in New Jersey at the time of the Film's release, and therefore, New Jersey law presumptively applies to this case. [AOB:14-15.] Appellant supports this contention by claiming, for the

13

first time on appeal, that he lived in New Jersey for two years. [AOB:14.] Appellant did not offer evidence of this purported "fact" to the District Court. To the contrary, the record discloses that Appellant was in New Jersey for a period of just over two months. [2-ER:119-120, ¶¶35,38.] Accordingly, Appellant's belated and factually unsupported claim must be disregarded by this Court. N/S Corp. v. Liberty Mut. Ins. Co., 127 F.3d 1145, 1146 (9th Cir. 1997) (striking brief, in part, due to assertion of facts that were not supported by the record); U.S. ex rel. Robinson Rancheria Citizens Council v. Borneo, Inc., 971 F.2d 244, 248 (9th Cir. 1992) (appellate courts generally "will not consider facts outside the record developed before the district court").

As important, Appellant submitted a sworn declaration to the District Court that contradicts his assertion that he was domiciled in New Jersey. Appellant declared under oath that he "was stationed" at the Picatinny Arsenal in Dover, New Jersey until he "was transferred" to Fort Campbell in Tennessee. [2-ER:119-120, ¶¶33-34,38.] The relevant law mandates that Appellant was not domiciled in New Jersey, even though he may have been stationed there around the time of the Film's release.

As a serviceman, Appellant is compelled to live in certain places. Comment d to Section 17 of the Restatement (Second) of Conflict of Laws specifically addresses this issue, explaining that, "a soldier … if he is ordered to a station to

14

which he must go and live in quarters assigned to him, will probably not acquire a domicile there though he lives in the assigned quarters with his family. He must obey orders and cannot choose to go elsewhere." Restatement (Second) of Conflict of Laws §17, cmt. d (1971); Restatement (Second) of Conflict of Laws §15(1) (1971) ("A domicile of choice may be acquired by a person who is legally capable of changing his domicile"). The relevant commentary further explains that a soldier may only acquire a domicile in such circumstances if the soldier "is allowed to live with his family where he pleases provided it is near enough to his post to enable him to perform his duties." Restatement (Second) of Conflict of Laws §17, cmt. d. Appellant's admission that he was stationed in New Jersey directly contradicts any argument that he lived "where he please[d]."

To find that Appellant was domiciled in New Jersey would require additional supporting facts that are not in the record. Appellant failed to provide the District Court with specific information that would allow a determination that New Jersey was, in fact, Appellant's domicile, such as his voting registration and voting practices, location of his personal and real property, location of his brokerage and bank accounts, location of his spouse and family, membership in unions and other organizations, his place of employment or business, his driver's license and automobile registration, and where he pays taxes. See, e.g., Lew v. Moss, 797 F.2d 747, 750 (9th Cir. 1986); McCann v. Newman Irrevocable Trust,

15

458 F.3d 281, 286 (3d Cir. 2006).   Therefore, Appellant is not entitled to a presumption that New Jersey law applies to this case based on his domicile.

### 3.      Appellant's Claimed Injury Did Not Occur In New Jersey.

Based upon his unsupported claim to have been domiciled in New Jersey during the relevant time period, Appellant also asserts that his alleged injury occurred in New Jersey.  Specifically, Appellant claims that his domicile "is likely most significant as the place where [Appellant] suffered the most reputational injury."  [AOB:14.]  However, as discussed above, New Jersey is not Appellant's domicile, and there is no evidence to demonstrate that Appellant's supposed "injury" occurred there.

Appellant asserts that "New Jersey was the state where [Appellant] was best known to his Army cohorts when 'The Hurt Locker' was released," and it was where "his fellow servicemen best knew of him and his EOD job with the Army." [AOB:14.]  These purported "facts" should be disregarded because they are not in the record.  N/S Corp., 127 F.3d at 1146 (striking brief where facts were not supported by the record); U.S. ex rel. Robinson Rancheria Citizens Council, 971 F.2d at 248 (refusing to "consider facts outside the record").

Appellant made very different claims regarding his purported injury before the District Court.  There, Appellant claimed that the alleged use of his likeness in the Film put him at "increased risk of harm and/or death" in any theater of combat,

16

prevented him from assuming leadership roles in the Army, caused him fear "of whether [his] peers will no respect / protect [him] in the theater of war," and caused him concern about how his son may react to scenes in the Film if his son were to see it. [2-ER:125, ¶46.] By their nature, these injuries could not have occurred in New Jersey.[2]

Moreover, Appellant did not even view the Film in New Jersey. Appellant admitted he travelled to New York with other service members to attend the Film's premiere on June 26, 2009.[3] [2-ER:119-120, ¶35.] Therefore, if Appellant was injured at the time he viewed the Film (which he was not), that injury occurred at the Film's premiere in New York.

Finally, Appellant's primary claim is that Appellees misappropriated his likeness through the Film. This claim is a form of invasion of privacy. For invasion of privacy claims, the Restatement (Second) of Conflict of Laws §153 (1971) urges use of the "local law of the state which, with respect to the particular

---

[2] As well, Appellant's alleged injury and damages to his standing among friends, family and military peers would necessarily occur where Appellant is deployed or lives (*i.e.*, Tennessee), or where Appellant's friends, family and military peers live. [2-ER:175,188, ¶¶1,69; 2-ER:125, ¶46.]

[3] This fact sets this lawsuit apart from the authorities Appellant cites in his Opening Brief, including Prager v. American Broadcasting Cos., Inc., 569 F. Supp. 1229 (D.N.J. 1983), which indicate that the plaintiff saw the offending broadcast in his state of domicile. See id. at 1232-1233.

issue, has the most significant relationship to the occurrence and the parties." [AOB:14-15.] That state is California because the Film's pre-production, domestic production work, and post-production work were all done in California by Appellees. [SER:9-10, ¶4-8, 10; SER:5, ¶3; SER:7, ¶2; SER:2, ¶3; 2-ER:175-176, ¶¶3-14.] Therefore, California has a stronger relationship to Appellant's claimed injury than does New Jersey.

        4.    <u>The Remaining Factors To Be Considered In Connection With Choice Of Law All Favor Application Of California Law.</u>

All of the other choice of law factors that must be considered favor application of California law over New Jersey law. The following additional factors are: (a) the place where the conduct causing the injury occurred; (b) the domicile, residence, nationality, place of incorporation and place of business of all parties to the lawsuit; and (c) the place where the relationship between the parties is centered. <u>Restatement (Second) of Conflict of Laws</u> §145(2) (1971). Appellant ignores these factors in his Opening Brief, likely because they do not support his assertion that New Jersey substantive law applies to his claims.

First, if Appellant suffered an injury, the place where the conduct causing the injury occurred was California. Pre-production, domestic production work, and post-production work for the Film were all performed in Southern California. [SER:10, ¶10.] And, although other conduct leading to Appellant's alleged

injuries occurred outside of California, it did not occur in New Jersey. For example, the Film was primarily shot outside of the United States in locales such as Jordan and Canada, and no part of the Film's production took place in New Jersey. [SER:10, ¶10.] The Film initially premiered at overseas film festivals. [SER:10-11, ¶13.] Boal met Appellant and witnessed Appellant's missions in the field while Boal was embedded with Appellant's unit in Bagdad, Iraq. [2-ER:154, ¶3.] Boal and Appellant met again after Appellant returned from Iraq while Appellant was living in Wisconsin in early 2005. [2-ER:116, ¶23.] Accordingly, California has a far more significant relationship to the conduct that allegedly caused Appellant's injuries than does New Jersey. Indeed, none of the conduct occurred in New Jersey.

Next, the vast majority of the parties are residents of California, and none are residents of New Jersey. Appellant concedes that the Film's director, producers, financiers, and distributor are all located in California. [2-ER:175-176, ¶¶3-14.] Similarly, the business entities Appellant sued were formed under the laws of the state of California. [SER:9-10, ¶¶4, 7; SER:2, ¶3.] Appellant was stationed in Tennessee at the time he filed the Complaint. [2-ER:175, ¶1.] Again, this factor tips heavily in favor of California.

Finally, New Jersey is not the place where the relationship between the parties is centered. None of the Appellees had any relationship at all with the

Appellant, with the arguable exception of Boal, and no aspect of that "relationship" had any connection to New Jersey. Boal met Appellant and witnessed his field missions in Bagdad, Iraq. [2-ER:154, ¶3.] Boal also met with and interviewed Appellant in Wisconsin, following Appellant's tour of duty in Iraq. [2-ER:116, ¶23.] While this factor does not weigh in favor of the application of California law, neither does it support the application of New Jersey law.

The aggregate of "relationship" factors dictate that this action has a more significant relationship to California than New Jersey. Therefore, the District Court properly determined that California substantive law applies to this case.

 B. Federal Courts Should Not Enforce The 60-Day Timeframe Set By Cal. Civ. Proc. Code §425.16(f).

Appellant argues that the SLAPP Motions were untimely based upon a procedural provision of Cal. Civ. Proc. Code §425.16(f), which provides that a SLAPP motion "may" be brought within 60 days. [AOB:16-20.] However, federal courts view the 60-day timeframe set by Cal. Civ. Proc. Code §425.16(f) as a procedural aspect of the statute, not a substantive aspect. The Ninth Circuit has determined that this procedural provision "directly collides" with the Federal Rule of Civil Procedure 56(d).[4] Metabolife Int'l, Inc. v. Wornick, 264 F.3d 832, 846-

---

[4] Revisions to Fed. R. Civ. P. 56 took effect in December 2010. Prior to the 2010 amendments, current subsection (d), which pertains to discovery necessary for a

847 (9th Cir. 2001). Due to the conflict, federal courts should not enforce the 60 day deadline. Id.; Vess, 317 F.3d at 1109 (recognizing the collision with Rule 56). These authorities indicate that Appellees could have filed their SLAPP Motions at any reasonable time.

