Nos. 11-56986, 12-55429
_____

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT
_____

SGT. JEFFREY S. SARVER,

Plaintiff and Appellant,

v.

NICHOLAS CHARTIER, et al.

Defendants and Appellees.
_____

On Appeal from the United States District Court, Central District of California
The Honorable Jacqueline H. Nguyen
Case No. 2:10-CV-09034 JHN (JCx)
_____

**AMICI CURIAE BRIEF OF MOTION PICTURE ASSOCIATION OF
AMERICA, INC. AND ENTERTAINMENT MERCHANTS ASSOCIATION
IN SUPPORT OF DEFENDANTS/APPELLEES**
_____

KELLI L. SAGER (SBN: 120162)
KAREN A. HENRY (SBN: 229707)
DAVIS WRIGHT TREMAINE LLP
865 S. Figueroa Street, Suite 2400
Los Angeles, California 90017-2566
Telephone: (213) 633-6800/Facsimile: (213) 633-6899

Attorneys for Amici Curiae
MOTION PICTURE ASSOCIATION OF AMERICA, INC. and
ENTERTAINMENT MERCHANTS ASSOCIATION

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to F.R.A.P. 26.1 and 29(c), <u>amicus</u> <u>curiae</u> Motion Picture Association of America, Inc. ("MPAA") discloses the following:

1. MPAA is a non-profit trade association;

2. MPAA does not have any parent companies; and

3. There are no publicly-held companies that own 10 percent or more of MPAA.

<u>Amicus</u> <u>curiae</u> Entertainment Merchants Association ("EMA") discloses the following:

1. EMA is a non-profit trade association;

2. EMA does not have any parent companies; and

3. There are no publicly-held companies that own 10 percent or more of EMA.

RESPECTFULLY SUBMITTED this 29th day of August, 2012.

> DAVIS WRIGHT TREMAINE LLP
> KELLI L. SAGER
> KAREN A. HENRY
>
> By _____/s/ Kelli L. Sager_____
> Kelli L. Sager
>
> Attorneys for <u>Amici</u> <u>Curiae</u>
> MOTION PICTURE ASSOCIATION OF
> AMERICA, INC. and ENTERTAINMENT
> MERCHANTS ASSOCIATION

1

# TABLE OF CONTENTS

<u>Page</u>

1. SUMMARY OF ARGUMENT....................................................................1

2. THE FIRST AMENDMENT DOES NOT PERMIT MISAPPROPRIATION CLAIMS TO ARISE FROM MOTION PICTURES INSPIRED BY REAL PEOPLE AND EVENTS. .....................2

3. THIS COURT SHOULD APPLY A BRIGHT-LINE TEST FOR MISAPPROPRIATION CLAIMS BASED ON EXPRESSIVE WORKS RELATED TO REAL PEOPLE OR EVENTS. ...........................14

    A. This Court Should Find That Expressive Works Inspired By Real People Or Events Are Not Subject To Claims For Alleged Violations Of Publicity Rights. ........................................................20

    B. Alternatively, The Court Should Adopt The <u>Rogers</u>/<u>Restatement</u> Test...................................................22

4. CONCLUSION.........................................................................................27

i

# TABLE OF AUTHORITIES

## CASES

Ann-Margret v. High Soc'y Magazine, Inc.,
    498 F. Supp. 401 (S.D.N.Y. 1980) ......................................................5

Arenas v. Shed Media U.S., Inc.,
    Case No. CV11-05279 DMG, 2011 U.S. Dist. LEXIS 101915 (C.D. Cal.
    Aug. 22, 2011) ..................................................................................16

Bartnicki v. Vopper,
    532 U.S. 514 (2001)...........................................................................20

Bertsch v. Rupert Murdoch, et al.,
    3:2012cv05029 (W.D. Wash., January 11, 2012) .............................18

Cher v. Forum Int'l, Ltd.,
    692 F.2d 634 (9th Cir. 1982) ...............................................................5

City of Renton v. Playtime Theatres, Inc.,
    475 U.S. 41 (1986)..............................................................................21

Comedy III Productions, Inc. v. Saderup,
    25 Cal. 4th 387 (2001) ...................................................................9, 15

Cooper v. Aaron,
    358 U.S. 1 (1958)................................................................................19

Daly v. Viacom, Inc.,
    238 F. Supp. 2d 1118 (N.D. Cal. 2002)...............................................5

Davis v. Electronic Arts, Inc.,
    Case No. 10-03328 RS (DMR), 2011 U.S. Dist. LEXIS 71642 (N. D.
    Cal. July 5, 2011) ...............................................................................16

Doe v. Roe,
    638 So. 2d 826 (Ala. 1994)..................................................................7

Doe v. TCI Cablevision,
    110 S.W.3d 363 (Mo. 2003) ..............................................................16

DWT 20044952v6 0058278-000014

Dora v. Frontline Video, Inc.,
  15 Cal. App. 4th 536 (1993) ...............................................................5

Dr. Seuss Enterprises, L.P. v. Penguin Books USA, Inc.,
  109 F. 3d 1394 (9th Cir. 1997) ..........................................................16

E.S.S. Entm't 2000, Inc. v. Rock Star Videos, Inc.,
  547 F.3d 1095 (9th Cir. 2008) .............................................24, 25, 26

Eastwood v. Superior Court,
  149 Cal. App. 3d 409 (1983) ...............................................................7

Erie R.R. v. Tompkins,
  304 U.S. 64 (1938).............................................................................19

Frazier v. Boomsma,
  No. CV07-08040, 2007 WL 2808559 (D. Ariz. Sept. 27, 2007) .......21

Guglielmi v. Spelling-Goldberg Prods.,
  25 Cal.3d 860 (1979) ...........................................................6, 8, 10, 15

Hart v. Electronic Arts, Inc.,
  808 F. Supp. 2d 757 (D.N.J. 2011)....................................................16

Hicks v. Casablanca Records,
  464 F. Supp. 426 (S.D.N.Y. 1978) ......................................................7

Hilton v. Hallmark Cards,
  599 F.3d 894 (9th Cir. 2010) .............................................................19

Hoffman v. Capital Cities/ABC, Inc.,
  255 F.3d 1180 (9th Cir. 2001) .............................................................5

Joseph Burstyn, Inc. v. Wilson,
  343 U.S. 495 (1952)..........................................................................5, 6

Katzev v. Los Angeles County,
  52 Cal. 2d 360 (1959) ..........................................................................7

Keller v. Electronic Arts, Inc.,
  No. CV09-1967 CW, 2010 U.S. Dist. LEXIS 10719 (N.D. Cal. Feb. 8,
  2010) .............................................................................................16, 17

DWT 20044952v6 0058278-000014

Mattel, Inc. v. MCA Records, Inc.,
    296 F.3d 894 (9th Cir. 2002) ....................................................................25, 27

Matthews v. Wozencraft,
    15 F.3d 432 (5th Cir. 1994) ...................................................................6