C.     The District Court Properly Exercised Its Discretion To Hear Appellees' Motions To Strike.

Even if Section 425.16(f) is applicable in federal diversity actions such as this one, the fact that Appellees did not file their SLAPP motions within 60 days of the initiation of the lawsuit did not bar the motions; it merely put the decision of whether to hear them within the District Court's discretion. Cal. Civ. Proc. Code §425.16(f) provides, in part, that a defendant "may" file a special motion to strike "within 60 days of the service of the complaint." That 60-day timeframe is not jurisdictional and merely sets a timeframe in which a defendant can file such a motion as a matter of right. Lam v. Ngo, 91 Cal. App. 4th 832, 840 (2001) (explaining that the nonjurisdictional nature of the time limit, emphasized by the statute's use of the permissive phrase "may"). Indeed, Section 425.16(f) affirmatively recognizes a court's broad discretion to hear a special motion to

---

party to oppose summary judgment, had been labeled as subsection (f). Thus, pre-2010 caselaw refers to subsection (f) when discussing this issue.

strike "at *any* later time upon terms it deems proper." Cal. Civ. Proc. Code §425.16(f) (emphasis added).

Caselaw confirms the breadth of the District Court's discretion. As this Court stated earlier this year, "We rarely question a district judge's discretion when applying the local rules, . . . and the language of § 425.16(f) (motion 'may be filed . . ., in the court's discretion, at any later time upon terms it deems proper') plainly allows a district judge to determine when a motion is timely filed." Hampton-Stein v. Aviation Fin. Group, LLC, No. 10-56537, 2012 WL 892455, *2 (9th Cir. Mar. 16, 2012) (affirming district court's order granting an SLAPP motion and finding "the district court did not abuse its discretion in refusing to deny" the motion, which was filed more than 60 days after commencement of the lawsuit) (internal citations omitted);[5] see also Morin v. Rosenthal, 122 Cal. App. 4th 673, 681 (2004) ("even though we might have exercised the statutory discretion differently had it been ours, we cannot say the trial court's decision 'exceeds the bounds of reason, all of the circumstances before it being considered'"). So broad is the latitude given to the trial court, a defendant need not seek leave before submitting a later filed motion. Chitsazzahdeh, 199 Cal. App. 4th at 684 (holding that a trial "court has the discretion to consider, and grant or deny on the merits, a special motion to

---

[5] Appellees cite this decision for its persuasive, not precedential, effect in accordance with Fed. R. App. P. 32.1 and Ninth Cir. R. 36-3.

strike filed after the 60-day deadline even if the moving defendant fails to request leave of court").

Section 425.16(f) does not identify any specific factors a court must consider when deciding whether to hear a SLAPP motion filed more than 60 days after a complaint is filed. The absence of limiting criteria in the statute evidences the District Court's wide latitude to make its determination based on any relevant circumstances at issue. For example, in New.net, Inc. v. Lavasoft, a case the District Court cited to support its decision to hear Appellees' SLAPP motions, the court looked at such factors as whether the case had "proceeded in any material respect," whether it was "prudent" for the defendant to file the motion after the initial 60 days, and whether the later filing prejudiced the plaintiff. New.net, Inc., 356 F. Supp. 2d 1090, 1100-1101 (C.D. Cal. 2004). More recently, in Chitsazzadeh, the California Court of Appeal commented that trial courts "may very well elect to [consider later filed motions] if it appears that the motion has merit," indicating that the relative strength of the motion may factor into the court's analysis. Chitsazzahdeh, 199 Cal. App. 4th at 684.

Here, Appellant cites no facts that would suggest the District Court abused its discretion in hearing Appellees' motions eight months into the lawsuit, and indeed, there was no abuse of discretion. The District Court articulated an explicit basis for choosing to hear Appellees' motions when it did. Succinctly stated, the

District "Court exercise[d] its discretion to review the Motions, as the case has not proceeded in any material respect." [1-ER:43.] Appellant offers nothing to the contrary, nor could he. The only substantive issue addressed in the lawsuit prior to Appellees' SLAPP Motions was the propriety of transferring the case to California.[6] Legally, this particular factor, *i.e.* the stage of the case at the time the motion is made, is a valid legal basis for the District Court to exercise discretion to hear Appellees' motions. New.net, Inc., 356 F. Supp. 2d at 1100-1101. Appellant did not argue, and he has not offered any evidence demonstrating, that he suffered any prejudice as a result of the timing of the SLAPP Motions.

In addition, the District Court certainly recognized the merits of Appellees' motions, providing an additional, implicit basis for entertaining them despite the timing of their filing. Chitsazzahdeh, 199 Cal. App. 4th at 684 (concluding that the merits of the motion may provide a basis to hear a later filed motion). Indeed, the District Court ultimately granted Appellees' SLAPP Motions in their entirety, dismissing each of Appellant's claims.

---

[6] For this reason, the caselaw Appellant cites is inapposite. For example, in Kunysz v. Sandler, the trial date was a mere six weeks away when the defendant filed his motion. Kunysz, 146 Cal. App. 4th 1540, 1542 (2007). In Platypus Wear, Inc. v. Goldberg, the appellate court noted that by the time the trial court heard defendant's SLAPP motion, the "discovery cut-off date had already passed, and the trial was scheduled to begin in a week." Platypus Wear, Inc., 166 Cal. App. 4th 772, 784 (2008).

II.   THE DISTRICT COURT PROPERLY DISMISSED EACH OF
      APPELLANT'S CLAIMS PURSUANT TO CAL. CIV. PROC. CODE
      SECTION 425.16.

California's SLAPP statute allows a court to strike any "cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution."  Cal. Civ. Proc. Code §425.16(b)(1).  Courts evaluate a SLAPP motion in two steps.  First, the moving party, in this case Appellees, must make a threshold, *prima facie* showing that the acts of which the plaintiff (here Appellant) complains were taken in furtherance of Appellees' right of free speech as defined in the statute.[7]  If the court finds that such a showing has been made, the burden then shifts to Appellant to demonstrate a probability of prevailing on the claims; *i.e.*, Appellant must demonstrate that his Complaint is both legally sufficient and supported by a sufficient *prima facie* showing of facts to sustain a favorable judgment if the evidence submitted by Appellant is credited.  Hilton v. Hallmark Cards, 599 F.3d 894, 903 (9th Cir. 2010); Equilon Enter., LLC v. Consumer Cause, Inc., 29 Cal. 4th 53, 67 (2002).

---

[7]  A cause of action's label is of no consequence; the critical consideration is whether a claim is based on a defendant's exercise of free speech.  City of Cotati v. Cashman, 29 Cal. 4th 69, 78 (2002).

Below, the District Court correctly found that Appellees' creation, filming, production and distribution of the Film fell within the ambit of Cal. Civ. Proc. Code §425.16(e). The District Court also properly determined that Appellant failed to meet his burden of showing that his claims have merit.

A.    Appellees Were Engaged in the Exercise of Free Speech In Connection With A Public Issue.

Cal. Civ. Proc. Code §425.16(e) enumerates four categories of acts deemed to be "in furtherance of" free speech. The two categories relevant to this action are: (i) any "conduct in furtherance of the exercise of the constitutional . . . right of free speech in connection with a public issue or an issue of public interest," and (ii) "any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest." Cal. Civ. Proc. Code §§425.16(e)(3) and (e)(4).

The creation, production and distribution of a motion picture are prototypical acts in furtherance First Amendment-protected speech.[8] Polydoros v. Twentieth Century Fox Film Corp., 67 Cal. App. 4th 318, 323-324 (1997) (quoting Joseph Burstyn, Inc. v. Wilson, 343 U.S. 495, 501-502 (1952)) (motion pictures, including fictional films, are "a 'significant medium for the communication of ideas'"

---

[8] The SLAPP statute is expressly applicable to actions "based upon the creation, dissemination [and] exhibition . . . of any . . . motion picture." Cal. Civ. Proc. Code §425.17(d)(2).

entitled to full First Amendment protection).  Appellant nonetheless argues that the Film does not raise a "public issue" or an "issue of public interest."  Appellant is wrong.

"The definition of 'public interest' within the meaning of [the SLAPP statute] has been broadly construed."  Damon v. Ocean Hills Journalism Club, 85 Cal. App. 4th 468, 481 (2000).  Any issue in which the public takes an interest is one of "public interest," and the topic need not be subjectively important or otherwise "significant."[9]  Nygard, Inc. v. Uusi-Kerttula, 159 Cal. App. 4th 1027, 1042 (2008) (former employee's statements about his work experience for a celebrity were of public interest; even "tabloid issues" qualify as public interests).  Indeed, courts have found certain motion pictures themselves to be matters of public interest.  E.g. Kronemyer v. Internet Movie Data Base, Inc., 150 Cal. App. 4th 941, 949 (2007) (the film "My Big Fat Greek Wedding" constituted "a topic of widespread public interest" because it was "a successful independent motion picture").  The speech does not have to advocate a specific position on the subject at issue; it is enough that the speech "contributed to the general debate of the pros and cons of" a subject of public interest.  Gilbert v. Sykes, 147 Cal. App. 4th 13,

---

[9]  A statement need not be of interest to *every* member of the public.  Statements of interest only to a specific segment of the public still qualify for protection.  E.g. Traditional Cat Ass'n, Inc. v. Gilbreath, 118 Cal. App. 4th 392, 397 (2004) (cat breeding community); Damon, 85 Cal. App. 4th at 479 (homeowners' association).

24 (2007) (review of internet website posting information about plastic surgery); Kronemyer, 150 Cal. App. 4th at 949 (speech is protected if it in some manner "contributes to the public debate").

Here, the Film tells a fictional story about a team of EOD technicians stationed in Iraq who spend their days going from one bomb disposal mission to another, hoping to survive until their deployment ends. The Film generated a great deal of public discussion about the war in Iraq and the omnipresent danger of the "improvised explosive devices" ("IEDs") used by insurgents. The Film garnered widespread public attention when it was nominated for nine Academy Awards and won six, including for Best Picture.