Meeropol v. Nizer,
    560 F.2d 1061 (2d Cir. 1977) ...................................................................6

Middlebrooks v. Curtis Publishing Co.,
    413 F. 2d 141 (4th Cir. 1969) ...................................................................8

Mutual of Omaha Ins. Co. v. Novak,
    836 F.2d 397 (8th Cir. 1987) ...................................................................16

Newton v. Thomason,
    22 F.3d 1455 (9th Cir. 1994) ...................................................................7

No Doubt v. Activision Publg., Inc.,
    192 Cal. App. 4th 1018 (2011) ...................................................................16

Parks v. LaFace Records,
    329 F.3d 437 (6th Cir. 2003) ...................................................................27

People v. Charles Scribner's Sons,
    205 Misc. 818, 130 N.Y.S.2d 514 (N.Y. Mag. Ct. 1954)............................11, 12

Polydoros v. Twentieth Century Fox Film Corp.,
    67 Cal. App. 4th 318 (1997) ................................................................4, 6, 10, 11

R.A.V. v. City of St. Paul,
    505 U.S. 377 (1992)...................................................................20

RAR, Inc. v. Turner Diesel Ltd.,
    107 F.3d 1272 (7th Cir. 1997) ...................................................................19

Rogers v. Grimaldi,
    875 F. 2d 994 (2d Cir. 1989) ...................................................................passim

Rosemont Enterprises, Inc. v. McGraw-Hill Book Co.,
    85 Misc. 2d 583, 380 N.Y.S.2d 839 (N.Y. Sup. 1975) ........................................7

DWT 20044952v6 0058278-000014

Roth v. U.S.,
    354 U.S. 476 (1957)...............................................................................27

Ruffin-Steinback v. dePasse,
    82 F. Supp. 2d 723 (E.D. Mich. 2000) ...............................................5

Sable Comm'ns of California, Inc. v. FCC,
    492 U.S. 115 (1989) .............................................................................20

Seale v. Gramercy Pictures,
    949 F. Supp. 331 (E.D. Pa. 1996) .......................................................7

Stewart v. Rolling Stone LLC,
    181 Cal. App. 4th 664 (2010) ..............................................................5

Terry v. Fox Group,
    Los Angeles Superior Court No. BC478450 .....................................18

Turner Broad. Sys., Inc. v. FCC,
    512 U.S. 622 (1994)............................................................................20

Tyne v. Time Warner Entm't Co., L.P.,
    901 So.2d 802 (Fla. 2005) ...................................................................6

Winter v. DC Comics,
    30 Cal. 4th (2003) ..............................................................................15

Winters v. New York,
    333 U.S. 507 (1948)..............................................................................6

Zacchini v. Scripps-Howard Broadcasting Co.,
    433 U.S. 562 (1977)............................................................................16

**TREATISES**

Restatement (Second) of Torts § 652C...................................................24

Restatement (Third) of Unfair Competition, § 46 ................................24

Restatement (Third) of Unfair Competition, § 47, cmt. c ................2, 21

**CONSTITUTIONAL PROVISIONS**

California Constitution, Article 1, § 9 ....................................................7

DWT 20044952v6 0058278-000014

United States Constitution, First Amendment ..................................................passim

**OTHER AUTHORITIES**

D. Kelley & L. Jordan, Twenty Years of Rogers v. Grimaldi: Balancing the
Lanham Act with the First Amendment Rights of Creators of Artistic
Works, 99 Trademark Rep. 1360, 1373-1374 (2009).........................................25

Dougherty, 27 Colum. J. L. & Arts 1 .....................................................16

E. Volokh, Freedom of Speech and the Right of Publicity, 40 Hous. L. Rev.
903, 908 & n. 20 (2003).......................................................................25

Gerald Warner Brace, The Stuff Of Fiction (1969)...............................12

H. Stam, Defamation In Fiction, at 580-81..........................................12

Heidi Stam, Comment, Defamation In Fiction: The Case For Absolute First
Amendment Protection, 29 Am. U. L. Rev. 571, 572 (1980) .......................9, 10

J. Thomas McCarthy, The Rights of Publicity and Privacy, § 1:35 at 76 (2d
ed. 2010) ..........................................................................................25

Mary Borden, Personal Experience and the Art of Fiction, in Essays By
Divers Hands, Being the Transactions of the Royal Society Of Literature
87 (E.V. Rieu ed. 1958) ......................................................................12

Volokh, 40 Hous. L. Rev. .....................................................................16

W.L. Prosser, Privacy, 48 Calif. L. Rev. 383, 405 (1960)..........................8

DWT 20044952v6 0058278-000014

## 1.   SUMMARY OF ARGUMENT

Appellant Jeffrey Sarver claims that the Academy-Award winning film, "The Hurt Locker," was derived from his personal experiences as an Explosive Ordinance Disposal technician for the United States Army in Iraq, and that one of the characters in the film was based on him.  According to Appellant, this "taking" of a part of his life story without his consent gives rise to a tort claim for misappropriation, and entitles him to substantial damages against the filmmaker and a laundry-list of other defendants.

Appellant may or may not be right in claiming that one of the characters in this fictional film was based on him; although the record does not resolve that question, for purposes of this brief, Amici assume that it is true.  In that event, Appellant would join the thousands (or even millions) of men, women, and children around the world, living and dead, whose lives have served as the inspiration for authors, screenwriters, and playwrights since the advent of the written word.

But Appellant is wrong in claiming that this connection – even if irrefutable – entitles him to demand payment from the filmmakers, or to otherwise control any public discourse about (or inspired by) him.  The First Amendment's broad protection for free speech and press simply does not permit this kind of monopolization of expression relating to real people or events.  Consequently, this

1

Court should hold unequivocally that misappropriation claims purporting to arise from films inspired by (or based on) real people or events are constitutionally barred.  <u>See</u> Section 3(A), <u>infra</u>.

If, notwithstanding these important First Amendment interests, this Court finds that such misappropriation claims can be brought under narrowly defined circumstances, it should adopt a constitutionally-based bright-line test that strictly limits these claims to scenarios where plaintiffs can prove that the use of their names, likenesses, or personas was wholly unrelated to the underlying work, or were merely a "disguised advertisement" for an unrelated product or service.  <u>See</u> Section 3(B), <u>infra</u>; <u>Rogers v. Grimaldi</u>, 875 F. 2d 994 (2d Cir. 1989); <u>Restatement (Third) of Unfair Competition</u>, § 47, cmt. c (misappropriation claims based on creative works are constitutionally barred unless name/likeness "is used solely to attract attention to a work that is not related to the identified person").

## 2.  THE FIRST AMENDMENT DOES NOT PERMIT MISAPPROPRIATION CLAIMS TO ARISE FROM MOTION PICTURES INSPIRED BY REAL PEOPLE AND EVENTS.

From William Shakespeare to Mark Twain, writers throughout history have drawn from their own life experiences, as well as from their knowledge of real-life events, to create great works of literature.[6]  Authors like Charles Dickens, James

---

[6] Mark Twain is often credited with originating the phrase adopted by generations of creative writing teachers:  "Write what you know."