The war in Iraq is, without question, a matter of public interest and a public issue.[10] The war has been covered extensively by all major news outlets since its inception. Indeed, Appellant admits that the Defense Department promoted embedment of news reporters which allowed for unprecedented media coverage and gave the public a near first-hand look at the war in real time. [2-ER:179-180,

_____

[10] At least one California court determined that the Iraq war is a topic of public concern for the purposes of a SLAPP motion. Four Navy Seals v. Associated Press, 413 F. Supp. 2d 1136, 1149 (S.D. Cal. 2005). Although they were not reviewing a SLAPP motion, other courts also have found the Iraq war to be a matter of "public interest." E.g., Hiken v. Dept. of Defense, 521 F. Supp. 2d 1047, 1056 (N.D. Cal. 2007) (Freedom of Information Act request); Mayer v. Monroe County Cmty. Sch. Corp., 1:04-cv-1695-SEB-VSS, 2006 WL 693555, *11 (S.D. Ind. Mar. 10, 2006) (discussion about the Iraq war was a matter of public interest).

28

¶¶27-29.]  The prevalence of IEDs in Iraq and the dangers EOD technicians face in disarming them[11] is merely a more specific focus on one aspect of the Iraq war, and is just as much a public issue and a matter of public interest as the war in general.

Appellant argues that the District Court erred by taking a broad view of whether the Film, and the conduct related to its creation and production, is connected to a public issue.  Appellant contends that the query is limited to whether the purported use of Appellant's *persona* bears on an issue of public interest.  This approach improperly divorces individual bits and pieces of the Film from the overall context, and ignores the scope of the conduct at issue in this case.  It also directly contradicts the scope of the conduct Appellant put at issue by alleging that his claims stem from the overall "writing, filming, production and distribution" of the Film.  [2-ER:189-191,194-195, ¶¶71,76,79,93.]

Recent decisions denounce the very tactic Appellant attempts to take here.  In Tamkin v. CBS Broadcasting, Inc., 193 Cal. App. 4th 133 (2011), the plaintiffs similarly claimed that they were defamed through the use of their names and

---

[11]  In their briefing to the District Court, Appellees referenced Department of Defense statistics that explosive devices caused 2,195 deaths and 21,583 injuries to U.S. troops in Operation Iraqi Freedom (abbreviated "OIF" in the reports), significantly more than any other cause of death or injury in theater, so much so that a soldier was almost nine times more likely to be injured by an explosive device than a gunshot.  These statistics, published as "Casualty Summary by Reason Code (As of November 10, 2010)," are publically available at: http://siadapp.dmdc.osd.mil/personnel/CASUALTY/gwot_reason.pdf.

personas in an episode of CBS's popular television show *CSI: Crime Scene Investigation*. However, the <u>Tamkin</u> court refused to look solely at defendants' use of the plaintiffs' names or personas. Rather, the court examined how the use of the plaintiffs' names and personas "furthered" the defendants' broad "exercise of their right of free speech in connection with an issue of public interest," and more specifically whether "defendants demonstrated that their challenged conduct was in furtherance of the creative process of developing and broadcasting" the television episode. <u>Id.</u> at 143-144. The court held that it must examine the conduct as a whole "and to inquire whether that conduct furthered such defendants' exercise of their free speech rights concerning a matter of public interest. The court found no requirement in the SLAPP statute that the plaintiff's persona itself be a matter of public interest in order to find that the conduct falls within the scope of Section 425.16.[12] <u>Id.</u>

---

[12] In so holding, the court specifically "disagree[d] that defendants' acts are not entitled to protection of the anti-SLAPP statute because it was not necessary for [defendant] to use real [plaintiffs'] names as placeholders for guest characters when she could have created fictional names." <u>Id.</u> at 144. The <u>Tamkin</u> court determined that holding otherwise would interfere with defendants' "creative process [which] must be unfettered." <u>Id.</u> This finding squares with California authority holding that similarities between the "personal experiences" of a real person and a fictional character *did not* support a right of publicity claim. <u>Polydoros</u>, 67 Cal. App. 4th at 322-323 (holding that all fictional works spring from an "acorn" of fact).

The same rationale applies here. The fictional personality of the Film's protagonist and the events he faces within the context of the Film are, by their very nature, an essential part of the writing, filming and production of the Film, making them clear acts in furtherance of Appellants' right to free speech. The Film is about issues of public interest, including the Iraq war, the dangers posed by IEDs, and the dangers faced by those whose job it is to defuse them. The elements of the Film that Appellant puts at issue through his claims are directly related to the Film's issues of public interest.[13] Specifically, how the fictional James character handled IED missions,[14] how he coped with the dangers faced by soldiers at war, generally, and EOD personnel in Iraq, specifically, how he interacted with others

---

[13] For this reason, Appellant's reliance on Dyer v. Childress, 147 Cal. App. 4th 1273 (2007), is unavailing. Dyer is inapposite because, while the Dyer court found that the particular speech at issue did not tie to any significant issue of public interest (see id. at 1280), here, the allegations that form the basis for Appellant's Complaint go to the heart of those aspects of the Film that give rise to issues of public interest.

[14] Appellant avers that the Film's character handles the "same EOD missions" that Appellant did. [2-ER:121-124, ¶44.f.] Appellant also contends that the Film's character is like him because he disarmed more IEDs than any other soldier, severed communications while disarming IEDs, once discharged his pistol at a vehicle, once took off his bomb suit while disarming an IED, shot and killed Iraqi insurgents, found a bomb placed in a dead body, saw a fellow soldier killed by an IED, and encountered a suicide bomber. [2-ER:121-124, ¶44.m,o-s,v-aa.]

31

while in Iraq,[15] and how his time in Iraq affected his personal life,[16] are unquestionably integral elements of the Film and the story it tells. These are all unquestionably issues of public interest. The manner in which those events are portrayed in the Film cannot be reasonably separated from the Film's overall message.

The legal authorities Appellant relies upon to support his argument miss the mark. Appellant heavily relies on Whitaker v. A&E Television Networks, 2009 WL 1383617 (Cal. App. 2009). Pursuant to Cal. Ct. R. 8.1115(a), a rule which prohibits citation to or reliance upon appellate decisions not certified for publication, that unpublished decision cannot be used in the manner Appellant employs. Whitaker is also factually and legally distinct. There, the documentary film at issue used actual pictures of the plaintiff, yet those images had nothing to do with the public issue addressed in the documentary, *i.e.*, the HIV/AIDS epidemic, because the plaintiff did not suffer from AIDS and he was not a homosexual or intravenous drug user, which was the context in which his image

---

[15] Appellant claims that, like the Film's character, he drank alcohol with his subordinates and befriended Iraqi children. [2-ER:121-124, ¶44.l,u.]

[16] Appellant asserts that, like the Film's character, Appellant kept his son's picture by his bed, "struggle[ed] with personal, family relationships," left his son for a later deployment to Iraq, and became abnormally fascinated with death and explosives to the point that it significantly affected his family and personal relationships. [2-ER:121-124, ¶44.h,j,k,n,bb,cc.]

was used.  <u>Whitaker</u>, 2009 WL 1383617 at *3.  This is far different from the circumstances here, where Appellant was neither pictured nor named, and the elements of Appellant's life that were supposedly misappropriated are essential to the Film.

<u>Doe v. Gangland Productions, Inc.</u>, 802 F. Supp. 2d 1116 (C.D. Cal. 2011), is similarly unavailing.  There, the narrow issue was whether identifying the plaintiff by name during a broadcast interview, when the plaintiff allegedly agreed to be interviewed only if his identity was protected, was an issue of public interest.  <u>Id.</u> at 1123.  The court determined that plaintiff's identity was not an issue of public interest, even though the interview's subject matter, including gang violence and murder, were topics of widespread concern.  <u>Id.</u> at 1124.  The court reached this conclusion because "the absence of his identity from the Program would not have impacted the content of Defendants' ability to communicate their protected speech."  <u>Id.</u>  Again, in this case, Appellant was neither named nor pictured in the Film, and to prohibit the fictional James character from exhibiting any of Appellant's characteristics would certainly have impacted the content of Appellees' ability to communicate their protected speech.

Appellees' conduct therefore falls within the scope of Cal. Civ. Proc. Code §425.16(e).

B.    Cal. Civ. Proc. Code Section 425.16 Required Appellant To
      Demonstrate The Merit Of His Claims.

Since Appellees have satisfied their initial burden of proof under the SLAPP

statute, Appellant must demonstrate the probability of prevailing on each of his

claims.  Cal. Civ. Proc. Code §425.16(b)(1).  More specifically, Appellant must

demonstrate that the complaint is both legally sufficient and supported by a

sufficient *prima facie* showing of facts to sustain a favorable judgment if the

evidence submitted by Appellant is credited.  Hilton, 599 F.3d at 903; Equilon

Enter., LLC, 29 Cal. 4th at 67.  This standard has been equated with the proof

required for a plaintiff to defeat a motion for summary judgment or a nonsuit

motion.  E.g., Hilton, 599 F.3d at 902; Stewart v. Rolling Stone LLC, 181 Cal.

App. 4th 664, 679 (2010).  For the reasons set forth below, Appellant is incapable

of satisfying his burden.

III.   APPELLANT HAS FAILED TO DEMONSTRATE THE
       PROBABILITY OF PREVAILING ON ANY OF HIS CLAIMS.

       A.    Appellant Cannot Prevail On His Misappropriation Of Likeness
             Claim Because The Film Is Protected By The First
             Amendment, And In Any Event, The Film Does Not Use
             Appellant's Name Or Likeness.

Appellant asserts that he is portrayed by the Film's main character, and that

the Film therefore constitutes a misappropriation of his name and/or likeness.