DWT 20044952v6 0058278-000014

Michener, and Ernest Hemingway, just to name a few, have used the artifice of fiction to introduce readers to the world in which they lived.

Similarly, since the advent of motion pictures, filmmakers have created works that have entertained, inspired, and educated the viewing public, by drawing upon actual events and people. These films take many forms, including the adaptation of literary works by renowned authors;[7] docudramas, which dramatize historical events;[8] historical fiction, in which real people and events serve as a backdrop for a fictional story;[9] and purely fictional works that may have been inspired by real events or people.[10]

The recognition that such works are constitutionally protected is nothing new. To the contrary, just as news coverage cannot constitutionally be censored by individuals seeking to avoid media attention, it is well established that unauthorized biographies, documentaries, or other expressive works based on real

---

[7] See, e.g., "Richard III" (1955), "Tom Sawyer," "Oliver," and "A Farewell To Arms," among many others.

[8] "The King's Speech," "The Blind Side," "Erin Brockovich," "The Perfect Storm," and "The Social Network" are just a few recent critically-acclaimed films based on real-life people and events.

[9] The Academy-award winning film "Titanic," for example, depicted a real event, and depicted historical figures, but was set against the backdrop of an entirely fictional story.

[10] "Citizen Kane," "Primary Colors," "The Devil Wears Prada," and "The Help" were all inspired by (or even loosely based on) actual people or events.

3

people and events enjoy full First Amendment protection.  As one leading legal

commentator explained, contrary to popular belief, "life-story rights" do not

convey the "exclusive right" to tell a person's life story.  To the contrary, "[t]he

law gives to no living person the 'exclusive right' to tell his or her life story."

McCarthy, Thomas J., 2 Rights of Publicity & Privacy § 8:64 (2d ed.).  There is

good reason for this:

> If the law mandated that the permission of every living person and the
> descendants of every deceased person must be obtained to include
> mention of them in news and stories, both in documentary and
> docudrama telling, then they would have the right to refuse
> permission unless the story was told "their way."  That would mean
> that those who are the participants in news and history could censor
> and write the story and their descendants could do the same.  This
> would be anathema to the core concept of free speech and a free press.

Id.  Thus, in "life-story" contracts, "the subject can only promise two things:  (1)

cooperation by the subject; and (2) a waiver of suing for defamation and invasion

of privacy."  Id.[11]

Consistent with this principle, this Court and other courts around the country

repeatedly have found that the First Amendment bars misappropriation claims based

---

[11] The California Court of Appeal expressed a similar sentiment in
Polydoros v. Twentieth Century Fox Film Corp., 67 Cal. App. 4th 318, 326 (1997),
explaining that the "entertainment industry custom of obtaining 'clearance' of all
characters featured in both fictional and nonfiction motion pictures" establishes
"nothing, other than the unfortunate reality that many filmmakers may deem it
wise to pay a small sum up front for a written consent to avoid later having to
spend a small fortune to defend unmeritorious lawsuits such as this one."

4

on news and feature reporting, documentaries, and biographical works.  See, e.g., Cher v. Forum Int'l, Ltd., 692 F.2d 634, 638 (9th Cir. 1982); Daly v. Viacom, Inc., 238 F. Supp. 2d 1118, 1123 (N.D. Cal. 2002) (dismissing misappropriation claim arising from reality television program on First Amendment grounds); Ruffin-Steinback v. dePasse, 82 F. Supp. 2d 723, 730 (E.D. Mich. 2000) (right-of-publicity does not prohibit unauthorized depictions of life story); Dora v. Frontline Video, Inc., 15 Cal. App. 4th 536, 442-44 (1993) (documentary film about surfing protected); see also Hoffman v. Capital Cities/ABC, Inc., 255 F.3d 1180, 1185-86 (9th Cir. 2001) (First Amendment protected magazine's use of altered photograph of celebrity); Ann-Margret v. High Soc'y Magazine, Inc., 498 F. Supp. 401, 404-05 (S.D.N.Y. 1980) (First Amendment protected magazine's reprinting of photograph from a movie scene); Stewart v. Rolling Stone LLC, 181 Cal. App. 4th 664, 692 (2010) (reference to independent bands in magazine article protected).

Of particular importance here, this same broad constitutional protection consistently has been applied to misappropriation claims purporting to arise from fictional or dramatized works.  Sixty years ago, in Joseph Burstyn, Inc. v. Wilson, 343 U.S. 495, 501, 502 (1952), the United States Supreme Court confirmed that fictional films are "a significant medium for the communication of ideas" entitled to full First Amendment protection – just like books, newspapers and other forms of expressive communication.  The Court made clear that these constitutional protections are not diminished by the fact that the work may be properly labeled as

5

"entertainment," noting that "[t]he importance of motion pictures as an organ of public opinion is not lessened by the fact that they are designed to entertain as well as inform." Id. at 501-02.[12]

Following this rationale, courts across the country have held that the First Amendment protects fictional works from misappropriation claims, just as it protects news reporting and other fact-based publications. E.g., Guglielmi v. Spelling-Goldberg Prods., 25 Cal.3d 860, 866 (1979) (finding constitutional protection for unauthorized use of Rudolph Valentino's name and likeness in semi-fictional movie); Polydoros, 67 Cal. App. 4th at 326 (fictional film inspired by screenwriter's childhood experiences, including a character based on a member of his sandlot baseball team, was protected); Tyne v. Time Warner Entm't Co., L.P., 901 So.2d 802 (Fla. 2005) (protecting film that dramatized account of disappearance of fishing vessel and crew during powerful storm); Meeropol v. Nizer, 560 F.2d 1061, 1066-67 (2d Cir. 1977) (alleged fictionalized account of Julius and Ethel Rosenberg trial not actionable under misappropriation theory; both "historical" and "fictional" works are fully protected by the First Amendment); Matthews v. Wozencraft, 15 F.3d 432, 439 (5th Cir. 1994) (First Amendment protects

---

[12] Accord Winters v. New York, 333 U.S. 507, 510 (1948) (both entertainment and news are fully protected by the First Amendment because "[t]he line between the informing and the entertaining is too elusive for the protection of that basic right [of a free press]").