[AOB:38-40; 2-ER:189, ¶71.]  However, Appellant admits that the Film's main

character does not bear his name.  [AOB:39.]  Appellant does not contend that any

34

photographs or video footage of him appear in the Film. Appellant's "military occupation specialties" or duties during his time in Iraq are not unique to him. Appellant acknowledges that his EOD team was one of three in the Army's 788th Ordnance Company in which Appellant served, and that during his tour of duty, there were approximately 150 trained Army EOD technicians deployed in Iraq. [2-ER:180, ¶¶34-36.]

Nevertheless, Appellant relies upon a haphazard selection of personal characteristics, background and professional experiences, to support his claim that any "casual reader of the [previously-published] *Playboy* Article will easily identify" the Film's fictional James as the Appellant. [2-ER:184-186, ¶¶56,65-66.] Even if all of Appellant's comparisons were accurate – and they are not, as viewing the Film itself makes clear – they are insufficient to support a claim for misappropriation of Appellant's likeness based upon the production and distribution of the Film. In fact, even if the Film had been expressly about Appellant and his war experiences, even if the Film had used his exact name as the name of its main character, and even if the Film's title had incorporated Appellant's name, Appellant still could not have asserted an actionable claim for misappropriation of his name, likeness or identity.

       1.    <u>Even If The Film Had Made Use Of Appellant's Name And Likeness, Appellant's Misappropriation Claim Would Be Barred By The First Amendment.</u>

Under California law, noncommercial speech is accorded full First Amendment protection. This constitutional guarantee is not diminished for "popular entertainment" or "works of fiction." <u>Polydoros</u>, 67 Cal. App. 4th at 324. To the contrary, "motion pictures are a significant medium for the communication of ideas." <u>Joseph Burstyn</u>, 343 U.S. at 501. That motion pictures are "sold for profit does not prevent them from being a form of expression whose liberty is safeguarded by the First Amendment." <u>Id.</u> Simply put, the inclusion of a person's name, voice, photograph or likeness in an expressive work that enjoys First Amendment protection does not constitute "commercial speech," even if the expressive work is intended for purchase or profit.[17]

The First Amendment bars right of publicity claims where the defendant's use of name, likeness or image is found to be "transformative." <u>Comedy III Prod., Inc. v. Gary Saderup, Inc.</u>, 25 Cal. 4th 387, 405 (2001). When an expressive work contains significant "transformative" elements, *i.e.*, when it contains expressive

---

[17] This principle was recently affirmed in <u>Stewart v. Rolling Stone LLC</u>, 181 Cal. App. 4th 664 (2010), where the court dismissed "indie rock" musicians' asserted claims based on the use of their band names in an editorial feature that was surrounded by a cigarette advertisement, finding that the feature itself was noncommercial speech as a matter of law. <u>Id.</u> at 683.

content and is more than a "mere likeness or literal depiction" of a person, "First Amendment protection outweighs whatever interest the state may have in enforcing the right of publicity." Id. at 406. This "transformative use" defense poses "what is essentially a balancing test between the First Amendment and the right of publicity based on whether the work in question adds significant creative elements so as to be transformed into something more than a mere celebrity likeness or imitation." Id. at 391.

The transformative use test "simply requires the court to examine and compare the allegedly expressive work with the images of the plaintiff to discern if the defendant's work contributes significantly distinctive and expressive content; *i.e.*, is 'transformative.' If distinctions exist, the First Amendment bars claims based on appropriation of the plaintiff's identity or likeness; if not, the claims are not barred." Kirby v. Sega of Am., Inc., 144 Cal. App. 4th 47, 61 (2006) (citing Winter v. DC Comics, 30 Cal. 4th 881, 889-891 (2003)). Put another way, the test is "whether the celebrity likeness is one of the 'raw materials' from which an original work is synthesized, or whether the depiction or imitation of the celebrity is the very sum and substance of the work in question." Id. at 888 (quoting Comedy III, 25 Cal. 4th at 406). If "a product containing a celebrity's likeness is so transformed that it has become primarily the defendant's own expression rather

than the celebrity's likeness," a right of publicity claim is barred by the First Amendment.  <u>Comedy III</u>, 25 Cal. 4th at 406.

So, even if the fictional James character in the Film could be understood as a fictionalized portrayal of Appellant (which it is not), Appellant's likeness could not be viewed as anything more than one of the "raw materials" from which the Film – a prototypically "transformative" work – is synthesized.  <u>Winter</u>, 30 Cal. 4th at 888.  There can be no reasonable dispute that the Film contributes "significantly distinctive and expressive content" to any purported use of Appellant's likeness.  <u>Kirby</u>, 144 Cal. App. 4th at 61.

The "transformative use" cases relied on by Appellant are easily distinguishable.  [AOB:31-33.]  In each case, the work at issue was not sufficiently transformative because the "sum and substance" of the work as a whole was "the depiction or imitation of the celebrity," as opposed to a work that was primarily the defendant's expression.  <u>Comedy III</u>, 25 Cal. 4th at 406 (holding that defendant's T-shirts contained only a literal representation of "The Three Stooges" and that the First Amendment did not bar liability).  In <u>Hilton</u>, the Ninth Circuit held that while there were "some differences" between Paris Hilton's character in "The Simple Life" episode and her portrayal in the Hallmark card (*e.g.* different uniform and food depicted in the greeting card), "the basic setting is the same: we see Paris Hilton, born to privilege, working as a waitress."  <u>Hilton</u>, 599 F.3d at 910.

38

Similarly, in <u>No Doubt v. Activision Publishing, Inc.</u>, 192 Cal. App. 4th 1018, 1035 (2011), the California Court of Appeal held that "nothing in the creative elements of the *Band Hero* elevates the depictions of No Doubt to something more than 'conventional, more or less fungible, images' of its members that No Doubt should have the right to control and exploit." <u>Id.</u> at 1035 (<u>citing</u> <u>Comedy III</u>, 25 Cal. 4th at 405). Finally, while <u>Keller v. Electronic Arts, Inc.</u>, 2010 WL 530108, at *5 (N.D. Cal. Feb. 8, 2010) is not controlling here, it is also distinguishable because <u>Keller</u>'s defendant "d[id] not depict Plaintiff in a different form" and "the game's setting is identical to where the public found Plaintiff during his collegiate career."[18]

Unlike the defendants in <u>Comedy III</u>, <u>Hilton</u>, <u>No Doubt</u>, and <u>Keller</u>, the creators of the Film added "significantly distinctive and expressive content" to Appellant's purported likeness, identity and personal experiences. James is a fictional character in a film that speaks lines of dialogue that were created by a writer. These lines of invented dialogue are, by themselves, "significant expression" that has been added to any purported use of Appellant's image (which use Appellees deny). The lines of spoken dialogue and the events involving the

---

[18] The appeal of this unpublished order was argued and submitted on July 13, 2012. <u>In re: Samuel Keller, et al v. Electronic Arts Inc., et al.</u>, Docket No. 10-15387 (9th Cir. argued July 13, 2012).

fictional James are then interpreted by directors and producers for depiction in the medium of film. The invented dialogue is further interpreted by the lead actor, Jeremy Renner, in creating the character of James on screen. James inhabits a universe where he interacts with other fictional characters, played by other actors, in a sequence of fictional events. That universe is further expressed through the work of cinematographers, film editors, production designers, costume designers and music supervisors. Simply put, James, even if inspired by Appellant, is primarily the expression of the filmmakers. Thus, the Film's First Amendment protection outweighs any right of publicity interest that Appellant might have.

Based on all these factors, evident from the Film itself, this Court should conclude that Appellant's likeness or identity, if it indeed was the basis for the Film's main character, is only one of the Film's "raw materials," and not the "sum and substance of the work." Accordingly, the District Court's finding that Appellant's right of publicity claim is barred by the First Amendment should not be disturbed. Indeed, even if the Film had been called "Sgt. Sarver's Iraq Experience" and had deliberately portrayed Appellant, by name, engaging in missions in and around Baghdad, relaxing with his team on base and sharing his views about war, the Film would still be a transformative work and would still enjoy complete First Amendment protection against Appellant's misappropriation claim. See, e.g., Guglielmi v. Spelling-Goldberg Productions, 25 Cal. 3d 860, 875

40

(1979) ("fictionalized version" of Rudolph Valentino's life, depicting the actor's name, likeness and personality protected by First Amendment).  If that were not the case, then no writer could author an unauthorized biography of a sports figure; no documentarian could produce an unauthorized glimpse into the life of celebrity; and no film producer could create a fictionalized "docudrama" based upon a true story "ripped from the headlines."  All such works are fully-protected speech, notwithstanding their use of real people's names, likenesses and "life stories."  And in each instance, a real person's name or likeness has been combined with substantial creative elements to produce a fully transformative work that is far more than the mere likeness of the person portrayed therein.

> ### 2.    Appellant's Misappropriation Claim Is Subject To The Actual Malice Standard.

The label of the cause of action does not determine whether First Amendment protections apply.  Reader's Digest Ass'n v. Superior Court, 37 Cal. 3d 244, 265 (1984), cert. denied 478 U.S. 1009 (1986).  Thus, this Court and California courts have applied the actual malice standard to right of publicity claims that involve public figures or matters in the public interest.[19]  Hoffman v.

---

[19]  Although raised in the SLAPP Motions, the District Court declined to reach the issue of whether Appellant was a limited purpose public figure who would be required to prove actual malice because the District Court found that his defamation claims failed on other grounds.

Capital Cities, 255 F.3d 1180, 1186-1187 (9th Cir. 2001); Stewart, 181 Cal. App. 4th at 681-682 ("a defendant publisher may assert that the actual malice standard applies to claims for commercial misappropriation, whether claims are under the common law or Civil Code section 3344."); Dora v. Frontline Video, Inc., 15 Cal. App. 4th 536, 543-544 (1993).