use of persona in novel, including plaintiff's "character, occupation, and the general outline of his career, with many incidents of his life"); <u>Rogers</u>, 875 F.2d at 1004 ("fictional and semi-fictional book[s] or movie[s]" are constitutionally protected); <u>Hicks v. Casablanca Records</u>, 464 F. Supp. 426 (S.D.N.Y. 1978) (use of name and characteristics of Agatha Christie in fictional film protected under First Amendment); <u>Seale v. Gramercy Pictures</u>, 949 F. Supp. 331, 337 (E.D. Pa. 1996) (use of plaintiff's persona in dramatized film about Black Panthers was protected expression); <u>Doe v. Roe</u>, 638 So. 2d 826, 829 (Ala. 1994) (rejecting attempt to enjoin fictional novel about the murder of plaintiff's adoptive children's natural mother on constitutional grounds); <u>Rosemont Enterprises, Inc. v. McGraw-Hill Book Co.</u>, 85 Misc. 2d 583, 587, 380 N.Y.S.2d 839 (N.Y. Sup. 1975) (unauthorized, fictional biography of Howard Hughes could not provide the basis for a misappropriation claim; "Howard Hughes is no different from any other person in that he cannot have a monopoly, nor can he give a monopoly to any entity, with respect to works concerning his life"); <u>see also</u> <u>Newton v. Thomason</u>, 22 F.3d 1455, 1461 (9th Cir. 1994) (fictional television character based on living person not a commercial use).[13]  As Professor William Prosser concluded, "there is

---

[13] <u>See</u> <u>also</u> <u>Katzev v. Los Angeles County</u>, 52 Cal. 2d 360, 365-66 (1959) (ordinance prohibiting the sale of certain "fictional" accounts of crime in comic books was unconstitutional under the First Amendment and Article 1, § 9 of the California Constitution); <u>Eastwood v. Superior Court</u>, 149 Cal. App. 3d 409, 423

7

no liability when the plaintiff's character, occupation, and the general outline of his career, with many real incidents in his life, are used as a basis for a figure in a novel who is still clearly a fictional one."  W.L. Prosser, <u>Privacy</u>, 48 Calif. L. Rev. 383, 405 (1960) (citations omitted).

Indeed, the justifications for protecting works of fiction from right-of-publicity claims are compelling.  As former California Chief Justice Rose Bird concluded, in rejecting a claim based on a docudrama about Rudolph Valentino:

> It is clear that works of fiction are constitutionally protected in the same manner as political treatises and topical news stories.  Using fiction as a vehicle, commentaries on our values, habits, customs, laws, prejudices, justice, heritage and future are frequently expressed. What may be difficult to communicate or understand when factually reported may be poignant and powerful if offered in satire, science fiction or parable.  Indeed, Dickens and Dostoevski may well have written more trenchant and comprehensive on their times than any factual recitation could ever yield. …
>
> Thus, no distinction may be drawn in this context between fictional and factual accounts of Valentino's life.  Respondents' election of the former as the mode for their views does not diminish the constitutional protection afforded speech.

<u>Guglielmi</u>, 25 Cal. 3d at 867-68 (Bird, C.J., concurring) (footnotes omitted).[14]  <u>See also</u> <u>Middlebrooks v. Curtis Publishing Co.</u>, 413 F. 2d 141 (4th Cir. 1969)

---

(1983) ("works of fiction are constitutionally protected in the same manner as topical news stories").

[14] Although written as a concurrence, the Court subsequently noted that Chief Justice Bird's opinion "commanded the support of the majority of the court,"

("[a]uthors of necessity must rely on their own background and experiences in

writing fiction").

> Another author explained the importance of fictional works as follows:
>
> In many respects, fiction is as useful to society as any major historical text in depicting the events, customs, and general state of morality or intellectual advancement of a given period. . . .
>
> Fiction, however, is broader than history in that it is not limited by the requirement of factual accuracy. Novels deal with an infinite variety of subjects, situations, thoughts, and feelings; they have the ability to provide people with insights that would otherwise remain undisclosed. In this sense, fiction is a vehicle for expanding the minds of men and enables them to relate to all aspects of the human experience. . . .
>
> The combined impact of the author's personal right to express his views through a creative medium and the public's right of access to his ideas leaves little doubt that works of fiction are included within the first amendment's guarantee of free speech.

Heidi Stam, Comment, <u>Defamation In Fiction:  The Case For Absolute First

Amendment Protection</u>, 29 Am. U. L. Rev. 571, 572 (1980) ("<u>Defamation In

Fiction</u>") (citations and footnotes omitted).

> After surveying the case law, Professor McCarthy concluded that no

misappropriation claim should be permitted where a work of fiction essentially is

an "'unauthorized" biography that contains fictional episodes and dialogue

---

since her opinion was joined or endorsed by three other Justices.  <u>Comedy III Productions, Inc. v. Gary Saderup, Inc.</u>, 25 Cal. 4th 387, 396 n.7 (2001).

intentionally inserted to embellish the story and give greater entertainment value.

2 McCarthy § 8.9[F] (Release #11).  As he observed:

> No commercial injury greater or different in kind is presented when the story is fictional rather than factual, and is clearly labeled as such. While the argument has been made that such a fictionalized biography is no different from use of identity on non-media merchandise and advertising, this argument ignores the history of the first amendment … [which] makes it clear that books, magazines, newspapers, movies, television docudramas, and the like have a favored position in our law and culture.  All these forms of media convey ideas, information, and role models, as well as entertain.  I believe that the opinion of the California Supreme Court states the matter well in the <u>Rudolph Valentino</u> case [<u>i.e.</u>, Justice Bird's concurring opinion in the <u>Guglielmi</u> case]:  "<u>[A]ny assertion that fictional accounts pose a unique threat to the right of publicity not found in truthful reports is simply not justified.</u>"

<u>Id.</u> (citations omitted; emphasis added).

These constitutional principles consistently have been applied to reject claims, like Appellant's claim here, that individuals who serve as the inspiration for a fictional character are entitled to demand payment for the "use" of their persona, or for the "use" of some aspect of their life story in a fictional work.  For example, in a decision that is directly applicable here, the California Court of Appeal rejected a misappropriation claim brought against filmmakers of the fictional film "The Sandlot."  <u>Polydoros</u>, 67 Cal. App. 4th at 322.  The plaintiff asserted that one of the characters in that film was based on him because the character had physical characteristics similar to the plaintiff's when he was a child, and had a similar name.  But in affirming summary judgment for the defendants,

10

the appellate court explained that the plaintiff "is not entitled to recover under a commercial appropriation of name or likeness theory merely because [filmmakers] used a name that sounds like [his] name or employed an actor who resembles [him]." Id. at 325. Because the filmmakers "were creating a fictionalized artistic work, their endeavor [was] constitutionally protected." Id.

The Polydoros court also found "particularly compelling" the reasoning of a decision from New York, which held that misappropriation claims should not be permitted for works of fiction because writers must be allowed to draw from their personal experience in creating such works. In People v. Charles Scribner's Sons, 205 Misc. 818, 130 N.Y.S.2d 514 (N.Y. Mag. Ct. 1954), Joseph Anthony Maggio sued under a criminal statute that prohibited the appropriation of name and likeness, based on the publication of the fictional book and movie entitled "From Here to Eternity." The fictional works were inspired by the author's army experience during a period in which he served in the same company as Maggio in Hawaii. Although the book depicted a character named "Angelo Maggio" – and allegedly contained some scenes that actually occurred involving the plaintiff, the court dismissed the misappropriation charges, explaining that "[i]t is generally understood that novels are written out of the background and experiences of the novelist," and that the characters often "grow out of real persons the author has met

11

or observed.  This is so also with respect to the places which are the setting of the novel."  Id. at 821; 130 N.Y.S. at 517 (emphasis added).