In Hoffman, actor Dustin Hoffman alleged that *Los Angeles Magazine* violated his right of publicity under the common law and Cal. Civ. Code §3344 by publishing a digitally manipulated photo of him from the movie "Tootsie." This Court held that Hoffman must demonstrate actual malice because he was a public figure, and that Hoffman could not satisfy the constitutional standard. Hoffman, 255 F. 3d at 1186-1187. Here, Appellant is a limited purpose public figure and his claims involve matters in the public interest. Therefore, the actual malice standard should be applied to Appellant's misappropriation of likeness claim.

      a)      <u>The Actual Malice Standard Applies Because Appellant Is A Limited Purpose Public Figure And Appellant's Claim Involves Matters In The Public Interest.</u>

Courts recognize two separate categories of public figures: "all purpose" and "limited purpose." Reader's Digest Ass'n, 37 Cal. 3d at 253. A plaintiff who voluntarily thrusts himself into the public limelight through press interviews becomes a "limited purpose public figure[]." Rudnick v. McMillan, 25 Cal. App.

4th 1183, 1190 (1994) (plaintiff qualifies as limited public figure where he "discuss[es] the matter [at issue] with the press or by being quoted by the press, thus thrusting himself into the vortex of a public issue"); Denney v. Lawrence, 22 Cal. App. 4th 927, 934-936 (1994) (plaintiff was limited public figure where he thrust himself into the limelight by giving press interviews about circumstances surrounding homicide and promoting version of those circumstances to influence public opinion).

Appellant became a limited purpose public figure for purposes of his involvement in the Iraq War by voluntarily participating in hours of taped interviews with Boal in Iraq and voluntarily appearing in numerous photographs, some of which were used in the *Playboy* Article. [2-ER:154-155, ¶¶3-4.] After Appellant returned from Iraq, he invited Boal to visit him at his home in Wisconsin to conduct additional interviews. [Id., ¶4.]

On August 2, 2005, Boal sent the senior enlisted commander in Appellant's unit (in which Boal was embedded), Command Sergeant Major James Clifford, an advance copy of the *Playboy* Article and informed him that it would be released that month. [2-ER:154-155,172, ¶5, Ex. C.] Clifford praised the *Playboy* Article, stating: "Good job, Mark. I remember asking you to focus on the soldiers and that you did. Thanks. I'm sure this article will reflect positively on us." [2-ER:172.]

43

Appellant became a limited purpose public figure for purposes of his involvement in the Iraq War when the *Playboy* Article was published on August 12, 2005, because Appellant had voluntarily thrust himself into the limelight by participating in the article. [2-ER:154,159-169, ¶2, Ex. B.]

Appellant argued in the District Court that he could not be a limited purpose public figure because he "was unwillingly dragged into the public eye by Mr. Boal and the other defendants." But Appellant admitted in his declaration that he voluntarily participated in taped interviews with Boal, including an interview at his home in Wisconsin, and that he allowed Boal to videotape and take multiple photographs of him. [2-ER:114-116, ¶12-23.] Appellant knew the interviews with Boal would be "on the record," as even the purported media "ground rules" that Appellant attached to his declaration state that "all interviews with service members will be on the record." [2-ER:131, ¶4.A.] Accordingly, Appellant should be considered a limited purpose public figure and must therefore have met the "actual malice" standard to survive Appellees' Motions.

Even if Appellant were not a public figure, the actual malice standard applies to his misappropriation claim because it concerns publications of matters of public concern or public interest. Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc., 472 U.S. 749, 759 (1985) ("speech on matters of public concern [] is at the heart of the First Amendment's protection") (internal quotation marks omitted);

44

Time, Inc. v. Hill, 385 U.S. 374, 388-389 (1967); Khawar v. Globe Internat., 19 Cal. 4th 254, 274 (1998), cert. denied 526 U.S. 1114 (1999).  Thus, if the Court were to conclude that Appellant was not a limited purpose public figure, the actual malice standard still applies to Appellant's claims because the District Court correctly determined that the challenged activities all involved matters of public interest.  [See Section II.A, above.]

> b)  Appellant Was Required To, But Did Not, Submit Clear And Convincing Evidence To Demonstrate That Appellees Acted With Actual Malice.

To satisfy the actual malice standard, Appellant must prove by clear and convincing evidence that the speech at issue "was made with knowledge of its falsity or with reckless disregard for the truth."  Gertz v. Robert Welch, Inc., 418 U.S. 323, 342 (1974).  This high standard "requires that the evidence of actual knowledge of the falsity or reckless disregard for its falsity must be of such a character 'as to command the unhesitating assent of every reasonable mind.'" McGarry v. Univ. of San Diego, 154 Cal. App. 4th 97, 114 (2007).  As a public figure Appellant, therefore, "faces almost insurmountable obstacles to recovery" in this action due to "constitutional" constraints.  Brown v. Kelly Broad. Co., 48 Cal. 3d 711, 750-751 (1989).  Perhaps because of this high standard, Appellant made no attempt to offer the District Court clear and convincing evidence that Appellees acted with actual malice in publishing the Film.

45

3.    Appellant's Misappropriation Claim Fails Because The
      Film Is A Fictional Work That Does Not Use Appellant's
      Name, Photograph Or Likeness.

This Court need not reach the balancing test between the First Amendment and Appellant's right of publicity in order to conclude that Appellant failed to demonstrate the probability of prevailing on his misappropriation claim. This Court can strike that claim based upon the irrefutable evidence that the Film manifestly is not about Appellant and does not use any aspect of his name or likeness.

California recognizes both a statutory and a common law right of publicity. Cal. Civ. Code §3344 generally prohibits the unauthorized use of another's name, voice, photograph or likeness on or in products, or for purposes of advertising products or services. California's common law similarly prevents the unauthorized appropriation of another's identity for commercial or other advantage. White v. Samsung Electronics Am., Inc., 971 F. 2d 1395, 1398 (9th Cir. 1992). The elements of a claim under California law are: (1) the defendant's use of the plaintiff's identity; (2) the appropriation of plaintiff's name or likeness to defendant's advantage, commercially or otherwise; (3) lack of consent; and (4) resulting injury. Hilton, 599 F.3d at 909 (citing Downing v. Abercrombie & Fitch, 265 F.3d 994, 1001 (9th Cir. 2001)).

For either type of claim, the claimant must make a threshold showing that his or her actual name, voice, photograph or likeness was used. Appellant admits, as he must, that the Film does not use his name, voice or photograph in any manner. The fictional James is played by actor Jeremy Renner, so the character also does not use Appellant's "likeness" as that term is construed under California law. Kirby, 144 Cal. App. 4th at 55 ("The misappropriation of one's 'likeness' refers to a person's visual image"); White, 971 F.2d at 1397 (mechanical robot dressed and positioned like game show personality does not appropriate her "likeness"); Midler v. Ford Motor Co., 849 F.2d 460, 463 (9th Cir. 1988) (song performed by a "sound-alike" does not use celebrity's "likeness").

With no use of his likeness, Appellant's claim depends upon the assertion that the Film appropriates his "personal story," *i.e.* deploying the fictional James to the same base camp where Appellant was stationed, imbuing the fictional James with a random selection of ordinary characteristics, mannerisms and background that he allegedly shares with Appellant, and having the fictional James engage in certain military actions purportedly similar to those that Appellant undertook during his deployment in Iraq. [2-ER:186, ¶63.]

Under these circumstances, courts have asked whether a reasonable person viewing the motion picture would understand the fictional character to be Appellant. Aguilar v. Universal City Studios, Inc., 174 Cal. App. 3d 384, 387-388

(1985); <u>Polydoros</u>, 67 Cal. App. 4th at 326.  Other courts have examined whether the work is "of or concerning," or specifically references the plaintiff.  <u>Blatty v. New York Times Co.</u>, 42 Cal. 3d 1033, 1044 (1986).

Appellees have found no California decision holding that the use of certain aspects of a person's "personal circumstances" violate either the statutory or common law right of publicity.[20]  By contrast, in <u>Polydoros</u>, the court concluded that claimed similarities between the "personal experiences" of a real person and a fictional character *did not* support a right of publicity claim.  <u>Polydoros</u>, 67 Cal. App. 4th 318.  <u>Polydoros</u> is instructive here.

In <u>Polydoros</u>, the plaintiff sued the producers and distributors of the fictional motion picture *The Sandlot* for misappropriation of his name and likeness.  One of the film's characters, a 10-year-old boy, was named "Michael Palledorous," which was phonetically similar to plaintiff's own.  Although the plaintiff conceded that the film was fictional, he nonetheless alleged the film misappropriated his likeness

_____

[20]  Judicial decisions finding misappropriation of a *celebrity's* "identity" without the use of his or her name, voice, photograph or likeness, have done so only where a defendant used a distinctive element readily and uniquely identifiable with the celebrity Appellant in connection with some implied commercial sponsorship by the celebrity.  <u>E.g.</u> <u>Midler</u>, 849 F.2d at 463-464 (use of "sound-alike" to perform song closely identified with famous singer in television commercial); <u>Abdul-Jabbar v. General Motors Corp.</u>, 85 F.3d 407, 415-416 (9th Cir. 1996) (commercial use of athlete's former name).  These cases are inapplicable here, because Appellant is not a celebrity and Appellant does not claim his likeness was appropriated for commercial sponsorship of some product or brand.

because the character allegedly shared a number of similarities to the plaintiff in his youth, including growing up in a similar setting, wearing eyeglasses and a t-shirt with a particular design, playing sandlot baseball, swimming in a community pool, and being "somewhat obstreperous." Id. at 320-321.