> As one commentator has noted:
>
> Novelists need the resource of real life to adequately present their views.  They intentionally use real people in a fictional context to mark the time, heighten interest, or interpret a character, process, or era….  [T]he use of a familiar personality may be crucial to the desired impact of the book.  Punishing the use of an actual person in this instance detracts from the usefulness of fiction as a medium for the expression of ideas.  The genre of fiction that employs this device serves an important social purpose and often is no less fictional than other works.

H. Stam, Defamation In Fiction, at 580-81 (emphasis added; citations and footnotes omitted).  See also Mary Borden, Personal Experience and the Art of Fiction, in Essays By Divers Hands, Being the Transactions of the Royal Society Of Literature 87 (E.V. Rieu ed. 1958) (life is the "raw material of fiction"; the author's experiences add color to "those aspects of the human drama that he will turn into stories"); Gerald Warner Brace, The Stuff Of Fiction, 82-85 (1969) (many fiction writers strive to remain close to reality, and derive their characters from individuals they know; in discussing the real-life basis of many fictional characters – including those created by Charles Dickens, Thomas Wolfe, James Joyce and others – the author notes that it is "paradoxical to point out that the life study is of immense value to the writer").

The need for broad protection of such creative works is plain:  if misappropriation claims are permitted to proceed based on the use of fictional

characters that were based on, inspired by, or even largely copied from real-life experiences, there would be an unprecedented – and all but insurmountable – hurdle for authors who, as a matter of practice and necessity, frequently draw upon people that they have encountered in real life, without seeking permission from those individuals before incorporating either their names, or depictions of their life experiences, into works of fiction. Without constitutional protection for these works, an inestimable number of valuable and entertaining fictional works never would be published because of fear of potential lawsuits by those portrayed in the work. The end result would be to stifle any creative work derived from an author's life experiences, unless the hugely expensive, and often impossible, task is undertaken of obtaining releases from <u>every single individual</u> who might claim that his or her identity is used for a character in the work.

Indeed, if Appellant's theory of the law had been the norm, many acclaimed motion pictures about or inspired by real people likely would never have been made. Orson Welles might well have simply shelved the film "Citizen Kane," which includes a character who was inspired by William Randolph Hearst, since it is inconceivable that Hearst would have consented to having his "persona" depicted in that manner. Steven Spielberg might have confined himself to movies about extraterrestrials, instead of making the epic film "Saving Private Ryan," which was inspired by the true story of Sgt. Frederick Niland – a real-life

paratrooper in the 101st Airborne Division whose three brothers were killed in action in different theatres of war around the same time. Writer/director Cameron Crowe might have been reluctant to produce the fictional motion picture "Almost Famous," which is a semi-autobiographical account of his real-life experience as a 15-year-old journalist for *Rolling Stone* magazine. Kathryn Stockett might never have found a publisher – let alone a film producer – for her best-selling novel, "The Help," which drew upon her childhood experiences in the Deep South to vividly depict the perspective of African-American maids in the 1960s about their complicated relationships with the white families they served. And James Cameron might have skipped to avatars rather than producing the blockbuster film "Titanic," which set a fictional story against the backdrop of the real-life, tragic sinking of the British passenger liner.

### 3. THIS COURT SHOULD APPLY A BRIGHT-LINE TEST FOR MISAPPROPRIATION CLAIMS BASED ON EXPRESSIVE WORKS RELATED TO REAL PEOPLE OR EVENTS.

Because it is unpredictable and susceptible to inconsistent application, the transformative-use test creates uncertainty that is inconsistent with the First Amendment principles described above. Even worse, Appellant's crabbed interpretation of that test cannot be reconciled with existing constitutional jurisprudence. Under his ill-conceived interpretation, the transformative-use test would shield only highly fanciful or surreal works, and would strip constitutional

protection from an entire genre of expressive works that, up to now, have enjoyed full constitutional protection. This is contrary to the California Supreme Court's admonition that "[n]o author should be forced [by threat of a right-of-publicity claim] into creating mythological worlds or characters wholly divorced from reality." Guglielmi, 25 Cal. 3d at 869. This Court should find instead that the First Amendment categorically bars right-of-publicity claims arising from expressive works inspired by real people and events. At minimum, if this Court declines to find that such claims are constitutionally prohibited, it should ensure that the limitations on such claims are clearly and narrowly drawn.

The limitations of the transformative-use test are apparent. Just two years after its first articulation,[15] the California Supreme Court had to clarify its earlier ruling. Even though the Court noted that the application of the test to a comic-book's phantasmagoric depiction of celebrity musicians was "not difficult," its statement came in a decision reversing an intermediate appellate court's unanimous holding that the test did not protect the publisher's depiction of the musician-brothers as "worm-like" creatures. Winter v. DC Comics, 30 Cal. 4th at 890, 892 (2003).

In the nine years since Winter, the confusion caused by the transformative-use test has not abated. Instead, courts have continued to struggle with its proper

---

[15] Comedy III, infra, 25 Cal. 4th 406 (2001).

application, resulting in inconsistent opinions that have created substantial

confusion and uncertainty in this area of the law.[16] Thus, it is not surprising that

leading commentators have criticized this test. Professor McCarthy, for example,

observed that the transformative-use test is "extremely difficult to predict and

apply because it requires a court to make an aesthetic judgment" about "the degree

of the artistic transformation" required for a work to qualify for First Amendment

protection. 2 McCarthy § 8:72, at 248, 269.[17] As he explained:

---

[16] Compare Keller v. Electronic Arts, Inc., No. CV09-1967 CW, 2010 U.S. Dist. LEXIS 10719 (N.D. Cal. Feb. 8, 2010) (suggesting that transformative-use test requires defendant to alter the name or likeness of a plaintiff within an expressive work); No Doubt v. Activision Publg., Inc., 192 Cal. App. 4th 1018 (2011) (same); and Davis v. Electronic Arts, Inc., Case No. 10-03328 RS (DMR), 2011 U.S. Dist. LEXIS 71642 (N. D. Cal. July 5, 2011); with Hart v. Electronic Arts, Inc., 808 F. Supp. 2d 757 (D.N.J. 2011) (recognizing that the transformative-use test does not require a defendant to alter the name or likeness of a plaintiff within an expressive work); Arenas v. Shed Media U.S., Inc., Case No. CV11-05279 DMG, 2011 U.S. Dist. LEXIS 101915 (C.D. Cal. Aug. 22, 2011) (same).