The Polydoros court observed that similar claims "have been rejected by the courts when there is merely alleged to be some resemblance between an actual person and a character in a work of fiction." Id. at 322. The court concluded that "the rudimentary similarities in locale and boyhood activities do not make *The Sandlot* a film about [the plaintiff's] life" and that the "faint outlines [the plaintiff] has seized upon do not transform the fiction into fact." Id. at 323.[21] Accordingly,

------

[21] The Polydoros decision is particularly apt because the film's writer had been a schoolmate of the Appellant and drew from his childhood memories in writing that screenplay. The Polydoros court's recognition of and quotation from an earlier New York decision, People *ex rel*. Maggio v. Charles Scribner's Sons, 130 N.Y.S.2d 514 (1954), also directly apply to Appellant's misappropriation claims here:

> It is generally understood that novels are written out of the background and experiences of the novelist. The characters portrayed are fictional, but very often they grow out of real persons the author has met or observed. This is so also with respect to the places which are the setting of the novel. The end result may be so fictional as to seem wholly imaginary, but the acorn of fact is usually the progenitor of the oak, which when fully grown no longer has any resemblance to the acorn. In order to disguise the acorn and to preserve the fiction, the novelist disguises the names of the actual persons who inspired the characters in his book. Since a novel is not biography, the details of the character's life and deeds usually have, beyond possible faint

here, even if Appellant had accurately compared himself to the Film's fictional main character, these "personal circumstances" would be insufficient as a matter of law to support a claim for misappropriation of Appellant's likeness.

The Complaint, however, presents a decidedly inaccurate comparison of Appellant to the fictional James. The *Playboy* Article and the Film evidence that Appellant and the Film's fictional main character share few characteristics beyond those that would be common to many EOD technicians stationed in Iraq and/or members of the military in general. Most of Appellant's comparisons are generic or abstract similarities that could not conceivably be considered distinctive to Appellant.[22] Even if they are accurate, many of these claimed similarities cannot

outlines, no resemblance to the life and deeds of the actual person known to the author. Thus, the public has come to accept novels as pure fiction and does not attribute their characters to real life.

[22] It is of no legal consequence that Appellant and the actor who plays James might be of the same age or height (even assuming that either is true). Many military personnel have young children at home (as it happens, Appellant had an 8-year old boy, while the fictional James character has a baby boy), and undoubtedly have photographs of their children among their personal possessions. It is also common (and, therefore, legally insignificant) that both Appellant and the fictional Sgt. James experienced relationship problems – in fact, the *Playboy* Article quotes Appellant as remarking that "EOD" stands for "every one divorced." And it is hardly unique that members of the Armed Services might refer to each other as "rednecks." Military personnel are commonly known to drink alcohol when off-duty (and are so depicted in numerous films and television programs). Finally, that Appellant and the fictional James may treat their work as more important than their family is hardly unique to them, much less to military personnel in general. [2-ER:153-158; 2-ER:159-169; 2-ER:186-188, ¶67.]

be discerned by readers of the *Playboy* Article, which is the *only* claimed means by which viewers conceivably could associate the James character with Appellant.[23] Notably, a number of the alleged similarities are simply false.[24] Finally, the experiences of James in the Film are not "identical" or even similar to Appellant's experiences. [2-ER:155, ¶8.] Viewed without the filter of Appellant's self-serving comparisons, this Court readily can conclude that the James character is not intended as, and reasonable viewers could not understand that character to be, a portrayal of Appellant.

---

[23] No reader of the *Playboy* Article could possibly know that Appellant used the phrases "hurt locker" or "war is a drug," because neither is mentioned in the article. Readers would not know whether Appellant and the Film's actor are the same age or height, or that they share similar accents, dialects, expressions, mannerisms, or personality. The *Playboy* Article does not describe Appellant as sleeping in his bed wearing his bomb helmet and underwear, or taking a shower in full uniform. [2-ER:186-188, ¶67.]

[24] For example, Appellant has never been married; at the time of the *Playboy* Article, he had one 8-year old son with an ex-girlfriend, and a different girlfriend was due to give birth to another child of his. The fictional James, by contrast, has a wife and baby boy. Appellant also asserts that he and the James character have the same military background, but James is portrayed as having previously been an EOD technician in Afghanistan, while the *Playboy* Article states that Appellant had only been an EOD technician in peacetime operations prior to his deployment in Iraq. Finally, Appellant's assertion that both he and the fictional character decorated their sleeping areas with a map of Iraq (which is hardly distinctive) is misleading, because while Appellant's actual area was decorated like a "command center" with maps and pictures of IEDs, the fictional Sgt. James had nothing of the sort; just a map on his wall. [2-ER:153-158; 2-ER:159-169; 2-ER:186-188, ¶67.]

    B.    <u>Appellant Cannot Demonstrate The Probability Of Prevailing On His Claims For Defamation, Invasion Of Privacy And Intentional Infliction Of Emotional Distress.</u>

    1.    <u>The Actual Malice Standard Applies To Appellant's Defamation, Privacy And Emotional Distress Claims, But Appellant Did Not Submit Clear And Convincing Evidence To Demonstrate That Appellees Acted With Actual Malice.</u>

In Section III.A.2, above, Appellees explained why the actual malice standard applies to Appellant's misappropriation of likeness claim. The actual malice standard is not limited to that particular claim.

To prove defamation, public figures must prove that the defendants made the alleged defamatory statements with actual malice.[25] <u>Philadelphia Newspapers, Inc. v. Hepps</u>, 475 U.S. 767, 773 (1986). "[L]ogic compel[s] the conclusion that First Amendment limitations are applicable to all claims, of whatever label, whose gravamen is the alleged injurious falsehood of a statement . . .." <u>Blatty</u>, 42 Cal. 3d at 1045. Thus, the actual malice standard equally applies to claims for false light invasion of privacy or intentional infliction of emotional distress which involve public figures or matters of public interest and where the gravamen of the claim is

_____

[25] As discussed in Section III.A.I, above, Appellant is a limited public figure involved in issues of public interest.

a false statement of fact.[26]  Hustler Magazine v. Falwell, 485 U.S. 46, 55-56 (1988); Time, Inc., 385 U.S. at 387-388.

These authorities require that Appellant overcome the actual malice standard in order for Appellant to maintain claims for defamation, invasion of privacy, and intentional infliction of emotional distress.  Yet, Appellant made no effort to offer clear and convincing evidence to demonstrate that Appellees acted with actual malice when publishing the Film.  Appellant's defamation, privacy and emotional distress claims fail for this reason.

> 2. Appellant's Defamation Based Claims Fail Because No Reasonable Person Would Believe The Fictional James Character Was Appellant.

Appellant's defamation based claims – Counts II, III, and IV – all fail because no reasonable person could conclude that the James character was Appellant, as previously discussed in Section III.A.3, above.  Blatty, 42 Cal. 3d at 1044 ("The 'of and concerning' or specific reference requirement limits the right of action for injurious falsehood, granting it to those who are the direct object of criticism and denying it to those who merely complain of nonspecific statements that they believe cause them some hurt."); Polydoros, 67 Cal. App. 4th at 326.  In

---

[26] Here, Appellant's false light and emotional distress claims are based on allegations that Appellees made false statements and misrepresentations about Appellant.  [2-ER:190,194-195.]

53

addition, for the reasons discussed previously in Section III.A.1, above, the District Court was correct in concluding that the transformative nature of film bars Appellant's defamation claims. [1-ER:51-52.]

3.    <u>Appellant Failed To Demonstrate That The Film Includes A Provably False Or Defamatory Statement About Him.</u>

Appellant's defamation claims also fail because he did not, and cannot, present evidence to establish a *prima facie* case that the Film makes statements about him that are provably false or defamatory. [1-ER:52-55.] In discussing his defamation claim, Appellant erroneously contends that to survive Appellees' SLAPP Motions, he was solely required to satisfy the "minimal burden" of showing his defamation claims had "minimal merit." [AOB:40.] Neither of the cases cited by Appellant stand for such a proposition, nor do they use the terms "minimal burden" or "minimal merit." <u>Manufactured Homes Commn., Inc. v. City of San Diego</u>, 655 F.3d 1171, 1176-1177 (9th Cir. 2011); <u>Wilson v. Parker, Covert & Chidester</u>, 28 Cal. 4th 811, 821 (2002). Instead, both cases make clear that Appellant was required to demonstrate that his complaint was both legally sufficient and supported by sufficient *prima facie* facts to sustain a favorable judgment in his favor. <u>See</u> <u>id.</u>

The District Court did not engage in weighing the probative strength of competing evidence, as Appellant erroneously contends in his Brief. [AOB:40.]

54

The District Court reviewed the Film, the contents of which are undisputed, to determine if it reasonably could be interpreted as defamatory. [1-ER:52-55.] The question of whether a challenged statement contains the requisite factual imputation to be considered defamatory is a question of law for the trial court. Summit Bank v. Rogers, 206 Cal. App. 4th 669, 697 (2012). "Only once the court has determined that a statement is reasonably susceptible to such a defamatory interpretation does it become a question for the trier of fact whether or not it was so understood. [Citations.]" Id. (quoting Smith v. Maldonado, 72 Cal. App. 4th 637, 647 (1999)).

Appellant does not identify a single specific scene in the Film that would demonstrate the District Court was wrong to conclude that there is "no basis for the claim that Will James is fascinated with death." [1-ER:52.] Moreover, Appellant could not be defamed by imputing to him a fascination with and/or an addiction to war and death, because Appellant was quoted in the *Playboy* Article as stating that "anything that goes boom [is] addictive," and describing the feeling of approaching an IED as a "morbid thrill." [2-ER:160-169.]

Nor does Appellant cite evidence showing the District Court was wrong to reject his characterizations of James as a "bad father" with "no respect or compassion for human life." [1-ER:53.] Contrary to Appellant's unsupported assertions, a reasonable viewer would believe that James cares for his son; he

keeps photos of his son with him in Iraq and is shown visiting his wife and child while he is on leave from the war. Likewise, the Film does not depict James as lacking respect or compassion for human life. The Film depicts his compassion for Iraqi citizens whose lives are affected by the war, including a young boy with whom he plays soccer and from whom he buys DVDs, a boy who was killed and had a bomb placed in his body cavity, and an adult who has been locked into a suicide bomb vest against his will.