Other decisions have applied different tests, often without a discussion of the First Amendment issues or competing tests. See, e.g., Doe v. TCI Cablevision, 110 S.W.3d 363 (Mo. 2003) (applying a "predominant-use" test); Rogers, 875 F. 2d at 1004 (articulating its own test, consistent with the Restatement); Zacchini v. Scripps-Howard Broadcasting Co., 433 U.S. 562 (1977) (sui generis case arising from the appropriation of the plaintiff's entire act); Dr. Seuss Enterprises, L.P. v. Penguin Books USA, Inc., 109 F. 3d 1394 (9th Cir. 1997) (applying traditional trademark-law "likelihood of confusion" test, without discussion of First Amendment issues); Mutual of Omaha Ins. Co. v. Novak, 836 F.2d 397 (8th Cir. 1987) (applying "alternative avenues" test).

[17] For additional criticisms of the test, see Volokh, 40 Hous. L. Rev. at 916-925; Dougherty, 27 Colum. J. L. & Arts 1, at 35-71.

> Unclear rules with resulting unpredictability of results are always dismaying in any area of the law. But it is especially undesirable when First Amendment issues of free speech and free press are implicated. First Amendment rights are said to need 'breathing space': uncertainty about the legal rules governing speech protected by the First Amendment is viewed as having a 'chilling effect' on freedom of speech.

Id. at § 8:9.

Appellant's articulation of the transformative-use test would create even greater confusion and inconsistencies. Appellant contends that the district court erred because it did not limit its analysis to whether Appellant's likeness itself was transformed in the film. Op. Br. at 33. He relies on recent decisions from the Northern District of California in Keller and its progeny (which are currently on appeal), arguing that since the character in the "Hurt Locker" that he claims was inspired by his life "was not placed in a setting different from that in which [Appellant] worked and lived[,]" and "[h]is physical likeness, biography [and other] attributes were not altered[,] [t]he Will James [] character was simply walking in [Appellant's] shoes." Id. As a result, Appellant maintains that his alleged portrayal in "The Hurt Locker" was not transformative.[18]

---

[18] Contrary to Appellant's attempted formulation of the test, the district court properly found that the transformative-use test, as articulated by the California Supreme Court, must look at the work as a whole, and not merely at the alleged depiction of the plaintiff.

Under Appellant's incredibly restrictive interpretation of the transformative-use test, however, fictional works that depict real people and events (or that are inspired by actual people and events) never could qualify for First Amendment protection, because the characters in such works necessarily would share the attributes of the people they are intended to depict. This would turn decades of well-established constitutional jurisprudence on its head, and threaten an entire genre of expressive works.[19] It also raises the question how a principled distinction could be drawn between fictional works and other types of works; for example, it is not difficult to imagine prospective plaintiffs in future cases using this same argument to demand compensation for any "use" of their names or images in non-fiction publications, including documentaries, recreations of historical events, or even the evening news.[20]

---

[19] Indeed, because many states' laws allow post-mortem right-of-publicity claims Appellant's restrictive theory of First Amendment rights could eliminate even historical figures from the public discourse.

[20] Appellant's theory also subjects filmmakers to the risk of multiple claims by individuals claiming that a particular fictional character was "based on" or "inspired by" them. It is hardly uncommon for more than one individual to claim that he or she is the "real" person upon whom a fictional character is based. For example, two different plaintiffs – both with the first name "Michael" – unsuccessfully sued Fox Television Studios, Inc., each claiming that the fictional television series "Burn Notice," which featured an ex-spy named "Michael Westen," was based on his life story. Terry v. Fox Group, Los Angeles Superior Court No. BC478450; Bertsch v. Rupert Murdoch, et al., 3:2012cv05029 (W.D. Wash., January 11, 2012).

This Court is not limited to the California Supreme Court's transformative-use test, and can instead give district courts a clear, bright-line rule to apply to misappropriation cases involving expressive works. It is well-settled that "the federal judiciary is supreme in the exposition of the law of the Constitution[.]" Cooper v. Aaron, 358 U.S. 1, 18 (1958). Where, as here, a federal court is called upon to decide a federal constitutional issue, it is not bound by state-court authority. See RAR, Inc. v. Turner Diesel Ltd., 107 F.3d 1272, 1276 & n.1 (7th Cir. 1997) (emphasis omitted).[21] See also Hilton v. Hallmark Cards, 599 F.3d 894, 909 n.11 (9th Cir. 2010) (Court took "no position on whether there is a First Amendment defense to misappropriation of the right of publicity that is distinct from the [transformative-use test] the California Supreme Court has articulated," "leav[ing] for another day the question of whether the First Amendment furnishes a defense to misappropriation of publicity that is broader than the transformative use or public interest defenses").

This Court should answer the question left open in Hilton, by finding that right-of-publicity claims cannot arise from expressive works that are inspired by, or based on, real people or events. See Section 3(A), infra. In the alternative, if

---

[21] The Erie doctrine does not extend to "matters governed by the Federal Constitution." Erie R.R. v. Tompkins, 304 U.S. 64, 78 (1938). Federal courts sitting in diversity therefore "are under no obligation to defer to state court interpretations of federal [constitutional] law." RAR, 107 F.3d at 1276.

19

such claims are to be permitted at all, this Court should reject the transformative-use test in favor of the <u>Rogers</u>/<u>Restatement</u> test for such claims.  <u>See</u> Section 3(B).

**A.  This Court Should Find That Expressive Works Inspired By Real People Or Events Are Not Subject To Claims For Alleged Violations Of Publicity Rights.**

Right-of-publicity claims arising from expressive works are inconsistent with the First Amendment because they do not pass the constitutional test applicable to content-based restrictions on expressive works.  <u>Bartnicki v. Vopper</u>, 532 U.S. 514, 526 (2001) (a speech regulation is content based when it cannot be "justified without reference to the content of the regulated speech").  Under the First Amendment, such content-based restrictions on expressive speech are subjected to strict scrutiny.  <u>See</u> <u>R.A.V. v. City of St. Paul</u>, 505 U.S. 377, 382 (1992) (content-based speech regulation subject to the highest level of scrutiny); <u>Sable Comm'ns of California, Inc. v. FCC</u>, 492 U.S. 115, 126 (1989) (content-based speech restrictions must be narrowly drawn to serve a compelling government interest).[22]  Because right-of-publicity claims protect against the <u>commercial</u> use of a person's identity, which is not implicated by the use of a plaintiff's name or likeness in an <u>expressive</u> work, there is no compelling government interest to weigh against the public's significant interest in free expression.

---

[22] Even content-neutral speech restrictions must meet intermediate scrutiny: the restriction must be narrowly tailored to further a substantial government interest. <u>Turner Broad. Sys., Inc. v. FCC</u>, 512 U.S. 622, 642 (1994).

Although courts have tended to neglect well-established First Amendment strict scrutiny tests in this area, instead struggling with various kinds of "balancing" tests, that anomaly does not change the well-entrenched Supreme Court precedent requiring strict scrutiny of content-based restrictions on expressive works. See City of Renton v. Playtime Theatres, Inc., 475 U.S. 41, 48 (1986); see also Frazier v. Boomsma, No. CV07-08040, 2007 WL 2808559 at *15 (D. Ariz. Sept. 27, 2007) (right of publicity is a content-based restriction on protected speech, subject to strict scrutiny). The conflicting and confusing body of case law in misappropriation rights cases militates in favor of a return to the "strict scrutiny" analysis, and a categorical exemption protecting expressive works from publicity rights liability.