The District Court did not make "blatantly prohibited factual findings that should have been left to a jury" in rejecting Appellant's contention that a fictional scene where James responds to a burning car bomb with a fire extinguisher was defamatory. As discussed above, it is a question of law for the District Court to determine whether scenes in the Film could reasonably be interpreted as defamatory. Summit Bank, 206 Cal. App. 4th at 697. Appellant's characterization of the scene involving the car bomb is completely inaccurate. James does not learn the car has a bomb in it until after he puts out the fire. He must put out the fire to determine if there is a car bomb inside because the car is parked in front of a UN building that has not been fully evacuated. After learning the car is loaded with explosives, James successfully deactivates them and saves the lives of dozens. No one but Appellant would view James' actions as anything but heroic.

56

Finally, Appellant's defamation claim fails for the additional reason that California and federal law both require defamation claims to be pled with particularity by alleging the specific instances of defamatory utterances. <u>Gilbert</u>, 147 Cal. App. 4th at 31; <u>Jacobson v. Schwarzenegger</u>, 357 F. Supp. 2d 1198, 1216 (C.D. Cal. 2004). Appellant's conclusory and general allegations in his defamation claim were not pled with sufficient particularity to meet state and federal pleading requirements.

        4.    <u>The District Court Correctly Concluded That Appellant Cannot Prevail On His False Light/Invasion Of Privacy Claim.</u>

Appellant's claim for false light/invasion of privacy fails because it relies upon the identical publication as Appellant's defamation claim and was therefore duplicative. <u>Kapellas v. Kofman</u>, 1 Cal. 3d 20, 35, fn.16 (1969); <u>Selleck v. Globe International</u>, 166 Cal. App. 3d 1123, 1136-1136 (1986). Appellant essentially concedes that the District Court was correct to find these claims redundant, stating that "Plaintiff recognizes he may only have a single cause of action under *MG v. Time Warner*, *supra*." [AOB:40, fn.7.] However, with no citation to legal authority, Appellant claims that "the ferreting out of the crux of Plaintiff's claim should be saved for later proceeding." [Id.] Appellant again fundamentally misunderstands that Section 425.16 allows trial courts to dismiss claims that are

57

not legally sufficient and supported by prima facie evidence at the pleading stage. [See Section II, above.]

However, even if not duplicative, Appellant cannot state a cause of action for false light invasion of privacy because the Film does not portray James in a light that would be highly offensive to a reasonable person. Fellows v. National Inquirer, Inc., 42 Cal. 3d 234, 238-239 (1986). False light claims are generally limited to highly egregious sets of circumstances. See, e.g., M.G. v. Time Warner, Inc., 89 Cal. App. 4th 623, 631 (2001). For example, in M.G., an article about child molestation in youth sports included a photograph of a little league team partially revealing the identity of juvenile victims. The court held that plaintiffs demonstrated a probability of prevailing on the merits because state laws and general public policy concerns prohibited disclosure of the identities of juvenile molestation victims, and showing the boys' faces unnecessarily intruded on their privacy interests more than journalistic interest justified. Id. at 626-627, 637.

This case is not remotely similar to M.G. Appellant is not a juvenile molestation victim, and his name and likeness appear nowhere in the Film. But even if his name and likeness did appear in the Film, there is nothing in the Film that reveals any embarrassing private facts about Appellant that are remotely

comparable to being a victim of child molestation.[27] No reasonable person could consider the Film's portrayal of a heroic, but flawed, American bomb disposal technician to be highly offensive. The Film's depiction of the fictional James does not even come close to supporting the necessary element of "offensiveness."

> 5. Appellant Cannot Prevail on His Claim For Intentional Infliction Of Emotional Distress.

Appellant's Intentional Infliction of Emotional Distress Claim is based upon the same allegations and is duplicative of his claims for misappropriation of his name and likeness and defamation. [2:ER:194-195, ¶¶92-96.] Accordingly, this claim fails for the reason already discussed. Couch v. San Juan Unified School Dist., 33 Cal. App. 4th 1491, 1504 (1995) ("When claims for invasion of privacy and emotional distress are based on the same factual allegations as those of a simultaneous libel claim, they are superfluous and must be dismissed.").

Even if this Court were to find that this claim was not duplicative, the claim still fails. To prevail on a claim for intentional infliction of emotional distress, "a plaintiff must show: (1) outrageous conduct by the defendant; (2) the defendant's intention of causing or reckless disregard of the probability of causing emotional

---

[27] Appellant also again attempts to analogize his defamation claims to Dyer, supra, 147 Cal. App. 4th 1273 but that case is distinguishable for the reasons already discussed in Section II.A, above.

distress; (3) the plaintiff's suffering severe or extreme emotional distress; and (4) actual and proximate causation." <u>Huntingdon Life Sci. v. Stop Huntingdon Animal Cruelty USA</u>, 129 Cal. App. 4th 1228, 1259 (2005). The conduct must be "so extreme as to exceed all bounds of that usually tolerated in a civilized society." <u>Berkley v. Dowds</u>, 152 Cal. App. 4th 518, 533 (2007).

Appellant did not satisfy any of these pleading requirements, nor did he come close to submitting evidence showing that he could possibly prove them. There is no conduct alleged by Appellees that could be characterized as outrageous or intolerable to a civil society. The Film was intended to be fictional, and there was nothing done that would cause a reasonable person to suffer extreme emotional distress.

    C.    <u>Appellant Waived Any Challenge To The District Court's Dismissal of His Breach of Contract, Fraud and Negligent Misrepresentation Claims Because His Opening Brief Contains No Argument With Respect To These Claims.</u>

Issues must be argued specifically and distinctly in a party's opening brief. <u>See, e.g.</u>, <u>Miller v. Fairchild Indus., Inc.</u>, 797 F.2d 727, 738 (9th Cir. 1986). Bare assertions do not preserve a claim, particularly where other issues are properly presented for review. <u>Greenwood v. FAA</u>, 28 F.3d 971, 977 (9th Cir. 1994); <u>Sullivan v. Dollar Tree Stores</u>, 623 F.3d 770, 776, fn.3 (9th Cir. 2010). Likewise, an issue may be deemed waived where a party lists an issue in the opening brief

but does not offer any argument until the reply brief. Quan v. Computer Sciences Corp., 623 F. 3d 870, 878, fn. 4 (9th Cir. 2010).

Appellant does not address his breach of contract and negligent misrepresentation claims in his Opening Brief. The only passing reference to fraud in Appellant's Opening Brief is in the section titled "Intentional Infliction of Emotional Distress." In support of his intentional infliction of emotional distress claim, Appellant asserts that "Defendant Boal fraudulently misrepresented the purpose of his reporting in order to gain Appellant's trust." [AOB:47.] Appellant does not address the elements of fraud or the heightened pleading standard for fraud. Fed. R. Civ. P. 9(b). This one conclusory assertion is insufficient to preserve Appellant's claim. Therefore, pursuant to the authorities cited above, Appellant has waived the right to challenge the dismissal of his breach of contract, fraud and negligent misrepresentation claims.[28]

---

[28] Further, the District Court properly dismissed Appellant's breach of contract, fraud and negligent misrepresentation claims. [1-ER:55-58.] Appellant cannot prove a probability of success on his contract claim because, among other things, there is no indication that Appellant is a third-party beneficiary of the contract Appellant references in his Complaint. Sofias v. Bank of Am. Nat'l Trust & Sav. Ass'n., 172 Cal. App. 3d 583, 587 (2009). Appellant has not met the heightened pleading standards for fraud and negligent misrepresentation claims against any of the appellees. Fed. R. Civ. P. 9(b); Swartz v. KPMG LLP, 476 F.3d 756, 764-765 (9th Cir. 2007).

IV.  THIS COURT SHOULD AFFIRM THE DISTRICT COURT'S ORDER DENYING APPELLANT'S MOTION FOR STAY OF EXECUTION AND WAIVER OF BOND PENDING APPEAL.

A.  Appellant Abandoned This Issue Because His Opening Brief Contains No Argument Or Legal Authority With Respect To It.

Appellant's Opening Brief contends that the District Court erred by refusing to stay judgment enforcement efforts pending appeal.  [AOB:48-49.]  This is the sole issue Appellant raised through his second notice of appeal (*i.e.* Ninth Circuit Case No. 12-55429).  Despite identification of the issue, the Opening Brief is devoid of any substantive argument or legal citation to support Appellant's claims of error.

Again, and set forth above, Appellant's attempts to raise the issue without briefing his contentions and providing factual and legal support for them are improper.  Fed. R. App. P. 28(a)(9)(A).  Issues that are mentioned only in passing or not supported by substantive argument are deemed abandoned.  Christian Legal Soc. Chapter of Univ. of Calif. v. Wu, 626 F.3d 483, 487-488 (9th Cir. 2010); Quan, 623 F.3d at 878, fn.4.  Appellant's statement that "Appellant maintains his position that the district judge abused her discretion by denying [Appellant's] motion to waive bond" [AOB:49], is the exact type of bare assertion that results in abandonment of the issue.  Even if Appellant were allowed to wait until his reply brief to argue this issue, the Court need not address Appellant's contentions because the relief he seeks is moot.

62

B.   The Relief Appellant Requests From This Court Is Moot, Because The Efficacy Of The Requested Stay Will Be Determined At The Same Time As The Merits Of The Appeal.

Although Appellant requested a stay of enforcement efforts from the District Court, Appellant made no subsequent request to this Court for a stay or emergent review of the denial of Appellant's stay request.  This Court will therefore decide the substantive merits of Appellant's appeal (*i.e.* the propriety of the dismissal of Appellant's claims) at the same time the Court reviews the District Court's denial of Appellant's motion for a stay.  This Court's decision on the merits necessarily moots the issue of the requested stay.  In re Trans World Airlines, Inc., 322 F.3d 283, 293, fn.7 (3d Cir. 2003) (denying as moot district court's refusal to issue a stay where appellate court concurrently reviewed substantive merits of the appeal).  Accordingly, there is no reason for this Court to review the District Court's decision on this issue, and the relief Appellant seeks in connection with that issue should be denied as moot.