Such a finding would not mean that prospective plaintiffs are without a remedy if filmmakers cross the line of protected speech. If a plaintiff can meet the constitutional requirements for a defamation claim, or for a public disclosure of private facts claim, the law does and would continue to provide a remedy.[23]

But that differs from allowing an individual to have a monopoly on public events or historical facts. Giving individuals the ability to demand payment for any "use" of their names or likenesses in expressive works, or in works that may have been "inspired" by a real-life person, is the equivalent of censorship: it gives

---

[23] Different principles can and should apply where an individual's name or likeness is used to advertise products. See Restatement (Third) of Unfair Competition, § 47, cmt. c.

them the power to control what may be expressed, and the cost and attendant risks inevitably result in filmmakers avoiding stories that could give rise to expensive and time-consuming claims.

**B.  Alternatively, The Court Should Adopt The <u>Rogers</u>/<u>Restatement</u> Test.**

If this Court declines to issue a categorical bar against misappropriation claims arising from expressive works about (or inspired by) real people, the First Amendment requires, at minimum, that the parameters of such claims must be clearly and narrowly drawn.  The most appropriate test to ensure the protection of important constitutional rights is the <u>Rogers</u>/<u>Restatement</u> test, which provides a much more predictable and straightforward test than the California Supreme Court's muddled "transformative use" test.

In <u>Rogers</u>, actress Ginger Rogers brought Lanham Act, right-of-publicity, and other claims against the producers of the film "Ginger and Fred" – a title that alluded to Rogers' collaboration with Fred Astaire.  875 F.2d at 996-997.  The film was not about the iconic American performers, but instead related the story of two fictional Italian cabaret singers who once earned their livings by imitating the real Ginger and Fred.  <u>Id.</u> at 996-997.

Addressing the Lanham Act claim first, the <u>Rogers</u> court reasoned that "[t]itles, like the artistic works they identify, are of a hybrid nature, combining artistic expression and commercial promotion."  <u>Id.</u> at 998.  Consumers of artistic

works therefore "have a dual interest" in "not being misled" and in "enjoying the results of the author's freedom of expression." Id. Accordingly, "the expressive element of titles requires more protection than the labeling of ordinary commercial products." Id. But the court concluded that, "[b]ecause overextension of Lanham Act restrictions in the area of titles might intrude on First Amendment values, we must construe the Act narrowly to avoid such a conflict," and must allow Lanham Act claims to proceed "only where the public interest in avoiding consumer confusion outweighs the public interest in free expression." Id. at 998-999. That balance, the court held, favors the First Amendment "unless the title has no artistic relevance to the underlying work whatsoever, or, if it has some artistic relevance, unless the title explicitly misleads as to the source or the content of the work." Id. at 999 (emphasis added). Applying that two-part test, the court dismissed Rogers' Lanham Act claim. Id. at 1001-1002.

Turning to Rogers' right-of-publicity claim, the court cautioned that such claims pose even greater dangers to free speech than those brought under the Lanham Act. "Because the right of publicity, unlike the Lanham Act, has no likelihood of confusion requirement," the court warned, "it is potentially more expansive than the Lanham Act." Id. at 1004. "Perhaps for that reason, courts delineating the right of publicity, more frequently than in applying the Lanham Act, have recognized the need to limit the right to accommodate First Amendment

DWT 20044952v6 0058278-000014

concerns." Id. Borrowing heavily from its Lanham Act analysis, the court predicted that state law would not "permit the right of publicity to bar the use of a celebrity's name in a movie title unless the title was 'wholly unrelated' to the movie or was 'simply a disguised commercial advertisement for the sale of goods or services." Id. at 1004 (emphases added; citation omitted). Applying that test to the film at issue, the court held that Rogers' right-of-publicity claim also was barred by the First Amendment. Id. at 1004-1005.

The Rogers test is consistent with the Restatement approach, which limits liability for violating the right of publicity to the unauthorized appropriation of the commercial value of a person's identity "for purposes of trade." Restatement (Third) of Unfair Competition, § 46. The term "for purposes of trade" does not ordinarily include the use of a person's identity in "news reporting, commentary, entertainment, works of fiction or nonfiction, or in advertising that is incidental to such uses." Id. § 47 (emphasis added). Specifically, the Restatement presumes that "use in entertainment and other creative works is permitted," unless "the name or likeness is used solely to attract attention to a work that is not related to the identified person." Id. § 47, cmt. c.[24] Leading commentators have recognized that

---

[24] Accordingly, mere incidental uses do not result in tort liability. Moreover, such uses typically are not deemed to be "commercial" uses that would support a claim. See, e.g., Restatement (Second) of Torts § 652C, commend d; see also E.S.S., 547 F.3d at 1100 (alleged use of trademark was incidental).

the Rogers/Restatement approach provides a clear, predictable, and more

protective test for evaluating right-of-publicity claims arising from expressive

works, affording the necessary breathing room for free expression.[25]

It has been followed by other federal courts in cases adjudicating First Amendment

defenses to a Lanham Act claim.[26]  And importantly, this Court already has

"agree[d] with the Second Circuit's analysis and adopt[ed] the Rogers standard as

[its] own" for deciding whether the First Amendment protects expressive works

against Lanham Act claims.  Mattel, Inc. v. MCA Records, Inc., 296 F.3d 894, 902

(9th Cir. 2002); see also E.S.S. Entm't 2000, Inc. v. Rock Star Videos, Inc., 547

F.3d 1095, 1098-1101 (9th Cir. 2008) (Rogers test applies to any use of a mark

within an expressive work).[27]

------

[25] See, e.g., E. Volokh, Freedom of Speech and the Right of Publicity, 40 Hous. L. Rev. 903, 908 & n.20 (2003) ("courts have consistently held – correctly, in my view – that that the right of publicity may not restrict … movies, novels, plays, or songs that use people's names or likeness"; citing Rogers with approval); J. Thomas McCarthy, The Rights of Publicity and Privacy, § 1:35 at 76 (2d ed. 2010) (observing that with respect to entertainment and works of non-fiction, "liability [for violation of the right of publicity] could arise in this otherwise exempt category of uses only in the highly unusual situation that the work had nothing to do with the plaintiff and the plaintiff's identity was inserted solely to attract attention to the work").

[26] See D. Kelley & L. Jordan, Twenty Years of Rogers v. Grimaldi: Balancing the Lanham Act with the First Amendment Rights of Creators of Artistic Works, 99 Trademark Rep. 1360, 1373-1374 (2009).