<u>CONCLUSION</u>

This lawsuit is governed by California law, and because Appellant's claims impact Appellees' right to free speech, Appellant's claims fall within the purview of Cal. Civ. Proc. Code §425.16. Because the lawsuit had not yet proceeded in any material way, the District Court acted within its sound discretion to hear Appellees' SLAPP motions.

Likewise, the District Court properly granted Appellees' Motions. The District Court employed the correct two-step analysis, first determining that Appellees' creation, production and distribution of the Film was conduct in furtherance of free speech related to an issue of public concern. The District Court also correctly determined that Appellant could not substantiate his claims with the necessary factual support, which is his burden in opposing Appellees' Motions. Based on the arguments set forth above, Appellees respectfully request that this Court *affirm* the District Court's Order Granting Defendants' Motions To Strike and subsequently entered Judgments.

In connection with Ninth Circuit Case No. 12-55429, Appellant has failed to properly brief the issue of why he believes the District Court erred when it denied his Motion For Stay Of Execution And Waiver Of Bond Pending Appeal. That omission constitutes an abandonment of this issue on appeal, and regardless, the relief Appellant seeks through that appeal is moot at this stage of the litigation.

64

Based on the arguments set forth above, Appellees respectfully request that this Court ***affirm*** the District Court's Order Denying Plaintiff's Motion For Stay Of Execution And Waiver Of Bond Pending Appeal.


Dated: August 22, 2012          EISNER, KAHAN & GORRY


                                _____*/s/  Jon-Jamison Hill*_____
                                Jon-Jamison Hill
                                Attorneys for Appellees The Hurt Locker,
                                LLC, Greg Shapiro, Nicolas Chartier,
                                Voltage Pictures, LLC, Grosvenor Park
                                Media, L.P. and Kingsgate Films, Inc.


Dated: August 22, 2012          KATTEN MUCHIN ROSENMAN LLP


                                _____*/s/  David Halberstadter*_____
                                David Halberstadter
                                Attorneys for Appellee Summit
                                Entertainment LLC


Dated: August 22, 2012          KINSELLA WEITZMAN ISER KUMP
                                  & ALDISERT LLP


                                _____*/s/  Jeremiah T. Reynolds*_____
                                Jeremiah T. Reynolds
                                Attorneys for Appellees Mark Boal and
                                Kathryn Bigelow

65

ADDENDUM

California Code of Civil Procedure §425.16:

(a)     The Legislature finds and declares that there has been a disturbing increase in lawsuits brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances. The Legislature finds and declares that it is in the public interest to encourage continued participation in matters of public significance, and that this participation should not be chilled through abuse of the judicial process. To this end, this section shall be construed broadly.

(b)     (1)     A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim.

(2)     In making its determination, the court shall consider the pleadings, and supporting and opposing affidavits stating the facts upon which the liability or defense is based.

(3)     If the court determines that the plaintiff has established a probability that he or she will prevail on the claim, neither that determination nor

66

the fact of that determination shall be admissible in evidence at any later stage of the case, or in any subsequent action, and no burden of proof or degree of proof otherwise applicable shall be affected by that determination in any later stage of the case or in any subsequent proceeding.

(c)    (1)    Except as provided in paragraph (2), in any action subject to subdivision (b), a prevailing defendant on a special motion to strike shall be entitled to recover his or her attorney's fees and costs. If the court finds that a special motion to strike is frivolous or is solely intended to cause unnecessary delay, the court shall award costs and reasonable attorney's fees to a plaintiff prevailing on the motion, pursuant to Section 128.5.

(2)    A defendant who prevails on a special motion to strike in an action subject to paragraph (1) shall not be entitled to attorney's fees and costs if that cause of action is brought pursuant to Section 6259, 11130, 11130.3, 54960, or 54960.1 of the Government Code. Nothing in this paragraph shall be construed to prevent a prevailing defendant from recovering attorney's fees and costs pursuant to subdivision (d) of Section 6259, 11130.5, or 54690.51.

(d)    This section shall not apply to any enforcement action brought in the name of the people of the State of California by the Attorney General, district attorney, or city attorney, acting as a public prosecutor.

(e)     As used in this section, "act in furtherance of a person's right of petition or free speech under the United States or California Constitution in connection with a public issue" includes: (1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law, (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law, (3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest, or (4) any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest.

(f)     The special motion may be filed within 60 days of the service of the complaint or, in the court's discretion, at any later time upon terms it deems proper. The motion shall be scheduled by the clerk of the court for a hearing not more than 30 days after the service of the motion unless the docket conditions of the court require a later hearing.

(g)     All discovery proceedings in the action shall be stayed upon the filing of a notice of motion made pursuant to this section. The stay of discovery shall remain in effect until notice of entry of the order ruling on the motion. The court,

on noticed motion and for good cause shown, may order that specified discovery be conducted notwithstanding this subdivision.

(h)    For purposes of this section, "complaint" includes "cross-complaint" and "petition," "plaintiff" includes "cross-complainant" and "petitioner," and " defendant" includes "cross-defendant" and " respondent."

(i)    An order granting or denying a special motion to strike shall be appealable under Section 904.1.

(j)    (1)    Any party who files a special motion to strike pursuant to this section, and any party who files an opposition to a special motion to strike, shall, promptly upon so filing, transmit to the Judicial Council, by e-mail or facsimile, a copy of the endorsed, filed caption page of the motion or opposition, a copy of any related notice of appeal or petition for a writ, and a conformed copy of any order issued pursuant to this section, including any order granting or denying a special motion to strike, discovery, or fees.

(2)    The Judicial Council shall maintain a public record of information transmitted pursuant to this subdivision for at least three years, and may store the information on microfilm or other appropriate electronic media.

69

## STATEMENT OF RELATED CASES

Sarver v. Chartier, Ninth Circuit Case No. 11-56986 is related to Sarver v. Chartier, Ninth Circuit Case No. 12-55429, because both appeals arise from the same district court proceeding.  The Court has already consolidated these related appeals.


Dated:  August 22, 2012                        _/s/  Jon-Jamison Hill_
                                                                   Jon-Jamison Hill
                                                                   Attorney for Appellees The Hurt Locker,
                                                                   LLC, Greg Shapiro, Nicolas Chartier,
                                                                   Voltage Pictures, LLC, Grosvenor Park
                                                                   Media, L.P. and Kingsgate Films, Inc.

## CERTIFICATE OF COMPLIANCE

This brief complies with the enlargement of brief size permitted by Ninth Circuit Rule 28-4. The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and Fed. R. App. P. 32(a)(6) because the brief has been prepared in a proportionally spaced typeface using Microsoft Word 2007, Times New Roman 14 point font.

This brief is 15,353 words, excluding the portions exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

Dated: August 22, 2012          _____*/s/  Jon-Jamison Hill*_____

Jon-Jamison Hill
Attorney for Appellees The Hurt Locker, LLC, Greg Shapiro, Nicolas Chartier, Voltage Pictures, LLC, Grosvenor Park Media, L.P. and Kingsgate Films, Inc.

71

<u>PROOF OF SERVICE VIA ECF SYSTEM</u>

STATE OF CALIFORNIA       )
                                  )
COUNTY OF LOS ANGELES   )

       I am employed in the County of Los Angeles, State of California; I am over the age of 18 and not a party to the within action; my business address is 9601 Wilshire Boulevard, Suite 700, Beverly Hills, California 90210.

       I hereby certify that I electronically filed the foregoing document described as APPELLEES' JOINT ANSWERING BRIEF with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on August 22, 2012. The following participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

Michael R. Dezsi, Esq.

Nathan Dooley, Esq.

Rebecca F. Ganz, Esq.

David Halberstadter, Esq.

Erik Louis Jackson, Esq.

Dale F. Kinsella, Esq.

Jeremiah Reynolds, Esq.

**Executed on August 22, 2012, at Los Angeles, California.**

       I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

       */s/ Jon-Jamison Hill*     

Jon-Jamison Hill

<u>PROOF OF SERVICE VIA U.S. MAIL</u>

STATE OF CALIFORNIA      )
                                  )

COUNTY OF LOS ANGELES    )

      I am employed in the County of Los Angeles, State of California; I am over the age of 18 and not a party to the within action; my business address is 9601 Wilshire Boulevard, Suite 700, Beverly Hills, California 90210.

      On August 22, 2012, I served the document described as APPELLEES' JOINT ANSWERING BRIEF on the interested parties in said action by placing a true copy thereof in a sealed envelope(s) addressed as follows:

See Attached Service List

      **BY MAIL:**
I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing.  Under that practice, it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid at Los Angeles, California in the ordinary course of business.  I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one date after date of deposit for mailing the affidavit.

**Executed on August 22, 2012, at Los Angeles, California.**

      I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

                                   */s/  Janice J. Mills*
                                    Janice J. Mills

## SERVICE LIST

*Attorneys for Sgt. Jeffrey S. Sarver*

Michael R. Dezsi, Esq.
LAW OFFICES OF MICHAEL R.
   DEZSI, PLLC
615 Griswold, Suite 700
Detroit, MI 48226

*Attorneys for Sgt. Jeffrey S. Sarver*

Todd J. Weglarz, Esq.
LAW OFFICES OF TODD J.
   WEGLARZ
30903 Northwestern Highway
Farmington Hills, MI 48334

*Attorneys for Sgt. Jeffrey S. Sarver*

Erik L. Jackson, Esq.
Nathan Dooley, Esq.
COZEN O'CONNOR
601 S. Figueroa Street, Suite 3700
Los Angeles, CA 90017

*Attorneys for Mark Boal and
Kathryn Bigelow:*

Dale F. Kinsella, Esq.
Jeremiah T. Reynolds, Esq.
KINSELLA WEITZMAN ISER KUMP
   & ALDISERT LLP
808 Wilshire Boulevard, 3rd Floor
Santa Monica, CA 90401

*Attorneys for Summit
Entertainment LLC:*

David Halberstadter, Esq.
Rebecca F. Ganz, Esq.
KATTEN MUCHIN ROSENMAN LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067