[27] The two-part test, as articulated for Lanham Act claims, is:  (1) whether the use has "no artistic relevance whatsoever" to the underlying work; and (2)

In <u>E.S.S.</u>, the plaintiff operated a strip club called the "Play Pen" in East Los Angeles.  <u>Id.</u> at 1097.  The defendant's video game "Grand Theft Auto: San Andreas" featured a virtual strip club called "the Pig Pen" located in a virtual neighborhood called "East Los Santos."  <u>Id.</u>  The game's designers "took some inspiration" from photographs they had made of the real-world Play Pen, although the two establishments (one real, one virtual) were not identical in appearance.  <u>Id.</u> at 1097-1098.  Applying the <u>Rogers</u> test, this Court concluded that the video-game publisher's First Amendment rights defeated the strip club's Lanham Act claim because the virtual Pig Pen club was part of an artistic attempt "to develop a cartoon-style parody of East Los Angeles," and a "reasonable way" to do that is to "recreate a critical mass of the businesses and buildings" in that area, and because the use did not explicitly mislead the public into believing that the plaintiff endorsed the game.  <u>Id.</u> at 1100.

If this Court is inclined to ever permit right-of-publicity claims arising from works inspired by real people, like Appellant's claim here, it should adopt the <u>Rogers</u>/<u>Restatement</u> test.   Doing so would accomplish what this Court did when it applied the <u>Rogers</u> test to Lanham Act claims – it would provide a straightforward, predictable standard that would prevent right-of-publicity claims from

---

whether the use "explicitly misleads" as to the source or content of the work. <u>E.S.S.</u>, 547 F.3d at 1100.

26

"encroach[ing] upon the zone protected by the First Amendment." <u>Mattel</u>, 296 F.3d at 900. Whether it is applied to Lanham Act or right-of-publicity claims, the <u>Rogers</u> test affords creative expression the breathing space it needs to flourish, and avoids the chilling effect potentially caused by more subjective legal standards like the transformative-use test. <u>See</u> 2 McCarthy § 8:9 at 104-105. It is consistent with the <u>Restatement</u> test applied by other courts, and it protects important First Amendment interests in expressive works without preventing plaintiffs from suing over uses of their names or likenesses that are "wholly unrelated" to the content of the defendant's work (<u>see</u>, <u>e.g.</u>, <u>Parks v. LaFace Records</u>, 329 F.3d 437, 461 (6th Cir. 2003)), or that are "explicitly misleading" about the source or content of the work.

## 4.     CONCLUSION

The United States Supreme Court has recognized that "[t]he fundamental freedoms of speech and press have contributed greatly to the development and well-being of our free society and are indispensable to its continued growth. Ceaseless vigilance is the watchword to prevent their erosion[.] The door barring … intrusion into this area cannot be left ajar; it must be kept tightly closed and opened only the slightest crack necessary to prevent encroachment upon more important interests." <u>Roth v. U.S.</u>, 354 U.S. 476, 488 (1957). Adoption of Appellant's interpretation of the transformative-use test would swing the door wide

open, and in the process, create a seismic shift in the scope of First Amendment

protection available for fictional works depicting characters that are based on or

inspired by real people and events.  Such a dramatic change inevitably would stifle

the creativity of future Hemingways, Spielbergs, and Twains, with the nation's

literary discourse all the poorer for it.

     RESPECTFULLY SUBMITTED this 29th day of August, 2012.


DAVIS WRIGHT TREMAINE LLP
KELLI L. SAGER
KAREN A. HENRY


By _____/s/ Kelli L. Sager_____
           Kelli L. Sager

Attorneys for <u>Amici Curiae</u>
MOTION PICTURE ASSOCIATION OF
AMERICA, INC. and ENTERTAINMENT
MERCHANTS ASSOCIATION

DWT 20044952v6 0058278-000014

## **CERTIFICATE OF COMPLIANCE**

Pursuant to Rule 32(a)(7)(C) of the Federal Rules of Appellate Procedure and Ninth Circuit Rule 32-1, I certify that the attached Amici Curiae Brief is proportionately spaced in 14-point Times New Roman typeface and contains 6986 words (as calculated by Microsoft Word 2003), excluding the Corporate Disclosure Statement, Motion For Leave To File Amici Curiae Brief, Declaration of Kelli L. Sager, and this Certificate of Compliance.

DAVIS WRIGHT TREMAINE LLP
KELLI L. SAGER
KAREN A. HENRY

By _____ /s/ Kelli L. Sager _____
                Kelli L. Sager

Attorneys for Amici Curiae
MOTION PICTURE ASSOCIATION OF
AMERICA, INC. and ENTERTAINMENT
MERCHANTS ASSOCIATION

29

| 9th Circuit Case Number(s) | 11-56986, 12-55429 |
|---|---|

**NOTE:** To secure your input, you should print the filled-in form to PDF (File > Print > *PDF Printer/Creator*).

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## CERTIFICATE OF SERVICE
### When All Case Participants are Registered for the Appellate CM/ECF System

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on (date) _____ .

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Signature (use "s/" format) [                    ]

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## CERTIFICATE OF SERVICE
### When <u>Not</u> All Case Participants are Registered for the Appellate CM/ECF System

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on (date) August 29, 2012 .

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

I further certify that some of the participants in the case are not registered CM/ECF users. I have mailed the foregoing document by First-Class Mail, postage prepaid, or have dispatched it to a third party commercial carrier for delivery within 3 calendar days to the following non-CM/ECF participants:

See Attached Service List.

Signature (use "s/" format) /s/ Gino M. Pasquale

**SERVICE LIST**

Michael R. Dezsi, Esq.
LAW OFFICES OF MICHAEL R. DEZSI, PLLC
615 Griswold, Suite 700
Detroit, MI 48226

Todd J. Weglarz, Esq.
LAW OFFICES OF TODD J. WEGLARZ
30903 Northwestern Highway
Farmington Hills, MI 48334

Erik L. Jackson, Esq.
Nathan Dooley, Esq.
COZEN O'CONNOR
601 S. Figueroa Street, Suite 3700
Los Angeles, CA 90017

Dale F. Kinsella, Esq.
Jeremiah T. Reynolds, Esq.
KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 Wilshire Boulevard, 3rd Floor
Santa Monica, CA 90401

David Halberstadter, Esq.
Rebecca F. Ganz, Esq.
KATTEN MUCHIN ROSENMAN LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067

Timothy J. Gorry, Esq.
Jon-Jamison Hill, Esq.
Jackie M. Joseph, Esq.
EISNER, KAHAN & GORRY
9601 Wilshire Boulevard, Suite 700
Beverly Hills, CA 90210

Geoffrey Nels Fieger, Esq.
FIEGER FIEGER KENNEY JOHNSON AND GIROUX PC
19390 West Ten Mile Road
Southfield, MI 48075

Linda George
577 Summit Avenue
Hackensack, NJ 07601

Andrew J. Hughes, Esq.
Stephen M. Orlofsky, Esq.
BLANK ROME LLP
301 Carnegie Center
Princeton, NJ  08540

Scott A. Resnik, Esq.
KATTEN MUCHIN ROSENMAN, LLP
575 Madison Avenue
New York, NY  10022